IN THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA,   * | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | CASE NO. 2:06-CV-00116-MEF |
| | * | |
| FIVE HUNDRED FORTY-THREE | * | |
| THOUSAND ONE HUNDRED NINETY | * | |
| DOLLARS ($543,190.00 in United States | * | |
| Currency | * | |
|       Defendant. | * | |
| and | * | |
| | * | |
| ENRIQUE ALCARAZ-BARAJAS, | * | |
| | * | |
|     Claimant. | * | |

## CLAIMANT'S MOTION TO SUPPRESS SEIZED MONEY, EVIDENCE OF MONEY LINE-UP, DOG ALERT AND FRUITS THEREOF

Comes now the Claimant Enrique Alcaraz-Barajas, by and through his attorney, Bruce Maddox, and moves the Court to suppress the money made subject of this action, all evidence relating to the drug dog alert or alerts described in the Complaint for Forfeiture, and further, to suppress any and all evidence resulting in whole or in part from the seizure of said money and/or the drug dog line-up, including the all statements of Defendant and alleged claims resulting from his stop, detention, questioning, arrest or seizure, and events which are the fruits thereof, and as grounds therefor says as follows:

### FACTS

On August 29, 2005 the Claimant, Enrique Alacaraz-Barajas was a passenger in a vehicle driven by his sister, Esther Sandoval (Sandoval) on Interstate Highway 85 traveling north in wet, rainy conditions. Alabama State Trooper Andy Sutley pulled out to follow that vehicle, tailgating a

car in another lane apparently in an attempt to catch the Sandoval vehicle. Sandoval was violating no traffic law. Sutley, however, turned on his blue light, cut between the Sandoval vehicle and one behind it, causing Sandoval to begin stopping.  Because Trooper Sutley had begun tailgating Sandoval and had cut in too close to the front of the trailing vehicle, Sutley was forced to leave the road to avoid hitting Sandoval and the trailing vehicle swerved to avoid Sutley.  By such reckless driving and display of emergency lights in hazardous driving conditions, Trooper Sutley caused Sandoval to make that stop.  He then interrogated her, though she spoke almost no English, and eventually wrote her a warning ticket for ""impeding the flow of traffic" and explained it to her. That business concluded, he began asking her if she had "cerveza" and whether she had "drugos". He asked if she had money or "dinero".  He asked to search the car and she did not answer.  He asked again and she said her English was not very good.  He then gave her an alleged "consent to search" written in Spanish. During all of this time, she was confined to the Trooper's car.  She said she needed her glasses and the trooper sent her to her vehicle to get them, saying to come back with them.  He waited for her to read the form, and, then, "held out the pen and told Sandoval to sign at the bottom if she agreed."  She signed.  He then went to Claimant Alcaraz-Barajas and asked him to sign the consent form also after ascertaining from Claimant that he had luggage in the vehicle. Claimant signed. Sutley then searched the vehicle, finding the subject currency, and questioned Claimant about it. The car was then towed to a government auto shop where a more extensive search was conducted. It was at that place that the drug dog sniffed the vehicle and the bags in which the money was found. Claimant was transported, against his will, to the Montgomery "HIDTA" office for further interrogation.  There, he made statements about the source of the monies and, allegedly claimed to be a U.S. citizen.   The Claimant was arrested for False Impersonation of a Citizen and this action ensued. (Attached hereto is a Memorandum from Trooper Sutley).

## GROUNDS FOR SUPPRESSION

1. The money was seized for forfeiture by government agents without probable cause and in violation of the rights of Claimant.  The Fourth Amendment Exclusionary Rule applies to civil

forfeiture.   See **U.S. v. Premises and Real Property with Bldgs., Appurtenances and Improvements at 500 Delaware Street, 113 F.3d 310, 312 n.3 (2nd Cir. 1997)**.

2.   The Claimant was stopped illegally.   The trooper did not have authority under law to stop the vehicle because there was no violation of law. The ultimate warning ticket was the result of a driving event actually CAUSED by the state trooper making the stop.   Even if the stop was lawful, it should have terminated, without requests to search, once the warning ticket was completed.  **United States v. Perkins, 348 F.3d 965 (11th Cir. 2003)**

3.  The drug dog line-up and alert were the result of an illegal seizure without probable cause, and/or an unreasonably long detention of Claimant and said money and, thus, are due to be suppressed as the product of illegal detention, seizure, and/or arrest.   Such money, at the time of the dog alert, had been detained by government agents in excess of 90 minutes and moved to a different location.  **United States v. Place, 462 U.S. 696 (1983)**.

4.   The statements purported to be evidence in this cause would not exist but for the illegal stop, detention, search and seizure of the Claimant and the defendant funds.

5.   The seizure of the money, the dog alert, the custodial interrogation, and subsequent investigation played a pivotal role in the initiation of this action  All information derived from the stop, detention, search, further detention, dog alert, and all interrogations are thereto "fruits of the poisonous tree."   The actual possession of the money, even though ultimately by Order of this Court, is the fruit of the illegal stop, detention, search and seizure of same.  **U.S. v. Wong Sun, 371 U.S. 471 (1963)**.  See affidavit for Search Warrant attached hereto and incorporated by reference.

5.   All actions from initial seizure of Claimant and the Defendant money from Claimant, including the interrogation after his arrest and the seizure of the money, were warrantless.

WHEREFORE, premises considered, Claimant Enrique Alcaraz-Barajas moves the Court to set this matter for hearing and, because the government bears the burden of proof in a warrantless seizure of property and the taking of statements, require the government to adduce sufficient evidence to justify such seizure and the admissibility of all evidence resulting from the governmental actions described herein.

s/Bruce Maddox
Bruce Maddox (MAD013)
Attorney for Enrique Alcaraz-Barajas
6728 Taylor Court
Montgomery, Alabama 36117
Phone: (334) 244-7333
Fax: (334) 260-9600
retrocam@aol.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 14th day of May, 2007, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system which will send notification of such filing to appropriate parties.

s/Bruce Maddox
Of Counsel

MEMORANDUM
To: Agent Joe Herman
From: Trooper Andy Sutley

On 08/29/2005 around 7:00 PM I was sitting in the median of I-85 near the 18 mile marker. I heard Trooper Wayne Dailey run a driver's license which came back suspended. Trooper Dailey was north bound on I-85 near the 16 mile marker. Trooper Dailey did not call for assistance but I decided to go back him up. As I pulled out of the median, a small black SUV came by my car in the outside lane. As I caught up to the vehicle near the 17 mile marker I noticed it was a Toyota RAV 4 and it was weaving in its lane. I began driving about a car length behind the car in the inside lane. The Toyota dropped its speed to about 50 MPH. The Toyota then sped up to 60 and dropped back to 50. The Toyota continued to weave in its lane of travel. We went under the exit 16 overpass and as I started to get behind the Toyota I noticed a Toyota Camry come up behind the RAV 4. I could not safely make a lane change to get behind the RAV 4. I turned on my rear lights for just a second to slow the Camry down. The RAV 4 continued to weave and go from 50 MPH to 60 MPH. The Camry slowed down and as I started to get over the RAV 4 slammed on brakes. I swerved into the emergency lane to avoid the RAV 4 and the Camry slammed on brakes and swerved to the left and nearly hit my car. I came to a stop without my lights on. The RAV 4 pulled in front of my car and stopped. I turned on my lights and after making sure the road was clear got out and went to the front of my car. We were next to the guard rail and for my safety I called the driver to the back. I asked the driver, Esther Sandoval, for her license and registration. At this time it began raining. I asked Ms. Sandoval to sit in the front of my car. I asked Ms. Sandoval if she had been drinking and she said, "No." I asked her why she was driving all over the road, speeding up and slowing down and stopping for no reason. Sandoval said she did not understand. I asked Sandoval where she was going and she said she was looking for a hotel. I asked Sandoval if she owned the vehicle and she said, "Yes." I looked at her license and asked her if she still lived at the address listed on her license and she said, "No." I asked Sandoval for her current address and she asked for a pen to write it down. Sandoval wrote her current address on my warning book. I asked Sandoval for the registration and she said she did not understand. I asked Sandoval where she was coming from and she said she did not know the city in Florida. I asked her what she was doing in Florida and she said her brother was sick. I asked for the registration again and Sandoval said to ask her brother who could speak English. I went to the passenger side of the car and opened the back door. I asked the back seat passenger, Enrique Barajas, if he could speak English and he said, "Yes." I asked for the registration and Barajas spoke in Spanish to the front seat passenger, Mario Martinez. Martinez pulled the registration from the passenger side window. Martinez handed the registration to me over the back seat. I told Martinez he could roll up the front window and told Barajas to hand Martinez a towel to dry the front seat. It had stopped raining at this time. I asked Barajas and Martinez for identification. I noticed Barajas was breathing heavy and appeared nervous. As Barajas handed me his license, I could see his hand was shaking. I asked Barajas if he was OK and he said, "I've been sick." I asked Barajas where they were coming from and he said, "Tampa." Barajas then began talking on his own. He said he was in Tampa on vacation and became sick. He called his sister in Santa Ana, California to come pick him

up and they were heading back. I asked Barajas how he got to Florida and he said he drove with friends. I opened the front passenger door and asked Martinez for identification. He produced a Pacifcare health care card that had no picture but contained the name Mario G. Martinez. I asked Martinez if he could drive and he said, "Yes." I asked Martinez to drive to the end of the guard rail and he did. I returned to my car, drove behind the RAV 4 and ran the license of Sandoval and Barajas as well as the vehicle tag. I called Trooper Will Barnes to assist me. I finished the warning for impeding the flow of traffic and explained the warning to Sandoval. Trooper Barnes arrived at this time. While waiting for the NCIC information to return, I asked Sandoval who was in the car. She said, "My brother and son-in-law." Since I did not have a picture ID for Martinez I asked Sandoval what her son-in-laws name was. Sandoval had a lost look come over her face. She appeared to be trying to think up a name. I asked Sandoval again what her son-in-laws name was and she said, "I don't know." I asked again, "You don't know what your son-in-laws name is?" Sandoval paused for a few seconds, looked away and said, "No." After receiving the NCIC information, I asked Sandoval if there was any alcohol in the car. She said, "No." I asked if there was any "cerveza" and Sandoval laughed and said, "No." I asked if there were any drugs in the car and Sandoval said, "No." I asked if there were any "drugos" and Sandoval said, "No." During each of these questions Sandoval looked at me and answered. I asked Sandoval if there was any money in the car. Sandoval looked away and down and mumbled, "No." I asked Sandoval if there was any "dinero" in the car. Sandoval again looked away and down and said, "No." I asked Sandoval if I could search the car. Sandoval looked at me and did not answer. I said again, "Can I search your car." Sandoval said, "I am sorry my English is not that good." I asked Sandoval if she could read Spanish and she said, "Yes." I filled out the Alabama Department of Public Safety consent to search form on the Spanish side. I explained the form to Sandoval and told her to read the form. I got out of my car and gave Sandoval time to read the form. I got back in and Sandoval said she needed her glasses. I went to her vehicle and asked Barajas to hand me her purse. The purse did not have her glasses. I told Sandoval to go get her glasses. She did and came back to my car. I told Sandoval she could sit back down in my car and read the form. I gave Sandoval time to read the form and sat back down. I held out a pen and told Sandoval to sign at the bottom if she agreed. Sandoval signed the form. I went to the back of the RAV 4 where Trooper Barnes was talking with Barajas. I asked Barajas if he had luggage in the car and he said, "Yes." I asked Barajas if I could search his luggage and he said, "Yes." I put Barajas' information on the same consent to search form and told Barajas to read the form. After he read the form I asked Barajas to initial by his name and sign if he agreed. Barajas did sign the form. I asked Martinez if he had any luggage in the car and he said, "No." I asked Barajas to sit in the back of my car so he could stay dry. I asked Martinez to sit in Trooper Barnes car. Sandoval remained seated in my front seat. I went to the back of the Toyota RAV 4 and opened the rear door. I opened a cooler, looked inside and sat it on the ground. I looked in two black pieces of luggage and sat them on the ground. I saw a black wind breaker and picked it up. I saw a black bag that was opened containing bundles of US currency. I tried to open a red duffle bag that was beside the black bag. The zipper broke and the bag came open revealing more bundles of US currency. I removed the bags and placed them in the trunk of my car. I went to the passenger side of my car and opened the front door. I asked Sandoval whose money was in the car and she said, "I don't know." I

went to the passenger side of my car and asked Barajas whose money was in the car. Barajas said, "I found the money." I went to Trooper Barnes car and asked Martinez whose money was in the car. Martinez said, "What money." I called the post and advised the PCO to notify the chain of command and ABI. Agent Herman arrived. The car was towed to the auto shop and a further search was conducted. A drill with a Phillips head bit was found in the cargo area. I found screws on the back of the seat had fresh marks. The material was loose as if something had been hidden in the back.