IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

UNITED STATES OF AMERICA,    :
    :
    PLAINTIFF,    :
    :
    v.    :    CIVIL ACTION NO.2:06cv116-MEF
    :
FIVE HUNDRED FORTY-THREE    :
THOUSAND ONE HUNDRED NINETY    :
DOLLARS ($543,190.00)    :
IN UNITED STATES CURRENCY,    :
    :
    DEFENDANT.    :

## RESPONSE TO CLAIMANT'S MOTION TO SUPPRESS

Comes now the United States of America (United States), by and through Leura G. Canary, United States Attorney, Middle District of Alabama, and John T. Harmon, Assistant United States Attorney, and hereby states as follows:

### I.  Facts

On August 29, 2005, Alabama State Trooper Sutley ("Sutley") noticed a Toyota RAV4 ("RAV4") driving erratically, weaving in its lane of travel and varying its rate of speed.  The RAV4 operator's erratic driving forced Sutley into the emergency lane and almost caused Sutley to have an accident.  The RAV4 then stopped in front of Sutley.

The RAV4 driver, Esther Sandoval ("Sandoval"), was asked for her license and registration.  Because of rain, Sutley asked Sandoval to sit in his vehicle.  Sutley asked Sandoval several routine questions and about her itinerary.  Sandoval said she was

coming from Florida but did not know her departure city in Florida. She did not have the vehicle registration with her.

Sutley then approached the RAV4 and asked the back seat passenger, Enrique Alcaraz-Barajas ("Alcaraz-Barajas") if he could speak English. Alcaraz-Barajas answered yes. Sutley asked Alcaraz-Barajas for the vehicle registration and Alcaraz-Barajas in Spanish, spoke to the front seat passenger Mario Martinez ("Martinez"). Martinez produced the registration and gave it to Sutley. Sutley then asked Alcaraz-Barajas and Martinez for identification. Alcaraz-Barajas appeared nervous and was breathing heavily. Sutley noticed that Alcaraz-Barajas's hand was shaking when he handed Sutley his driver's license. Sutley asked Alcaraz-Barajas if he was "ok" and he responded that he had been sick.

Alcaraz-Barajas told Sutley that they were coming from Tampa where he had been on vacation, became ill, and called his sister to come and get him. He also stated that he had traveled to Florida with friends.

Martinez produced a health care card in the name of Mario G. Martinez.

Sutley did a driver's license and registration check of Sandoval and the vehicle, called another Trooper ("Barnes") to assist him, wrote a warning ticket for impeding traffic flow to Sandoval and explained the ticket to her. Barnes then arrived at the scene.

2

While waiting for the "NCIC" information on these individuals to arrive, Sutley asked Sandoval if there was alcohol or drugs in the RAV4.[1]  Sandoval looked at Sutley and answered no.  Sutley then asked her if there was any money in the car, she looked away from him and said no.

Sutley then asked Sandoval for permission to search the RAV4.  She looked at him and did not answer.  Sutley asked her again and she replied that her English was not good.  Sutley asked her if she could read Spanish and she said yes.  Sutley then gave her a Spanish language consent to search form.  Sutley explained the form to Sandoval and told her to read it.  After she had time to read the form, he told her to sign the form if she agreed to the search.  She then signed the form.

Sutley asked Alcaraz-Barajas if he had luggage in the RAV4 and he responded yes.  Sutley then asked him for permission to search his luggage and he agreed to the search.  Sutley added Alcaraz-Barajas's personal information to the consent form signed by Sandoval and told him to read it.  After Alcaraz-Barajas read it, Sutley asked Alcaraz-Barajas to sign the form if he agreed.  Alcaraz-Barajas agreed and signed the form.

Sutley asked Martinez if he had luggage in the RAV4 and he said no.

---

[1]The NCIC is the National Crime Information Center, a database containing criminal information on individuals.

Sutley searched the RAV4 and found a large amount of currency in two bags. Sutley put the bags into the trunk of his trooper car. Sutley asked Sandoval who owned the money and she said she did not know. When asked about the money, Martinez acted as if he had no knowledge of the money.

An Alabama Bureau of Investigation ("ABI") agent was contacted about the cash discovery and responded to the scene. Because of the weather situation, the RAV4 was towed to the State Trooper Automotive Shop ("Shop") for further inspection.

At the Shop, a trained drug detection dog alerted on at least one of the bags containing the currency and the luggage compartment of the RAV4. An alert means that the dog has detected the scent and/or presence of illegal drugs or chemicals and by-products associated with illegal drugs or their production and manufacture.

Alcaraz-Barajas was advised of his Miranda rights. He acknowledged that he understood these rights, waived them, declined legal counsel and agreed to be interviewed. He stated that he found the money in Tampa, Florida about one month prior when he found a plastic bag near a Hampton Inn. Alcaraz-Barajas stated he did not look in the plastic bag until one day after he found it. Upon inspection he found three bags inside each other with the inner bag containing the money. Alcaraz-Barajas stated he hid the money again near the Hampton Inn, called Sandoval (his sister) and told her he needed a safe deposit box. Sandoval flew from

4

California to Florida, obtained a safe deposit box in Tampa and put the money in this box. Alcaraz-Barajas then took a bus home to California.

Alcaraz-Barajas stayed in California for approximately three weeks, went to Tijuana, Mexico and then returned to Tampa about two days prior to the stop. Alcaraz-Barajas stated that he told Sandoval that he needed her to come to Tampa to open the safe deposit box. He said Sandoval arrived in Tampa in the evening of August 28, 2005, and that he and Martinez also arrived in Tampa. Alcaraz-Barajas stated that he and Sandoval went to the safe deposit box on August 29, 2005 and that Sandoval had the box opened. Alcaraz-Barajas said that he put the money in the bags and the bags in the RAV4 without Sandoval or Martinez's knowledge. The three then left Tampa headed to California.

Sandoval also was advised of her rights, waived them, declined counsel and agreed to be interviewed. She stated (through a translator) that she knew nothing about the money. Sandoval said they left Tampa between 1 and 2 p.m. on August 29, 2005. She said she arrived in Tampa approximately two days before to pick up Alcaraz-Barajas.

Sandoval said she did not go to any bank in Tampa and that she did not have a safe deposit box in Tampa. Upon the questions regarding the safe deposit box, Sandoval requested legal counsel and the interview was terminated.

Martinez also agreed to be interviewed. He stated that he was in the United States illegally. Sandoval asked him to accompany her to pick up Alcaraz. He said they left California on August 26, 2005 and traveled two days to get to Florida. Martinez said that upon arriving in Florida, he and Sandoval went to a hotel and picked up Alcaraz. He said he had no knowledge of the currency. He declined to answer other questions and the interview was terminated.

Alcaraz-Barajas subsequently admitted that he was in the United States illegally.

The currency was counted by bank officials and was converted to a cashier's check. One cloth bag contained $160,280. The other bag contained $382,910.

Sandoval has a criminal history of providing false information to a United States Customs Official in 1979 and Alien Smuggling on December 31, 2004; October 10, 2004 and January 3, 2005.

Martinez has no criminal history.

Alcaraz-Barajas has no criminal history. $9,860 was seized from him in California based upon involvement in narcotics smuggling.

6

II.   <u>The Motion to Suppress</u>[2]

Alcaraz-Barajas seeks to have evidence seized suppressed along with his statements.  He states that he was stopped illegally.  In fact another individual (Sandoval) was driving the vehicle at the time of the stop. Alcaraz-Barajas was not stopped or ticketed and was not detained.

Alcaraz-Barajas does <u>not</u> specify the deficiencies noted above nor does he allege any facts to support them.[3]

> A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and non-conjectural to enable the court to conclude that a substantial claim is presented. (cites omitted)  In short, the motion must allege facts which, if proven, would provide a basis for relief.

<u>U.S. v. Richardson</u>, 764 F.2d 1514, 1527 (11th Cir. 1985).

The United States contends that the motion to suppress is not definite, specific, detailed or non-conjectural.  The only evidence submitted is contrary to any reasonable belief that the initial stop and subsequent contacts were illegal.

---

[2]The United States notes that the Claimant's motion states that an "affidavit for search warrant" is "attached hereto and incorporated by reference."  See paragraph 5 of motion.  The copy of the motion received by the United States has only an unsworn,  unsigned "memorandum" attached.

[3]As shown above, Alcaraz-Barajas does attach a purported  unsigned memorandum.  The memorandum does not support Alcaraz-Barajas's version of the facts.

Without waiver of this position, the United States will address the other ground raised for suppression to the extent the basis for it can be determined from the general and conclusory assertions made in the motion.

### III.   The Vehicle Stop and Search

A.   Standing.

The United States first contends that Alcaraz-Barajas lacks standing to object to the stop.  He was not driving, he was not stopped and he was not ticketed.  The stop was proper, based upon the Claimant's submitted version of the facts.

A person has standing to challenge the admission of evidence only if his own constitutional rights have been violated.  See U.S. v. Salvucci, 448 U.S. 83, 86-87 (1980); Rakas v. Illinois, 439 U.S. 128, 134 (1978).  The person asserting the challenge to admission must show that his rights were violated.  Salvucci at 86.

Here the Claimant has made no showing that the traffic stop violated any of his constitutional rights.  He cites no case supporting a position that a traffic stop, based upon the improper actions of the driver of an automobile, impinges upon the constitutional rights of a passenger.  He has shown no basis to allow a challenge of the traffic stop.

B.   The Stop and the Search of the Vehicle and Luggage.

Sutley could legally stop the automobile driven by Sandoval because he had probable cause to believe a traffic

8

violation occurred. <u>U.S. v. Purcell</u>, 236 F.3d 1274, 1276 (11th Cir. 2001). Sutley's actions during the traffic stop must be reasonably related in scope to the circumstances which justified the stop and the duration of the stop must be limited to the time necessary to effectuate the purpose of the stop. <u>Purcell</u>, 236 F.3d at 1277. The traffic stop may not last longer than necessary to process the traffic violation unless there is some other articulable suspicion of the presence of other illegal activity. <u>Id.</u>

  The Claimant makes no assertion as to how much time passed between the time the vehicle was stopped and the point at which Sandoval and the Claimant consented to the search of the vehicle and luggage. However, based upon Claimant's version of the facts, it is clear that Sutley asked permission to search as soon as he completed the warning ticket, explained the ticket to Sandoval and received the results of the "NCIC" check. "It is well established that officers conducting a traffic stop may take such steps as [are] reasonably necessary to protect their personal safety. This includes a protective search of the driver, the passengers, and the vehicle." <u>Purcell</u>, 236 F.3d at 1277 (internal citations omitted). Sutley "may also prolong the detention to investigate the driver's license and the vehicle registration, and may do so by requesting a computer check." <u>Purcell</u>, 236 F.3d at 1278 (internal citations omitted). "Many courts have recognized that knowledge of the criminal histories of a vehicle's occupants

will often be relevant to that safety." Id.  "The request for criminal histories as part of a routine computer check is ...both reasonable and minimally intrusive." Id. "So long as the computer check does not prolong the traffic stop beyond a reasonable amount of time under the circumstances of the stop, the inclusion of a request for criminal histories does not constitute a Fourth Amendment violation." Purcell, 236 F.3d at 1279.  The apparent short time between the initiation of the traffic stop and the consent to search are "the only ones relevant to a determination of whether the duration of the traffic stop was reasonable." Id. The Eleventh Circuit has approved traffic stops of 30 and 50 minutes. Id. Based upon the Claimant's own submission, the stop did not extend too long.

The questions posed by Sutley were also justified. "Questioning, even on a subject unrelated to the purpose of the stop, is [not] itself a Fourth Amendment violation.  Mere questioning...is neither a search nor a seizure." Purcell, 236 F.3d at 1279.  "Therefore, only unrelated questions which unreasonably prolong the detention are unlawful; 'detention, not questioning, is the evil at which Terry's [prohibition] is aimed.' Questions which do not extend the duration of the initial seizure do not exceed the scope of an otherwise constitutional traffic stop." Purcell, 236 F.3d at 1280 (internal citations omitted). Sutley's questions regarding travel plans, etc. are not improper

10

where the duration of the "traffic stop was not exceeded because the officer was waiting for the results of the computer check." Id.

Sutley's search of Sandoval's vehicle and the Claimant's luggage was justified because both consented to such searches. Ohio v. Robinette, 519 U.S. 33 (1996) (after a lawful traffic stop is completed, police may ask for consent to search a vehicle without announcing the driver is free to leave). It is "well-settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973). The Claimant does not deny that he consented to the search. As shown above, this consent allowed Sutley to search his luggage.[4]

Claimant cites U.S. v. Perkins, 348 F.3d 965 (11th Cir. 2003) as grounds for an assertion that the traffic stop should have been terminated without a request to search. That assertion is incorrect.

In Perkins, officers stopped a vehicle and wrote a warning ticket. Upon completion of the ticket, the officer sought permission to search the vehicle and such permission was denied. At that point, the officer called for a drug detection canine to be dispatched to the stop. Id. at 967-969.

---

[4]The Claimant also does not deny that Sandoval consented to the search of the vehicle.

The court found no problem with the stop or its duration. Id. at 970.  The court found that the "continued detention" of the vehicle's occupants was the problem.  Id.  The lack of consent to search is the wrong in Perkins.  Once consent is given officers may conduct the agreed upon search.  An assertion that, once permission to search is granted, officers may not then conduct the search and continue a vehicle detention to accomplish the same strains any credible construction of search and seizure law.

IV.  Detention and Seizure

The consent search of the Claimant's luggage revealed the defendant cash - $543,190.  Warrantless seizures of property are authorized if there is probable cause to believe the property is subject to forfeiture and an exception to the warrant requirement is applicable.  See 18 U.S.C. § 981(b) made applicable hereto by 21 U.S.C. § 881(b).  See also Florida v. White, 526 U.S. 559 (1999).

Here, the circumstances under which the money was seized, the amount of the money, the dog alert, the incredible nature of the story told by the Claimant, the conflicting stories by all participants, and the prior seizure of drug associated currency from the Claimant provides probable cause to seize the money. Although the government has the burden at trial by a preponderance, it may seize property pretrial based only upon probable cause. See U.S. v. Melrose East Subdivision, 357 F.3d 493, 504 (5th Cir. 2004).

See also <u>U.S. v. $577,933.89 More or Less, In U.S. Funds</u>, 287 F.3d
66 (2nd Cir. 2002).

V.   <u>Conclusion</u>

The motion to suppress should be denied.

Respectfully submitted this 30th day of May, 2007.


FOR THE UNITED STATES ATTORNEY
LEURA G. CANARY


<span style="margin-left:40%">/s/John T. Harmon</span>
<span style="margin-left:40%">John T. Harmon
Assistant United States Attorney
Office of the United States Attorney
Middle District of Alabama
One Court Square, Suite 201 (36104)
Post Office Box 197
Montgomery, Alabama 36101-0197
Telephone:(334) 223-7280
Facsimile:(334) 223-7560
E-mail: John.Harmon@usdoj.gov</span>

13

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 30, 2007, I electronically filed the foregoing Response to Motion to Suppress with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: **Bruce Maddox.**


/s/John T. Harmon
John T. Harmon
Assistant United States Attorney