# FREEDOM COURT REPORTING    1

EXHIBIT

C

1    IN THE UNITED STATES DISTRICT COURT

2    FOR THE MIDDLE DISTRICT OF ALABAMA

3    NORTHERN DIVISION

4                                    **ORIGINAL**

5    CASE NUMBER:  2:06-cv-116-MEF

6    UNITED STATES OF AMERICA,

7            Plaintiff,

8        vs.

9    FIVE HUNDRED FORTY-THREE THOUSAND

10   ONE HUNDRED NINETY DOLLARS ($543,190)

11   IN UNITED STATES CURRENCY,

12           Defendant.

13

14

15           **DEPOSITION OF ANDY SUTLEY**

16           In accordance with Rule 5(d) of

17   The Alabama Rules of Civil Procedure as

18   Amended, effective May 15, 1988, I,

19   Virginia Denese Barrett, am hereby

20   delivering to Mr. Bruce Maddox, the

21   original transcript of the oral testimony

22   taken on the 3rd day of October, 2007,

23   along with exhibits.

# FREEDOM COURT REPORTING    2

```
1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE MIDDLE DISTRICT OF ALABAMA

3                    NORTHERN DIVISION

4

5      CASE NUMBER:  2:06-cv-116-MEF

6      UNITED STATES OF AMERICA,

7                 Plaintiff,

8           vs.

9      FIVE HUNDRED FORTY-THREE THOUSAND

10     ONE HUNDRED NINETY DOLLARS ($543,190)

11     IN UNITED STATES CURRENCY,

12                 Defendant.

13

14             S T I P U L A T I O N

15             IT IS STIPULATED AND AGREED by

16     and between the parties through their

17     respective counsel, that the deposition of

18     ANDY SUTLEY may be taken before Virginia

19     Denese Barrett, Commissioner, at the

20     offices of Bruce Maddox, 6728 Taylor Court,

21     Montgomery, Alabama, on the 3rd day of

22     October, 2007.

23             IT IS FURTHER STIPULATED AND
```

# FREEDOM COURT REPORTING

3

1    AGREED that it shall not be necessary for

2    any objections except as to form or leading

3    questions, and that counsel for the parties

4    may make objections and assign grounds at

5    the time of the trial, or at the time said

6    deposition is offered in evidence, or prior

7    thereto.

8            IT IS FURTHER STIPULATED AND

9    AGREED that the notice of filing of the

10   deposition by the Commissioner is waived.

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

4

1                          INDEX

2    EXAMINATION BY:                    PAGE NUMBER:

3    Mr. Maddox                              7

4                      EXHIBIT INDEX

5    DEFENDANT'S EXHIBITS:              PAGE NUMBER:

6    1 - Report of Trooper Andy              20

7        Sutley to Agent Joe Herman

8    2 - Details of Investigation           21

9    3 - Report of Investigation            23

10

11

12

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

```
 1          IN THE UNITED STATES DISTRICT COURT

 2         FOR THE MIDDLE DISTRICT OF ALABAMA

 3               NORTHERN DIVISION

 4

 5   CASE NUMBER:  2:06-cv-116-MEF

 6   UNITED STATES OF AMERICA,

 7              Plaintiff,

 8        vs.

 9   FIVE HUNDRED FORTY-THREE THOUSAND

10   ONE HUNDRED NINETY DOLLARS ($543,190)

11   IN UNITED STATES CURRENCY,

12              Defendant.

13

14

15   BEFORE:

16     VIRGINIA DENESE BARRETT, Commissioner

17          UNITED STATES ATTORNEY'S OFFICE,

18   by Mr. John Harmon, Post Office Box 197,

19   Montgomery, Alabama  36101, appearing on

20   behalf of the Plaintiff.

21          LAW OFFICES OF BRUCE MADDOX, by

22   Mr. Bruce Maddox, 6728 Taylor Court,

23   Montgomery, Alabama  36117, appearing on
```

# FREEDOM COURT REPORTING

1  behalf of the Defendant.

2          PATRICK MAHANEY, ESQUIRE, by

3  Mr. Patrick Mahaney, 505 South Perry

4  Street, Montgomery, Alabama  36104,

5  appearing on behalf of the Defendant.

6          ALABAMA DEPARTMENT OF PUBLIC

7  SAFETY, by Mr. Jack M. Curtis, 301 S.

8  Ripley Street, Montgomery, Alabama  36104,

9  appearing on behalf of the Alabama

10  Department of Public Safety.

11  ALSO PRESENT:

12          Mr. Joe Herman

13

14

15

16

17

18

19

20

21

22

23

# FREEDOM COURT REPORTING

1           MR. MADDOX:  Are you going to

2                want to read and sign the

3                deposition?

4           MR. CURTIS:  What that means is

5                that you have the right

6                before the deposition is

7                official to read it if you

8                want to and sign it to make

9                sure that what you have said

10               today is accurately

11               reflected.  Not that you can

12               change anything.  It's just

13               to make sure that it's --

14               you don't have to do that.

15               You can trust the court

16               reporter to take down

17               everything that's said

18               today.  You can waive the

19               reading and the signing.

20               It's up to you as to whether

21               you want to do that or not.

22          MR. SUTLEY:  Whether I read and

23               sign?

# FREEDOM COURT REPORTING

1          MR. CURTIS:  Right.  So if you

2              just want to on the record

3              state whether you want to

4              read or sign or whether you

5              waive that.

6          MR. SUTLEY:  I'll read and sign.

7          MR. MADDOX:  Okay.

8              ANDY SUTLEY

9      The witness, having been first

10  duly sworn or affirmed to speak the truth,

11  the whole truth, and nothing but the truth,

12  testified as follows:

13              EXAMINATION

14  BY MR. MADDOX:

15      Q.    State your name for the record,

16  please.

17      A.    Andy Sutley.

18      Q.    Mr. Sutley, how are you

19  employed?

20      A.    Department of Public Safety as

21  a trooper.

22      Q.    All right.  And what rank do

23  you hold?

# FREEDOM COURT REPORTING

```
1          A.      Trooper.

2          Q.      Okay.  How long have you been a

3    state trooper?

4          A.      Three and a half years.

5          Q.      Okay.  What did you do prior to

6    becoming a state trooper?

7          A.      Was a city police officer for

8    the City of Dothan.

9          Q.      All right.  How long were you a

10   police officer for Dothan?

11         A.      Eight and a half years.

12         Q.      What training did you have to

13   qualify you to be a police officer or

14   trooper?

15         A.      Bachelor's degree from Troy

16   State University.  I also completed two

17   different --

18         Q.      What is that bachelor's degree

19   in?

20         A.      Criminal justice.

21         Q.      Okay.

22         A.      Also, I completed basic police

23   academy and the trooper academy.
```

# FREEDOM COURT REPORTING    10

1    Q.    Okay.  Had any other training

2    and experience that qualifies you to do the

3    work that you do as a trooper these days?

4    A.    I've been to numerous schools

5    throughout the years.

6    Q.    Tell me some of the schools

7    you've been to.

8    A.    Most of my career has been

9    handling a dog.  For the City of Dothan, I

10    handled a bite dog and a drug dog and with

11    the troopers.

12    Q.    A bite dog?

13    A.    Control dog.  We send him into

14    buildings and things like that.

15    Q.    Okay.  When you became a

16    trooper, what year was that?

17    A.    2004.

18    Q.    Okay.  And what was your duty

19    assignment when you first became a trooper

20    after the academy?

21    A.    Same as it is today.  I was

22    assigned to Montgomery County.

23    Q.    Okay.  And was it patrol duty

# FREEDOM COURT REPORTING     11

```
 1    or what?
 2         A.     Yes, sir.
 3         Q.     Were you a K-9 officer at that
 4    time?
 5         A.     No, sir.
 6         Q.     When did you become a K-9
 7    officer?  I note the K-9 unit emblem on
 8    your uniform.
 9         A.     It's been March or April of
10    last year.
11         Q.     2006?
12         A.     That's right.
13         Q.     Okay.  Now, how did your duties
14    change when you became a K-9 officer?
15         A.     They didn't change a whole lot.
16    They put me on a more on call status
17    handling requests from other troopers,
18    other agencies for the use of the drug dog.
19         Q.     I didn't ask you this.  Before
20    Dothan, were you in law enforcement?
21         A.     Before Dothan, yes, sir.
22         Q.     Where were you in law
23    enforcement?
```

# FREEDOM COURT REPORTING    12

1          A.      City of Enterprise.

2          Q.      How long were you with the City

3     of Enterprise?

4          A.      About a year and a half.

5          Q.      What was your employment

6     capacity there?

7          A.      I was just a patrol officer.

8          Q.      Okay.  Before that, were you in

9     law enforcement?

10         A.      City of Luverne.

11         Q.      How long were you with the City

12    of Luverne?

13         A.      About eight months.

14         Q.      As what?

15         A.      Patrol officer.

16         Q.      Prior to that, were you in law

17    enforcement?

18         A.      I was in college before that.

19         Q.      And that was at Troy State?

20         A.      Yes, sir.

21         Q.      Okay.  The training you've had

22    since becoming a police officer, does it

23    include narcotics training?

# FREEDOM COURT REPORTING    13

1          A.      Yes, sir.

2          Q.      Tell me the training that

3     you've had in the field of narcotics

4     enforcement.

5          A.      I've been to a lot of patrol

6     officer response to narcotics.  Really

7     schools that deal with highway

8     interdiction.

9          Q.      Okay.  For the record, explain

10    what highway interdiction is.

11         A.      Making a traffic stop and

12    noting other things during the traffic stop

13    that are not the normal.

14         Q.      Okay.  And is it a primary duty

15    of yours to engage in highway interdiction?

16         A.      Just basic traffic enforcement

17    is what I do.

18         Q.      Okay.  Would you say that you

19    have an inordinately high rate of narcotics

20    and/or alleged narcotics fund recovery in

21    your highway traffic enforcement?

22         A.      Yes, sir.

23         Q.      Okay.  And is that because you

# FREEDOM COURT REPORTING

1    tend to focus in that direction?

2           A.      No, sir.

3           Q.      It's not?

4           A.      No, sir.

5           Q.      Why do you have a dog?

6           A.      The experience that I had with

7    the City, when the position came open, I

8    applied for it and I was selected.

9           Q.      You mean with the City of

10   Dothan?

11          A.      No, sir.  When I came over with

12   the State.

13          Q.      Yes, sir.  But you said your

14   experience with the City.  You meant the

15   City of Dothan?

16          A.      My experience as a dog handler

17   with the City.

18          Q.      Of?

19          A.      Of Dothan.

20          Q.      Okay.

21          A.      I feel like that was the reason

22   I was chosen for the state dog handler

23   position.

# FREEDOM COURT REPORTING    15

```
 1          Q.       You are the state dog handler?
 2          A.       One.
 3          Q.       One.   How many are there?
 4          A.       Thirteen.
 5          Q.       Thirteen.   How many -- you work
 6     out of the Montgomery post; is that right?
 7          A.       Yes, sir.
 8          Q.       How many dog handlers are there
 9     with the Montgomery post?
10          A.       Just one.
11          Q.       Just one.   As a dog handler,
12     you have to become accustomed to your dog
13     more than anybody else would?
14          A.       Yes, sir.
15          Q.       In fact, the reactions and
16     responses, actions, reactions and responses
17     of the dog are subject to your
18     interpretation more than anybody else's; is
19     that right?
20          A.       Yes.
21          Q.       It's because the two of you
22     have to train together so that you both
23     understand what each other is trying to
```

# FREEDOM COURT REPORTING    16

1    accomplish?

2         A.       Yes, sir.

3         Q.       Okay.  The highway interdiction

4    that you engage in, do you belong to any

5    organizations related to narcotics

6    interdiction, highway interdiction or

7    anything of that nature?

8         A.       No, sir.

9         Q.       Do you belong to any narcotics

10   officer organizations?

11        A.       No, sir.

12        Q.       Okay.  Prior to the time you

13   became a dog officer, how did you become as

14   heavily involved in highway interdiction as

15   opposed to simple traffic enforcement as

16   you worked?

17        A.       I was just getting out and

18   working, getting my dog out of the car.

19        Q.       I was talking about prior to

20   the time that you became a dog K-9 officer

21   with the state troopers.

22        A.       How did I get into it?

23        Q.       No, sir.  I'll try again.

# FREEDOM COURT REPORTING    17

1    Prior to the time you became a K-9 officer

2    with the state troopers, you were simply a

3    patrol officer with the state troopers?

4         A.        With the State, right.

5         Q.        Right.  During that time you

6    engaged in highway interdiction and had an

7    inordinate amount of success in recovering

8    narcotics or funds that you contended were

9    tied to narcotics?

10             MR. HARMON:  Object to form.  You

11                   can go ahead and answer.

12        A.      Right.

13        Q.      But you've previously said

14   that, haven't you?

15             MR. HARMON:   Object to form.

16        A.      Yes.

17        Q.      Now, the period of time prior

18   to becoming a K-9 officer, how do you

19   attribute -- withdraw that.  Between

20   joining the state troopers and doing that,

21   your focus on interdiction, why was that?

22        A.      There was no focus on anything.

23   It was just as it is today with everybody

# FREEDOM COURT REPORTING    18

1    else.  It's traffic enforcement.

2        Q.    All right.  When you're sitting

3    by the highway and a vehicle comes by --

4              (Brief interruption)

5        Q.    When you're sitting by the

6    highway and you see a vehicle come by that

7    you determine you have an interest in, how

8    do you go about doing that?  What kind of

9    triggers do you have that make you become

10   interested in a vehicle for interdiction

11   purposes?

12       A.    I don't think there's anything

13   for an interdiction purpose.  The only

14   thing I use is a traffic violation.

15       Q.    Okay.  So unless you see a

16   traffic violation, you don't become

17   involved with other vehicles?

18       A.    Not normally.

19       Q.    Not normally.  Okay.  Let's

20   talk about your history a little bit more.

21   What city do you reside in?

22       A.    Montgomery.

23       Q.    Are you engaged in any other

# FREEDOM COURT REPORTING    19

```
 1    employment other than as a state trooper?
 2         A.      I own a lawn and landscape
 3    business.
 4         Q.      What's the name of that
 5    business?
 6         A.      Capital Lawn Care.
 7         Q.      Okay.  Are you married?
 8         A.      Yes.
 9         Q.      Okay.  Is your wife employed?
10         A.      Yes.
11         Q.      Where is she employed?
12         A.      Montgomery City Schools.
13         Q.      In what capacity?
14         A.      Teacher.
15         Q.      Teacher.  All right.  Now, the
16    -- do you have children?
17         A.      Yes.
18         Q.      How many?
19         A.      One.
20         Q.      Okay.  Have you been married
21    previously?
22         A.      No.
23         Q.      Okay.  And has your wife been
```

# FREEDOM COURT REPORTING

1    married previously?

2         A.       No.

3         Q.       Okay.  The lawn care business,

4    do you do any lawn care for any judicial

5    officials or with the State of Alabama or

6    the federal government?

7         A.       No.

8         Q.       Okay.  Let's talk about August

9    29th, 2005.  You have studied your report

10   regarding that day?

11        A.       I looked over it.

12        Q.       Okay.  When did you do that?

13        A.       Yesterday.

14        Q.       And with whom did you do that?

15        A.       Mr. Harmon.

16        Q.       Okay.  That report is -- that's

17   something that you wrote yourself, or did

18   you dictate it?  How did that come about?

19        A.       Original report I wrote.  And

20   the one I looked at in the report was

21   transferred by someone else.

22        Q.       Transferred.  Okay.

23              (Whereupon Defendant's Exhibit 1

# FREEDOM COURT REPORTING    21

```
 1                      was marked for identification
 2                      and attached to the original
 3                      transcript.)
 4         Q.     Let me show you an item marked
 5    as Defendant's Exhibit 1.  Is that the
 6    report you reviewed yesterday?
 7         A.     No.
 8         Q.     Is that the report you wrote?
 9         A.     Yes.
10         Q.     Okay.  Now, did you write it
11    yourself, or did you tell someone what
12    happened and they wrote it for you?
13         A.     This is a copy of the one I
14    wrote myself.
15         Q.     Okay.
16              (Whereupon Defendant's Exhibit 2
17               was marked for identification
18               and attached to the original
19               transcript.)
20              MR. HARMON:  Can I see it just a
21                minute?
22              MR. MADDOX:  Sure.
23              MR. HARMON:  Thank you.
```

# FREEDOM COURT REPORTING    22

1          Q.      Let me show you an item marked

2    as Defendant's Exhibit Number 2.  Is that

3    the report you reviewed?

4          A.      I believe this is -- there were

5    several in the case file I looked at.

6          Q.      So you looked at all the

7    reports?

8          A.      I didn't look at all of them.

9          Q.      Okay.  Do I understand

10   correctly, though, you never looked at the

11   one you wrote?

12         A.      Not that exact copy.

13         Q.      Okay.

14         A.      I think what it was, somebody

15   typed that and then added some other

16   information towards the end.

17         Q.      Is there another report that is

18   yours other than this one?

19         A.      No, sir.

20         Q.      All right.

21             MR. HARMON:  Is that Exhibit 2,

22                 Bruce, right there he's

23                 looking at?

# FREEDOM COURT REPORTING    23

```
 1              MR. MADDOX:  That's Exhibit 2.

 2                   John, can you tell me

 3              what he was talking about

 4              that he looked at that is

 5              his that was something added

 6              to it?

 7         MR. HARMON:  It may be like the

 8              DEA referral report to me.

 9              It might have come to me as

10              a file for litigation.  I

11              think that's what he was

12              looking at.

13         MR. MADDOX:  Okay.

14         (Whereupon Defendant's Exhibit 3

15          was marked for identification

16          and attached to the original

17          transcript.)

18         Q.     Let me show you an item marked

19     as Defendant's Exhibit 3.

20              MR. MADDOX:  Let me show you,

21                   John, first.

22         Q.     This item marked as Defendant's

23     Exhibit 3, is that what you looked at
```

# FREEDOM COURT REPORTING    24

1    yesterday or one of the things you looked

2    at?

3        A.    Yes.  It's one of the reports I

4    looked over.

5        Q.    Okay.  And the one that was

6    Defendant's Exhibit 2, did I understand you

7    correctly that's one of the ones you looked

8    over?

9        A.    I think it is.  I think I

10   remember seeing that one.

11       Q.    All right, sir.  Did you find

12   any inaccuracies in those that you looked

13   over?

14       A.    No, sir.

15       Q.    Okay.

16            MR. MADDOX:  John, I'm going to

17                 offer 1, 2 and 3 as exhibits

18                 to this deposition.

19            MR. HARMON:  No objection from

20                 the United States.

21            MR. CURTIS:  No objection.

22       Q.    Now, the stop that you made

23   involved in this case --

# FREEDOM COURT REPORTING    25

1          MR. HARMON:  That would have been

2               the 29th.

3          MR. MADDOX:  Yes.  Yes.

4     Q.      On August 29th, 2005 around

5  seven p.m., where were you when you first

6  observed the vehicle that you wound up

7  searching?

8     A.      I was turning around at the

9  county line on I-85.

10    Q.      Montgomery County line?

11    A.      Uh-huh.

12    Q.      And about what exit is that?

13    A.      It's just past the Waugh exit,

14  exit sixteen.

15    Q.      Okay.  Where were you coming

16  from when you were turning around?

17    A.      I was coming from exit sixteen

18  and headed toward the Macon County line.

19    Q.      Okay.  And was it normal patrol

20  or did you have some purpose beyond that,

21  going somewhere specifically?

22    A.      Just normal patrol.

23    Q.      Okay.  So you were turning

# FREEDOM COURT REPORTING

1   around in the median?

2       A.      That's right.

3       Q.      Is it one -- is it one of those

4   drive across things that you troopers turn

5   through periodically on interstates?

6       A.      Yes, sir.

7       Q.      Okay.  You didn't actually

8   leave a ramp and go up on it?

9       A.      No, sir.

10      Q.      Okay.  What did you observe?

11      A.      Right whenever I was turning

12  in, there was one vehicle coming south.  It

13  was the suspect's vehicle.

14      Q.      Suspect's vehicle.  What did

15  you observe about it that made it a

16  suspect?

17      A.      Well, it would eventually be

18  the suspect's vehicle.

19      Q.      Suspect.  The suspect would be

20  who?

21      A.      Ms. Sandoval and Kiki.  I can't

22  remember his complete name.

23      Q.      Which reminds me, have you had

# FREEDOM COURT REPORTING     27

1    any training in the Spanish language?

2         A.     Yes.

3         Q.     Tell me what training you've

4    had in the Spanish language.

5         A.     At the regional counter drug

6    training academy in Meridian, Mississippi.

7         Q.     When?

8         A.     I've had -- I've been numerous

9    times throughout the year over there.

10        Q.     Do you get Spanish training

11   every time you go?

12        A.     Not every time, I don't

13   believe.

14        Q.     Do they teach you to pronounce

15   Spanish words and names?

16        A.     Some of them, yes.

17        Q.     Describe the Spanish training

18   that you have.  What do they teach you?

19        A.     Basically just for use on the

20   roadside.

21        Q.     Okay.  What kind of things do

22   you need to use on the roadside?

23        A.     Telling people to get out of

# FREEDOM COURT REPORTING    28

```
 1      the car or asking them for their license or
 2      paperwork on the car, things like that.
 3           Q.     How would you say get out of
 4      the car in Spanish the way they taught you?
 5           A.     I can't remember what get out
 6      of the car is.
 7           Q.     Okay.
 8           A.     I don't use it a whole lot.
 9           Q.     What else do you say to them in
10      Spanish?
11           A.     I ask for their license.
12           Q.     How do you say that?
13           A.     Lucencia.
14           Q.     Just one word?
15           A.     Yes.
16           Q.     And lucencia?
17           A.     Yes.
18           Q.     How would you spell that?
19           A.     I believe it's L-U-C-E-N-C-I-A.
20           Q.     Okay.  Do they teach you words
21      having to do with drugs?
22           A.     Yes.
23           Q.     What have you learned about
```

# FREEDOM COURT REPORTING    29

```
 1    words related to drugs?  What words do you
 2    use?
 3         A.     Drugs in Spanish is drugos.
 4         Q.     Drugos?
 5         A.     (Witness nodding head in the
 6    affirmative.)
 7         Q.     How would you spell that?
 8         A.     D-R-U-G-O-S.
 9         Q.     Okay.  Any other words related
10    to drugs or alcohol or anything like that?
11         A.     Cerveza.
12         Q.     Cerveza.  And that is?
13         A.     Alcohol.
14         Q.     Beer.  Works for either?
15         A.     I've never had a problem asking
16    that question and getting a response.
17         Q.     I see.  All right.  The report
18    you wrote indicates that --
19              MR. HARMON:  Which exhibit is
20                 this, Bruce, you're talking
21                 about?
22              MR. MADDOX:  I believe it's
23                 Defendant's Exhibit 1.
```

# FREEDOM COURT REPORTING

1          MR. HARMON:  Okay.

2     Q.     Well, let's just back up.

3 Forget the report.  You saw this car, the

4 suspect's vehicle come by.  And you said

5 the suspect turned out to be Sandoval and

6 somebody else?

7     A.     (Witness nodding head in the

8 affirmative.)

9     Q.     Do you know who it was, who the

10 other suspects were besides Sandoval?

11     A.     Can you hand me the Exhibit 1?

12     Q.     Sure.

13     A.     And I'll tell you the name.

14     Q.     Here you go.

15     A.     Barajas.

16     Q.     Barajas.  Okay.  Who else?

17     A.     And the driver was

18 Ms. Sandoval.

19     Q.     Anybody else in the car?

20     A.     Mario Martinez was in the front

21 seat.

22     Q.     Okay.  Was he a suspect, too?

23     A.     He would be in smuggling this

# FREEDOM COURT REPORTING    31

```
 1    drug money.
 2          Q.      But was he?
 3          A.      Yes.
 4          Q.      Okay.  And they were suspected
 5    of what?
 6          A.      Smuggling drug money.
 7          Q.      Smuggling drug money.  When did
 8    they become suspects of smuggling drug
 9    money?
10          A.      When I found a half a million
11    dollars in the back seat.
12          Q.      In the back seat?
13          A.      In the rear cargo area of the
14    SUV.
15          Q.      Okay.  The point in time that
16    you saw the car, what was the weather like?
17          A.      It was real cloudy.  The wind
18    was blowing a little bit.
19          Q.      It had been raining some?
20          A.      I think it had rained a little
21    bit, but it wasn't at that time.
22          Q.      It was when Hurricane Katrina
23    was passing through the southland, wasn't
```

# FREEDOM COURT REPORTING    32

1    it?

2         A.    That's right.

3         Q.    And we were getting rains in

4    the Montgomery County area related to that

5    weather system, weren't we?

6         A.    It was right at the beginning

7    of whenever we were starting to get the

8    rain.

9         Q.    Okay.  And it would get worse

10   later?

11        A.    Yes.

12        Q.    Okay.  You saw the car go by.

13   What did you observe about it, the SUV?

14        A.    The first thing I noticed was

15   that the speed of the vehicle dropped, the

16   speed limit being seventy right there.  And

17   as we continued on south, it would go from

18   fifty to sixty up and down weaving back and

19   forth across the road.

20        Q.    Across the road?

21        A.    Across its lane of travel.

22        Q.    Across its lane of travel.  Did

23   it ever leave the lane of travel?

# FREEDOM COURT REPORTING    33

```
1          A.      Yes.
2          Q.      So it wove to and from one lane
3    to the other?
4          A.      That's right.
5          Q.      Okay.  The -- when they passed
6    you, were you readily visible out in the
7    median there crossing making your turn?
8          A.      Yes.
9          Q.      So it would be safe to assume
10   that the driver saw you as they went by,
11   wouldn't it?
12              MR. HARMON:  Object to form.  You
13                  can answer.
14         A.      Yes.
15         Q.      Sir?
16         A.      Yes.
17         Q.      Okay.  In fact, you think they
18   did, don't you?
19              MR. HARMON:  Object to form.  You
20                  can answer.
21         A.      Yes.
22         Q.      Okay.  Just so you'll
23   understand, when he objects, it's something
```

# FREEDOM COURT REPORTING   34

1    we'll worry about later.  You can go ahead

2    and answer questions unless your lawyer

3    tells you not to.  Okay?

4         A.    Okay.

5         Q.    Now, is it unusual for people

6    to slow down when they pass a state

7    trooper?

8         A.    Not in that manner.

9         Q.    It's not unusual to do that.

10   Now, the -- is it unusual for people to

11   slow down enough that they hope you'll go

12   ahead and pass them?

13        A.    Is it usual or unusual?

14        Q.    Unusual.

15        A.    Not on the interstate.  A lot

16   of times people come by running eighty and

17   never slow down.

18        Q.    Go right by you?

19        A.    Go right by me.  Happened last

20   night.

21        Q.    Okay.  Okay.  Now, what did you

22   observe about the passengers in the

23   vehicle?  The occupants of the vehicle is a

# FREEDOM COURT REPORTING    35

```
1    better word.
2         A.      I couldn't see the occupants in
3    the vehicle.
4         Q.      Why couldn't you see them?
5         A.      They had already gotten past me
6    as I was turning around.
7         Q.      Oh, so you didn't see them as
8    they were passing.  You saw them after they
9    passed?
10        A.      I didn't see the occupants
11   until I got up to the vehicle.
12        Q.      Uh-huh.  My question, though,
13   is did you see the vehicle before it passed
14   you?
15        A.      I saw the vehicle.
16        Q.      Okay.  Could you see through
17   the windows?
18        A.      Not at that time.
19        Q.      Okay.  A law enforcement
20   officer is supposed to try to determine who
21   occupies the vehicle if they're observing
22   it if nothing else for safety sake, are
23   they not?
```

# FREEDOM COURT REPORTING    36

```
 1              MR. HARMON:  Object to form.
 2        A.      Well, that's a broad question,
 3   you know.
 4        Q.      Well, can you give me a broad
 5   answer?
 6        A.      Well, I can go right out there
 7   on the interstate right now and I won't
 8   tell you who occupies every vehicle that
 9   goes by me.
10        Q.      Right.  So the vehicle goes by
11   you.  It's weaving lane to lane and slowing
12   down to fifty and sixty miles an hour?
13        A.      (Witness nodding head in the
14   affirmative.)
15        Q.      All right.  Was it weaving lane
16   to lane illegally, improperly?
17        A.      Yes.
18        Q.      Okay.  And you got into the
19   roadway.  What happened?
20        A.      I continued south on the inside
21   lane.
22        Q.      When you say inside lane, you
23   mean the lane closest to the median?
```

# FREEDOM COURT REPORTING    37

1    A.    Right.

2    Q.    Okay.  The outside lane would

3  be the right-hand lane.  The inside lane

4  would be the left lane?

5    A.    Right.

6    Q.    Okay.  You're in the left lane.

7  They're in the right lane going south on

8  I-85 in Montgomery County, Alabama?

9    A.    Right.

10    Q.    What happened?

11    A.    It continued drifting back and

12  forth going across the fog line, speeding

13  up, slowing down.

14    Q.    What's the fog line?

15    A.    White line on the outside lane.

16    Q.    Okay.  Did it weave into your

17  lane?

18    A.    Yes.  It did go across the

19  broken white line in the middle of the

20  road.

21    Q.    Okay.  And what happened then?

22    A.    I was getting ready to pull

23  behind the vehicle.  When I did, another

# FREEDOM COURT REPORTING    38

1    vehicle came up in the outside lane.

2    Q.    Why were you going to pull

3    behind the vehicle?

4    A.    I was about to make a traffic

5    stop.

6    Q.    For?  For what?

7    A.    To make sure that the driver

8    wasn't drunk or falling asleep or having

9    some kind of medical condition.

10    Q.    Okay.

11    A.    Something was causing this

12    vehicle to drive as it was.

13    Q.    So you got behind it or were

14    about to get behind it with the intention

15    of stopping it by turning on your blue

16    lights?

17    A.    Right.

18    Q.    Okay.  What happened then?

19    A.    The car came up in the outside

20    lane.  I don't know if it saw that the

21    vehicle was going as slow as it was.  And

22    it appeared that it was traveling about

23    seventy miles an hour.  So I turned on my

1    back lights only to slow that vehicle down.

2        Q.      Okay.  And what happened then?

3        A.      Turned my lights back off.  The

4    vehicle started slowing down.  And as I got

5    ready to pull over behind the vehicle to

6    make a stop, they pulled over into the

7    emergency lane or they slowed down.

8        Q.      Who pulled over into the

9    emergency lane?

10       A.      Ms. Sandoval's vehicle.

11       Q.      Okay.  So by emergency lane,

12   you mean off the road across the fog line?

13       A.      Between the fog and the grass.

14       Q.      Okay.  Side of the road?

15       A.      Right.

16       Q.      Okay.  Where you would normally

17   expect them to stop if you were stopping

18   them?

19       A.      Right.

20       Q.      Okay.  As she pulls over there,

21   then what happens?

22       A.      I exited the roadway because

23   they had slammed on brakes and started to

# FREEDOM COURT REPORTING    40

1    pull over.  So I pulled all the way over to

2    open up the left lane for the Camry or

3    whatever vehicle was coming up behind so it

4    wouldn't rear end both of us so it could

5    have a passing lane.

6         Q.     Okay.  Then what happened?

7         A.     I turned my back lights back on

8    and got out of the car and walked up.

9         Q.     Okay.  What traffic laws had

10   they violated at that point?

11        A.     Impeding the flow of traffic.

12        Q.     How so?

13        A.     Well, causing me and the other

14   vehicle to have to slow down enough for me

15   to avoid an accident with them and the

16   other vehicle had to slow down to keep from

17   hitting both of us.

18        Q.     You didn't tell me about that.

19   You said that you were about to get over

20   and turn your back blue lights on.  The

21   Camry dropped back and she slammed on

22   brakes and pulled over.  What caused an

23   accident there or almost did?

1      A.      By her slamming on brakes in

2  the middle of the road like she did.

3      Q.      Who was so close behind her

4  that they almost hit her?

5      A.      Me.

6      Q.      You.  Would it be fair to say

7  you were following too closely?

8      A.      If I had been, I would have hit

9  her.

10     Q.      But you had to go -- other than

11  slowing down, what reaction did you have to

12  it?

13     A.      I had to move over to the

14  emergency lane.

15     Q.      At the time you were pulling

16  her over, it was your intention that she

17  stop and pull over, wasn't it?

18     A.      Not at that time.  I hadn't

19  turned on my lights.

20     Q.      What was your purpose in

21  getting -- trying to get behind the

22  vehicle?

23     A.      I was preparing to make a

# FREEDOM COURT REPORTING    42

1  traffic stop, but it never got to that.

2        Q.      Do you know whether or not the

3  occupants of that vehicle could have seen

4  your rear lights reflected off the Camry or

5  anything like that?

6        A.      No.

7        Q.      Blue lights?

8        A.      Not at that time.  It was still

9  good daylight.

10        Q.      But cloudy?

11        A.      Cloudy.

12        Q.      And raining?

13        A.      It wasn't raining.

14        Q.      Okay.  You don't think they

15  could have --

16            MR. HARMON:  Object to form.

17        Q.      -- seen the blue lights or the

18  reflection of them or anything?

19        A.      No.

20        Q.      Okay.  The -- you don't -- do

21  you know whether they could see you in rear

22  view mirrors or anybody looking back?

23        A.      I can't testify to what they

# FREEDOM COURT REPORTING    43

1    saw or what they thought.

2        Q.    The vehicle had windows you

3    could see through, didn't it?

4        A.    Their vehicle?

5        Q.    Uh-huh.

6        A.    They did.  The windows were

7    tinted.

8        Q.    Could you see the people inside

9    when you moved beside to get behind them?

10        A.    No, sir.

11        Q.    You couldn't see anybody doing

12    anything?

13        A.    No, sir.

14        Q.    So you couldn't tell whether

15    they were looking back at you or anything

16    like that?

17        A.    No, sir.

18        Q.    Okay.  But your purpose in

19    doing what you were doing was to get them

20    to stop and pull over?

21        A.    My purpose was about to be to

22    conduct a traffic stop, but the things that

23    happened prevented that.

# FREEDOM COURT REPORTING    44

1    Q.    Prevented a traffic stop?

2    A.    Uh-huh.

3    Q.    I mean, they did what you

4    wanted them to do, didn't they?

5    A.    I didn't turn my lights on.

6    They pulled over on their own.

7    Q.    But you wanted them to, didn't

8    you?

9    A.    I was about to make a traffic

10    stop, but we never got that far.

11    Q.    I think that answers my

12    question, but let's put it in plain

13    English.  You wanted them to slow down,

14    pull over and stop on the side of the road,

15    didn't you?

16    MR. HARMON:  Object to form.

17    A.    If I had turned my lights on,

18    that would have been what I wanted them to

19    do.  All I was doing was making a lane

20    change.

21    Q.    Were you going to turn your

22    lights on?

23    A.    Eventually.

# FREEDOM COURT REPORTING

1    Q.    Eventually.  Okay.  And that's

2  because you had decided to have them pull

3  over beside the road and stop, wasn't it?

4    A.    That was my intention.

5    Q.    All right.  And they did what

6  you wanted before you felt you adequately

7  signaled them to, didn't they?

8    A.    No.  They didn't do what I

9  wanted.  I didn't want them to slam on

10  brakes and almost cause a pileup on the

11  interstate.  That is not what I wanted.

12    Q.    Who almost piled up on the

13  interstate?

14    A.    Me and possibly the car behind

15  me.

16    Q.    Okay.  How did their -- you

17  hadn't gotten behind them yet when they

18  slammed on brakes?

19    A.    I was in the process of

20  starting to make my lane change.

21    Q.    How far behind them were you?

22    A.    Probably about seventy-five

23  feet.

1      Q.      Not a car length?

2      A.      No.

3      Q.      Okay.  When the vehicle

4 stopped, you said you pulled up behind it

5 and turned your rear blue lights on again.

6 You got out of your vehicle?

7      A.      Uh-huh.

8      Q.      Did anyone get out of that

9 vehicle?

10     A.      No, sir.

11     Q.      What happened next?

12     A.      I walked up on the passenger

13 side of the vehicle and asked the driver,

14 Ms. Sandoval, if she was okay.

15     Q.      And then what happened?

16     A.      I don't remember word for word

17 what was said.  But I think I would ask for

18 her driver's license and eventually ask for

19 the paperwork on the vehicle.

20     Q.      Did she seem okay?

21     A.      Well, she seemed very jittery,

22 very nervous.

23     Q.      When you approached her and

1    asked her if she was okay, she was still in

2    her car?

3        A.    Yes.

4        Q.    And she gave you her driver's

5    license still sitting in the car?

6        A.    I really don't remember if she

7    gave it to me in the car or outside.

8        Q.    Okay.  How did she get outside

9    of her car?

10        A.    I think I would eventually ask

11    her to come to the back of the car.

12        Q.    How did you do that?

13        A.    Would you come to the back of

14    the car?

15        Q.    Did you gesture like you just

16    did with your hand?

17        A.    And said, Come to the back of

18    the car.

19        Q.    Could you tell whether she

20    spoke English at that point?

21        A.    At that point she was

22    responding to everything I said in English.

23        Q.    Okay.  And you got her to the

```
1    back of the car.  What happened next?  And
2    by back of the car, you mean the back of
3    her car?
4         A.    Right.
5         Q.    Between your car and hers?
6         A.    Right.
7         Q.    Okay.  What happened then?
8         A.    I think I would ask her, you
9    know, why she was driving the way she was
10   or something to that effect.
11        Q.    And what did she say?
12        A.    I don't remember what she said.
13        Q.    What happened next?
14        A.    I believe we would have -- I
15   think that's when it started raining.  And
16   I said, Let's get out of the rain.  You can
17   sit in the front of my car.
18        Q.    Okay.  What happened next?
19        A.    And I checked her, ran her
20   license, and I think I checked on
21   registration of the car.
22        Q.    Was her license okay?
23        A.    I believe so.
```

# FREEDOM COURT REPORTING    49

1       Q.      Okay.  What state was it from?

2       A.      California.

3       Q.      Okay.  Did you check the

4   registration of the car?

5       A.      I'm sure I did.

6       Q.      Who was it registered to?

7       A.      I think it was registered to

8   her.

9       Q.      Okay.  Did you make notes of

10  these things as you were doing them?

11      A.      Not on paper.  Just mentally.

12      Q.      Mentally.  Okay.  So the

13  license was okay and the car registration

14  was okay as far as you could tell?

15      A.      I think so.

16      Q.      Okay.  What happened next?

17      A.      I think I eventually asked her

18  about having anything in the vehicle.

19      Q.      Did you write her a citation or

20  anything?

21      A.      A warning.

22      Q.      A warning for what?

23      A.      Impeding traffic.

# FREEDOM COURT REPORTING    50

1       Q.      Okay.  You said you eventually

2   asked her about anything in the vehicle?

3       A.      Uh-huh.

4       Q.      During that eventually, what

5   happened?

6       A.      All I was doing was writing the

7   warning waiting for the information to come

8   back through NCIC.

9       Q.      Okay.  Did you finish the

10  warning when you got all the information

11  through NCIC?

12      A.      At some point I finished it up

13  there.

14      Q.      Okay.  Did she sign it?

15      A.      Yes.

16      Q.      Okay.  And what did you do with

17  it then?

18      A.      I gave her a copy.

19      Q.      What did you do next?

20      A.      I think I started filling out

21  the consent to search form.

22      Q.      Consent to search form?

23      A.      Uh-huh.

# FREEDOM COURT REPORTING    51

1     Q.     Why did you do that?

2     A.     Because I'd asked her about

3 having anything illegal in the vehicle and

4 asked her for her permission to search the

5 car.

6     Q.     When had you done that?

7     A.     At some time after writing the

8 warning.

9     Q.     Okay.  So you finished the

10 warning and then you started asking her

11 questions about things in the car?

12     A.     Right.

13     Q.     Tell me what you asked her.

14     A.     I asked her -- I think I asked

15 her if she had been drinking and asked her

16 was there any alcohol in the car, cerveza.

17     Q.     Was there anything about her

18 that indicated she'd been drinking?

19     A.     Not at that point.

20     Q.     Did you perform any field

21 sobriety tests or anything of that nature?

22     A.     No, sir.

23     Q.     Okay.  What did she say when

1    you asked her about cerveza?

2        A.    She looked me eye to eye and

3    said no.

4        Q.    Okay.  And what did you ask her

5    next?

6        A.    I asked her if there was any

7    drugs in the vehicle.

8        Q.    How did you do that?

9        A.    Is there any drugs in the

10   vehicle and then I said any drugos in the

11   vehicle.

12       Q.    Drugos.  Okay.  And what did

13   she say?

14       A.    She looked at me and said no.

15       Q.    Okay.  What happened next?

16       A.    I asked her if there was any

17   money in there in the vehicle.

18       Q.    And what did she say?

19       A.    She looked away and looked down

20   and didn't answer me.

21       Q.    What happened next?

22       A.    I asked her again, and she

23   said, My English is not that good.

# FREEDOM COURT REPORTING 53

1    Q.    You had finished writing her a

2  warning ticket and were asking her these

3  questions about beer and drugs and money

4  and that sort of thing.  Why were you

5  detaining her after having finished the

6  ticket?

7    A.    Well, from when I was up at the

8  car the first time, Mr. Barajas who was

9  pretending to be asleep in the back seat

10  looked like he just got through running a

11  marathon he was breathing so heavily.  And

12  she couldn't tell me where she was coming

13  from in Florida.  She was headed back to

14  California.  She was way off route coming

15  from South Florida going back to

16  California, so I felt that that was

17  something.

18    Q.    She said that she was coming

19  from Florida going to California?

20    A.    Right.

21    Q.    Where was Hurricane Katrina at

22  that time?

23    A.    I don't know.

# FREEDOM COURT REPORTING    54

1     Q.    Coming from Florida to go to

2  California, you'd think you'd catch I-10

3  and drive across, wouldn't you?

4     A.    Right.

5     Q.    But Katrina was in the way and

6  I-10 was closed.  You knew that, didn't

7  you?

8        MR. HARMON:  Object to the form.

9     A.    No, sir.

10     Q.    You didn't know that?

11     A.    No, sir.

12     Q.    Okay.  Do you know where

13  Katrina hit?

14     A.    No, sir.

15     Q.    You don't know that Katrina hit

16  New Orleans?

17     A.    Oh, yes.  It hit New Orleans.

18  Of course.  Everybody knows that.

19     Q.    Well, you made me wonder for a

20  minute.

21     A.    See if you was still awake.

22     Q.    Yes, sir.  And does I-10 run

23  through that area?

# FREEDOM COURT REPORTING    55

1          A.      Yes, sir.

2          Q.      With Katrina in the Gulf, would

3     you have left Florida and gone across I-10

4     at that time?

5          A.      You know, at that time I don't

6     know where they were at when the hurricane

7     was approaching the United States.  And I

8     can't testify.  I'm not a meteorologist.  I

9     don't know where the hurricane was, where

10    the eye was, where the walls were.

11         Q.      In other words, that day you

12    didn't have any clue where Hurricane

13    Katrina was?

14         A.      I was in Montgomery.  That was

15    my concern.

16         Q.      And the people in Montgomery

17    weren't paying attention to where Hurricane

18    Katrina was?

19              MR. HARMON:  Object to form.

20         Q.      Is that right?

21         A.      I can't testify to what people

22    in Montgomery thought.

23         Q.      Yes, sir.  Well, did you know

# FREEDOM COURT REPORTING   56

1    what was causing the rain systems you were

2    dealing with that day?

3         A.    No, sir.

4         Q.    You just knew it was raining?

5         A.    That's right.

6         Q.    Okay.  All right.  Now, do you

7    know what day Hurricane Katrina hit New

8    Orleans?

9         A.    Not right off.

10        Q.    Okay.  The questioning you were

11   doing, you said at a certain point she said

12   she didn't speak good English.  And, in

13   fact, you were using Spanish words to ask

14   her questions like cerveza and drugos

15   except you said drugos or something like

16   that?

17        A.    I was asking English and

18   Spanish.

19        Q.    English and Spanish.  Okay.

20   You would say key words in Spanish and she

21   would respond, right?

22        A.    Right.

23        Q.    Okay.  And you don't speak a

```
1    lot of Spanish, do you?

2         A.    No, sir.

3         Q.    You can't put together an

4    actual sentence in the Spanish language,

5    can you?

6         A.    Sure.  I've got a card that has

7    many sentences I can read off of.

8         Q.    But you can't do it?

9         A.    Yes, sir.  I can read that and

10   put those sentences together.

11        Q.    Well, without the card, you

12   can't do it, can you?

13        A.    Sure.

14        Q.    You can?

15        A.    Uh-huh.

16        Q.    Give me a Spanish sentence.

17        A.    Los papelas nen lel auto.

18        Q.    What is that?

19             MR. HARMON:  That is a question.

20                  But my question is how is

21                  she going to transcribe his

22                  response?

23        Q.    Spell it for us.  What's the
```

1    first word of that sentence?

2        A.    Los.  Paperwork for the vehicle

3    is what it means.

4        Q.    How do you -- how do you spell

5    the first word?

6        A.    L-O-S.

7        Q.    L-O-S.  What's the next word?

8        A.    Papelas.

9        Q.    Spell it.

10        A.    P-A-P-E-L-A-S.

11        Q.    Okay.  What's the next word?

12        A.    N-E-N.

13        Q.    Okay.

14        A.    L-E-L.

15        Q.    Yeah.

16        A.    Auto.

17        Q.    Auto.  Okay.  And that's a

18    sentence?

19        A.    Yes.

20        Q.    How do you translate it?

21        A.    Where's the paperwork for the

22    car?

23        Q.    Spanish word for where is

# FREEDOM COURT REPORTING    59

1    donde.  I didn't hear that in the sentence.

2        A.      Well, that's not the actual

3    literal translation.

4            MR. HARMON:  I object to the form

5                of the question.

6        Q.      Is there a verb in that

7    sentence?

8        A.      I don't know.

9        Q.      Would you agree with me that

10   the literal translation of those words

11   means the papers in the car?

12       A.      That's pretty close.

13       Q.      Okay.  And that's not a

14   sentence, is it?

15       A.      Well, it's not a sentence in

16   English, but Spanish is a different

17   language.

18       Q.      Do you know a single verb in

19   the Spanish language?

20       A.      I'm sure I do.  I --

21       Q.      Well, tell me one.  Just one.

22       A.      I can't think of one right now.

23       Q.      Okay.  You can't put together a

# FREEDOM COURT REPORTING

```
1     single sentence in the Spanish language
2     without reading it from a card because you
3     can't come up with a verb; is that true?
4          A.     No.
5          Q.     Okay.  Give me a sentence in
6     the Spanish language including a verb.
7          A.     I don't know one.
8          Q.     Okay.  I'll teach you one.
9     Sientese.
10         A.     Sit.
11         Q.     Sit down.
12         A.     Yeah.
13              MR. HARMON:  That's impressive,
14                  Bruce.
15              MR. MADDOX:  Thank you.
16         Q.     The point in time you asked
17    about money, I believe you said dinero?
18         A.     Right.
19         Q.     And she didn't answer you
20    except to say I don't speak English very
21    well?
22         A.     The second time I asked her.
23         Q.     Second time.  You asked it the
```

# FREEDOM COURT REPORTING

1  same way the second time?

2       A.     Yes.

3       Q.     How did you ask it exactly?

4       A.     I don't remember exactly.

5       Q.     You just remember using the

6  word dinero?

7       A.     Yeah.  I remember asking about

8  money.

9       Q.     Okay.  But you don't know

10  whether you asked it in Spanish, English or

11  both?

12       A.     Both.  I just don't remember

13  exactly how I phrased it.

14       Q.     I see.  Okay.  What happened

15  next?

16       A.     I gave her the consent form,

17  and I think she asked for her glasses.  And

18  she went up to the car to get her glasses.

19       Q.     Okay.  And once she got her

20  glasses, what happened?  Did she come back

21  to your vehicle and sit down?

22       A.     Uh-huh.

23       Q.     Had the rain stopped then?

# FREEDOM COURT REPORTING    62

1      A.      I don't remember.

2      Q.      Okay.  So she might have gone

3  through the rain to get her glasses?

4      A.      It's possible.

5      Q.      Okay.  You told her to get

6  them?

7      A.      She said she needed her

8  glasses, and I said you can go get them.

9      Q.      She came back with her glasses?

10     A.      Uh-huh.

11     Q.      Was she free to leave then?

12     A.      Not at that time, but --

13     Q.      Okay.

14     A.      I didn't tell her that.

15     Q.      What happened next?

16     A.      She read the form and would

17  eventually sign it.

18     Q.      Eventually signed it?

19     A.      Uh-huh.

20     Q.      Signed it when you told her to,

21  didn't she?

22     A.      No.  I told her to read the

23  form, and after she got through reading it,

# FREEDOM COURT REPORTING    63

1    I gave her a pen and said if you agree with

2    it, you can sign at the bottom.

3        Q.    Did you say that in English or

4    Spanish?

5        A.    Said it in English.

6        Q.    Okay.  You said if you agree

7    with it, you can sign it?

8        A.    Uh-huh.

9        Q.    Or did you say if you agree

10    with it, sign it?

11        A.    I don't remember the exact

12    wording.

13        Q.    Okay.  What happened next?

14        A.    I got out and went up and asked

15    Mr. Sandoval if he had luggage in the

16    vehicle, and he said he did.

17        Q.    Mr. Sandoval?  There was no --

18        A.    I'm sorry.  Mr. Barajas.

19        Q.    Okay.  You asked him if he had

20    luggage.  Why did you ask him if he had

21    luggage?

22        A.    If he had luggage in the

23    vehicle that I was going to search, I

# FREEDOM COURT REPORTING    64

1    needed his permission to search that

2    luggage.

3          Q.      Okay.  And did you know whether

4    there was luggage in there already because

5    it was an open area that you could see

6    things or what?

7          A.      Yes, sir.  I could see several

8    bags in the back.

9          Q.      All right.  Did you ask him

10   which luggage was his?

11         A.      No, sir.

12         Q.      Okay.  Did he sign the consent?

13         A.      Yes, sir.

14         Q.      And there was a third man in

15   the car?

16         A.      Uh-huh.

17         Q.      Or the second man, third

18   person.  Who was he?

19         A.      Mr. Martinez.

20         Q.      Okay.  Did you ask him if he

21   had luggage in the car?

22         A.      I did.

23         Q.      And did he sign the consent?

1          A.      He stated he didn't have any

2     luggage in the vehicle.

3          Q.      Okay.  What happened next?

4          A.      I started searching the

5     vehicle.

6          Q.      Okay.  And what were you

7     searching for?

8          A.      Weapons, drugs, illegal money.

9          Q.      Okay.  And what happened next?

10         A.      I went to the back of the

11    vehicle and opened up the back door and

12    removed two bags.  And the bag with the

13    largest portion of money fell over and the

14    zipper busted and money starting fall out

15    of it.

16         Q.      You dropped it and the zipper

17    busted?

18         A.      No, sir.  I didn't drop it.  I

19    didn't touch it.  I was moving some bags

20    from the back, and the bag fell over.

21         Q.      Just rolled over in the car or

22    on the ground?

23         A.      In the car.

# FREEDOM COURT REPORTING

1    Q.    In the car.  And some money
2  fell out?
3    A.    Right.
4    Q.    Did you determine whose luggage
5  it was?
6    A.    Not at that point.
7    Q.    Tell me what happened when you
8  saw the money.
9    A.    I picked the bag back up and
10  put the money back in it that fell out.
11    Q.    Okay.
12    A.    Opened up the bag beside it and
13  saw that it was full of money.  We
14  eventually took those bags and put them in
15  the trunk of my car.
16    Q.    Okay.  Did you talk to any of
17  the people there during that time?
18    A.    I think I asked Ms. Sandoval if
19  the money belonged to her, and she said she
20  didn't know anything about it.
21    Q.    Okay.  Did you ask anybody
22  else?
23    A.    I'm sure I did.  I'm sure I

1   asked the other two.

2        Q.      And what did they say?

3        A.      I don't remember.

4        Q.      You don't remember whether

5   anybody claimed the money or the bags?

6        A.      Not right there on the

7   roadside.  I don't remember what they said.

8        Q.      Did you try to determine whose

9   bags they were?

10       A.      Not at -- I don't think I did

11   at that point.  That's when we called -- I

12   called ABI Agent Herman and told him what

13   we had.  And that's their job to interview

14   the people in the vehicle and find out

15   anything further.

16       Q.      Okay.  You're still by the

17   road.  How much time has passed by this

18   time?

19       A.      Probably about ten minutes from

20   the time I got out of my vehicle until now.

21       Q.      Okay.  So you find the money.

22   You ask people if it's theirs.  You

23   remember Ms. Sandoval said it was not hers.

# FREEDOM COURT REPORTING

1   And you don't remember what the others

2   said?

3       A.     No.  Not right off I don't

4   remember what was said.

5       Q.     Okay.  The call to -- you

6   called Agent Herman who is present here

7   today?

8       A.     Yes.

9       Q.     And what did you tell him?

10      A.     I told him that I was on a

11  traffic stop and had recovered a large

12  amount of currency.

13      Q.     Okay.  Did you tell him how

14  much?

15      A.     I didn't know how much.

16      Q.     Okay.  What happened next?

17      A.     We would call for a tow truck

18  and waited for Agent Herman to arrive.

19      Q.     Okay.  So you called for a tow

20  truck for what purpose?

21      A.     Well, by this time it had

22  started to rain very hard.  And we could

23  not finish searching the vehicle on the

# FREEDOM COURT REPORTING

1    roadside.  We took it to a secure place

2    where it was dry.

3        Q.    What did you do with the

4    occupants of the vehicle?

5        A.    Ms. Sandoval rode in my vehicle

6    and the other two occupants rode in Trooper

7    Barnes' vehicle.

8        Q.    Were they handcuffed?

9        A.    No.

10       Q.    Okay.  Did they ride in the

11   caged part of the vehicle that they

12   couldn't get out of?

13       A.    Ms. Sandoval was not.  And I

14   believe one rode up front with Trooper

15   Barnes and one, of course, had to go in the

16   back because there was nowhere else to put

17   them.

18       Q.    Were they free to leave then?

19       A.    Sure.

20       Q.    Okay.  How?

21       A.    They could have got out and

22   walked, but I didn't want to leave them out

23   there in the middle of the pouring rain.

# FREEDOM COURT REPORTING

1       Q.      You were going to keep the car
2   and money by that time, weren't you?
3       A.      No.  We weren't planning on
4   keeping the car that I was aware.
5       Q.      When you decided to tow the
6   vehicle, did you discuss with Ms. Sandoval
7   that you wanted to tow her vehicle
8   somewhere and see if she would consent to
9   that?
10      A.      I don't remember what was said
11  about that.
12      Q.      So you can't say you did, can
13  you?
14      A.      I don't remember what was said
15  about what we're doing with the vehicle.
16      Q.      It's a pretty simple question.
17  You cannot say that you asked permission to
18  tow the vehicle?
19      A.      I can't say.  I don't remember.
20  It seems like the same thing.
21      Q.      Did you have her sign a form
22  permitting the towing of the vehicle?
23      A.      No, sir.

1        Q.        Okay.  If she had said, Don't
2   take my car, I want to leave, what were you
3   going to do about the money?
4        A.        She didn't say that.
5        Q.        What were you going to do about
6   the money?
7                  MR. HARMON:  Object to the form.
8        A.        What do you mean what was I
9   going to do about the money?
10       Q.        Were you going to keep it or
11  let them leave with it?
12       A.        They weren't leaving with the
13  money.
14       Q.        Why not?
15       A.        Well, it's illegal to have that
16  type of money in your possession and nobody
17  claim it.
18       Q.        And you knew that then?
19       A.        Oh, yes.
20       Q.        You said nobody claimed it?
21       A.        That's right.
22       Q.        I thought a minute ago you said
23  you couldn't remember?

# FREEDOM COURT REPORTING

1      A.      No, I didn't.  I said I don't

2   remember what they said about it.

3      Q.      Uh-huh.

4      A.      Uh-huh.

5      Q.      But now you're saying nobody

6   claimed it?

7      A.      Mr. Barajas claimed that he

8   found it under a tree.

9      Q.      When did he claim that?

10      A.      At the HIDTA office.

11      Q.      I'm talking about out beside

12   the road.  You said --

13      A.      Well, I've already answered

14   your question about what was said on the

15   side of the road.  I don't remember exactly

16   what was said about it.

17      Q.      Yes, sir.  Are you saying that

18   beside the road nobody claimed the money or

19   the bags the money were in?

20      A.      Ms. Sandoval owned this

21   vehicle.  She was the driver.  I asked her

22   if it was her money or if she knew anything

23   about it, and she said she did not.

# FREEDOM COURT REPORTING

1        Q.      Okay.

2        A.      I don't remember what

3    Mr. Barajas said about the money.

4        Q.      All right.

5        A.      Okay.

6        Q.      Let's retrack some of your

7    testimony, then.  Number one, Mr. Barajas

8    said he had luggage in the vehicle, didn't

9    he?

10       A.      Uh-huh.

11       Q.      The other gentleman said he

12   didn't have luggage in the vehicle, didn't

13   he?

14       A.      That's right.

15       Q.      So the bags of money wouldn't

16   have been that gentleman's by what they

17   told you, would it?

18       A.      Well, that's a good assumption,

19   I guess.

20       Q.      Okay.  And Ms. Sandoval didn't

21   know anything about the money?

22       A.      Right.

23       Q.      So who does that leave that the

# FREEDOM COURT REPORTING

1  money must have belonged to?

2  　　　　MR. HARMON:  Object to form.

3  　　A.　　Well, at that time I didn't

4  know who it belonged to.

5  　　Q.　　You don't remember whether

6  Barajas said that's mine or not by the

7  road, do you?

8  　　A.　　No.  That's not what I said.  I

9  said I don't remember exactly what he said.

10  　　Q.　　What did he say generally?

11  　　A.　　I don't remember.

12  　　Q.　　Okay.  So you can't say he

13  didn't claim it right then and there, can

14  you?

15  　　A.　　I can't say he didn't claim it

16  and I can't say he did claim it.  I do not

17  remember what he said when I asked about

18  the money.

19  　　Q.　　Now, let's get back to what you

20  said about you were going to keep the

21  money, not let them leave with the money

22  when nobody was claiming it.  You don't

23  really know whether anybody claimed it then

# FREEDOM COURT REPORTING

1   or not, do you?

2       A.      I don't remember.

3       Q.      You don't remember whether you

4   know?

5       A.      I don't remember.  Do you want

6   me to take a minute and look back over the

7   report?

8       Q.      Well, if you'd like to.

9           MR. HARMON:  Bruce, do you mind

10              if we take a break?

11          MR. MADDOX:  Not at all.  Let's

12              take about a ten minute

13              break.

14      Q.      Okay.  You've had a chance

15   during the break to read over your report.

16      A.      Uh-huh.

17      Q.      Okay.  Now, did anybody at the

18   scene of the stop tell you that the bags

19   the money were in were theirs or that the

20   money was theirs?

21      A.      I did.  I asked Barajas who the

22   money belonged to, and he said that he

23   found the money.

# FREEDOM COURT REPORTING    76

1     Q.      Okay.  He said it was in his

2  possession then?

3     A.      That was all that I asked and

4  that was his only answer.  I found the

5  money.

6     Q.      Okay.  Now, the point in time

7  that we were talking about that you had

8  called for a wrecker and folks were

9  transported, where was the money?

10     A.      In the trunk of my car.

11     Q.      Okay.  At what time, what point

12  in the sequence of events did you take it

13  out of the Toyota RAV 4 and put it into

14  your car?

15     A.      Immediately after I found it.

16     Q.      So as soon as you found it, you

17  seized it and put it in your custody and

18  locked it in the trunk?

19     A.      Right.

20     Q.      Okay.  What about that money at

21  that point in time that you took possession

22  and locked it up caused you to believe it

23  was illegal?

1    A.    The fact that you've got people

2    coming from an unknown area and they can't

3    tell you where they're coming from, their

4    demeanor during the traffic stop, that

5    amount of money sitting in the back of a

6    vehicle and now two people saying they know

7    nothing about the money and that it was

8    found.

9    Q.    One knew something about the

10    money?

11    A.    Sir?

12    Q.    One of them knew something

13    about the money?

14    A.    From his statement, he had

15    found it.

16    Q.    Mr. Barajas?

17    A.    Right.

18    Q.    Okay.  You didn't get that

19    statement until after you'd locked it in

20    the trunk of your car, did you?  Let me

21    refresh you.

22    A.    Yes.  I had put the bags in the

23    trunk of my car and then asked.

# FREEDOM COURT REPORTING

1      Q.     As soon as you found it, you

2   put it in the trunk of your car?

3      A.     That's right.

4      Q.     You locked it up and went back

5   and started asking questions?

6      A.     (Witness nodding head in the

7   affirmative.)

8      Q.     Okay.  Now, what type of -- oh,

9   let's see.  It was something else I was

10  going to ask you.  If I put my glasses on,

11  I can actually figure it out.  The point in

12  time that you called in about the vehicle

13  registration and I guess called in about

14  the license, did you do that with one of

15  those data terminals in your trooper car,

16  or did you call it in on the radio?

17     A.     On the radio.

18     Q.     Okay.  Did you have one of

19  those data terminals in your car?

20     A.     No.  No, sir.

21     Q.     Do you have one now?

22     A.     Yes, sir.

23     Q.     Okay.  The -- was it raining

# FREEDOM COURT REPORTING

1    when you took the money out of the Toyota

2    and put it in the trunk of your car?

3        A.    I don't remember.

4        Q.    Okay.  Were -- when you

5    questioned folks about the money after

6    you'd locked it in the trunk of your car,

7    were they inside the vehicle or outside?

8        A.    Ms. Sandoval was seated in the

9    front seat of my car.  And I think

10   Mr. Barajas was standing by my car.

11       Q.    Was that because they were out

12   for purposes of your search of the vehicle?

13       A.    Yes, sir.

14       Q.    Okay.  Now, when did it start

15   raining?

16       A.    You know, it was -- it would

17   rain and it would stop.  And it did that

18   for about ten or fifteen minutes before it

19   just finally started raining hard.

20       Q.    Okay.  How long did it take for

21   the wrecker to get there?

22       A.    Probably ten or fifteen

23   minutes.

# FREEDOM COURT REPORTING

1      Q.      Okay.  And did you-all stay at

2  the scene with the car until the wrecker

3  got there?

4      A.      Yes, sir.

5      Q.      Okay.  Did anybody ride?  Was

6  it a commercial wrecker, or is it a law

7  enforcement vehicle that you used to tow

8  it?

9      A.      It was a rotation wrecker, a

10  flat bed wrecker.

11      Q.      Okay.  What did you do during

12  the transport of the vehicle from the

13  roadside to wherever you eventually went?

14  What did you do to maintain security on the

15  vehicle?

16      A.      I stayed right behind the

17  wrecker.  Trooper Barnes and Trooper Dailey

18  were also in the escort.  One was in front

19  and one was behind me.

20      Q.      Where did y'all go?

21      A.      The auto shop at the trooper

22  post.

23      Q.      And where is that?

# FREEDOM COURT REPORTING

1      A.     It's on Coliseum Boulevard.

2      Q.     How long did it take you to get

3 there?

4      A.     Maybe about ten minutes.

5      Q.     Ten minutes?

6      A.     (Witness nodding head in the

7 affirmative.)

8      Q.     Okay.  When you got there, what

9 happened?

10      A.     We pulled the vehicle into a

11 bay and finished searching the vehicle.

12      Q.     Did you find anything else of

13 interest?

14      A.     Yeah.  We found the -- a drill

15 with a Phillips head drill bit that was

16 laying in the cargo area under the bags.

17 That bit fit screws on the back of the

18 seat.  And those screws were all tooled up

19 as were the screws around the back lights.

20      Q.     By tooled up, what do you mean?

21      A.     They'd been taken on and off

22 several times.

23      Q.     I see.  So they had tool marks

# FREEDOM COURT REPORTING    82

1    on them?

2         A.    Right.

3         Q.    Okay.

4         A.    And inside of everywhere those

5    were tooled were large natural voids.  And

6    on the back of the seat, the cloth was

7    stretched out as if something like kilos

8    had been stuffed in there and transported

9    from maybe California to South Florida.

10        Q.    Kilos of what?

11        A.    With that type of money, I

12   would have guessed methamphetamine.

13        Q.    It's just a guess?

14        A.    Sure.

15        Q.    To your knowledge, were any

16   tests run to see if there was

17   methamphetamine residue or anything?

18        A.    The dog was used and alerted in

19   the areas that I just described.

20        Q.    Were you handling that dog?

21        A.    No, sir.

22        Q.    Who was handling that dog?

23        A.    Francisco Aponte.