# FREEDOM COURT REPORTING

```
1        Q.      Okay.  What became of his dog?
2        A.      I have no idea.
3        Q.      What agency was he with?
4        A.       I think he was with the
5   Montgomery Housing Authority assigned to
6   Highland.
7        Q.      Do you know his dog's name?
8        A.      No, sir.
9        Q.      Okay.  So you had no
10  familiarity with the dog yourself?
11       A.      Yes, sir.
12       Q.      You did?
13       A.      Yes, sir.  I've seen him used
14  on previous occasions.
15       Q.      Okay.  The -- do you have any
16  training with the dog?
17       A.      Did I have any training with --
18       Q.      That dog.
19       A.      -- Aponte's dog?
20       Q.      Yes, sir.
21       A.      No, sir.
22       Q.      Okay.  Do you know what drugs
23  the dog was certified for?
```

# FREEDOM COURT REPORTING    84

```
1        A.     No, sir.
2        Q.     By certified, that means the
3   dog is shown to have a nose that will
4   reveal the presence of different
5   substances.  Is that accurate?
6        A.     Different odors.
7        Q.     Odors.  So you wouldn't have
8   any way of knowing what the dog smelled or
9   didn't smell there, would you?
10       A.     No, sir.
11       Q.     Now, the -- oh, that lawn care
12  business of yours, is it a corporation,
13  just a privately held business, a
14  partnership or what?
15       A.     What's that got to do with
16  anything?
17       Q.     Well, it's something I need to
18  know.
19       A.     Why?
20       Q.     Answer my questions.
21            MR. CURTIS:  Yeah.
22            MR. HARMON:  I mean, I don't have
23                anything.  It's stretching
```

# FREEDOM COURT REPORTING

```
1                    far afield, but I don't have
2                    any objection.
3        A.     I don't see what it has
4   anything to do with --
5             MR. HARMON:  Let me ask you this.
6        A.     -- money being smuggled of drug
7   proceeds.
8             MR. HARMON:  Can you maybe put
9                    his mind at ease why you're
10                   asking it to help him
11                   understand what you're --
12       Q.     It's not to cause you any
13  trouble.
14       A.     Well, then why ask about it?
15       Q.     To give me information.
16       A.     It has nothing to do with this
17  case.
18       Q.     Well, you know --
19       A.     Next question.  I'm not going
20  to answer it.
21       Q.     You're not going to answer
22  that.
23            MR. MADDOX:  We're going to have
```

# FREEDOM COURT REPORTING

1           to take a break.  I've got

2           to call the judge.

3       MR. HARMON:  I can't make him do

4           that.

5       MR. MADDOX:  I understand.

6   Q.     What have you got to hide?

7   A.     What do you want to know about

8   it?  What is it to you?

9   Q.     I want to know if you have any

10  partners or other owners.

11  A.     I've got nothing else to say

12  about it.  You need to move on to the next

13  question.

14  Q.     I do.  Okay.

15      MR. MADDOX:  John, there's a

16          couple alternatives in terms

17          of how we want to litigate

18          this.  We can try to get him

19          in front of a judge to deal

20          with this, but I've got that

21          deadline Friday as you know.

22          Given our current set of

23          circumstances, will you

# FREEDOM COURT REPORTING    87

```
1        agree that I can have an

2        additional week so that we

3        can address these things in

4        terms of my Friday deadline

5        if the judge will go along

6        with it?

7   MR. HARMON:  Let me ask this.

8        Based upon what I'm hearing,

9        I don't know that, you know,

10       we're going to be able to

11       resolve that pending, like I

12       say, having a judge decide

13       it.  I'm not telling him not

14       to answer the question,

15       Bruce.  I can't make him

16       answer the question.

17   MR. MADDOX:  I'm not asking you

18       to make him answer it.  I'm

19       going to ask a judge to do

20       that to him.  But my

21       question is because it's

22       going to take us time to get

23       this accomplished
```

# FREEDOM COURT REPORTING

```
1                    apparently, my question --
2                    because I think we're going
3                    to have to put him in a
4                    courtroom -- my question is
5                    will you agree to an
6                    extension of my Friday
7                    deadline of one week?
8        MR. HARMON:  Are you going to
9                    take it in front of the
10                   judge anyway no matter what?
11       MR. MADDOX:  Yes.
12       MR. HARMON:  No.  I won't agree
13                   to it.
14       MR. MADDOX:  Why?
15       MR. HARMON:  I mean, you know, if
16                   he's going to have to go in
17                   front of the judge anyway,
18                   we may as well go on and
19                   let's get it done now.
20       MR. MADDOX:  All right.  If I
21                   agree not to take him in
22                   front of the judge, will you
23                   agree to an extension of the
```

# FREEDOM COURT REPORTING     89

```
1              deadline?

2         MR. HARMON:  What's the deadline?

3         MR. MADDOX:  Dispositive motions.

4         MR. HARMON:  You're talking about

5              on the summary judgment on

6              what issue, though?  We've

7              got the motion to suppress

8              pending.

9         MR. MADDOX:  I know that.

10        MR. HARMON:  So what --

11        MR. MADDOX:  I'm going to reshape

12             that, of course.  Like your

13             motion for summary judgment,

14             I'm going to do a second

15             one.  But we're dancing far

16             afield.  I'm concerned about

17             my deadline right now.  And

18             I can find out this by a

19             different method, but it

20             will take me longer.

21        MR. HARMON:  Well, I have to say,

22             Bruce, in all kindness, I

23             don't see where you're going
```

# FREEDOM COURT REPORTING

```
1                       on that.
2              MR. MADDOX:  I know you don't,
3                   and you're not intended to.
4              MR. HARMON:  I understand.
5              MR. MADDOX:  It's a strategic
6                   matter.
7              MR. HARMON:  But I don't see a
8                   reason to go ahead and
9                   extend it.  If you've got to
10                  do it, you've got to do it.
11             MR. MADDOX:  Okay.  Then I'll do
12                  what I've got to do.
13     Q.     Okay.  You are not going to
14  answer that question?
15     A.     Didn't I say that earlier?
16     Q.     Okay.  Your job in Dothan, you
17  were there eight years, eight and a half
18  years?
19     A.     Something like that.
20     Q.     Tell me your supervisors while
21  you were there.
22     A.     Andy Hughes.
23     Q.     Any others?
```

# FREEDOM COURT REPORTING

```
1          A.      That was my immediate
2    supervisor.
3          Q.      And who was his supervisor?
4          A.      I don't remember the
5    lieutenant's name.  John White was the
6    chief.
7          Q.      John White?
8          A.      Uh-huh.
9          Q.      Was he the chief the entire
10   time you were there?
11         A.      Yes.
12         Q.      Who was your supervisor in
13   Enterprise?
14         A.      Mike Lolly.
15         Q.      Who was the police chief in
16   Enterprise while you were there?
17         A.      Mike Lolly.
18         Q.      Okay.  He was your direct
19   supervisor?
20         A.      He's the only one that's still
21   there that worked there at the same time I
22   did.  I don't remember what the guy's name
23   was.
```

# FREEDOM COURT REPORTING

1    Q.    You don't remember the direct

2    supervisor?

3    A.    No.  Not right off.

4    Q.    What rank did he hold?

5    A.    Mike?

6    Q.    The direct supervisor whose

7    name you don't recall.

8    A.    It would have been sergeant, I

9    believe, is what his rank was.

10    Q.    Sergeant?

11    A.    Uh-huh.

12    Q.    Okay.  Luverne, who was your

13    supervisor?

14    A.    Jerry Pritchett.

15    Q.    What rank did he hold?

16    A.    Sergeant.

17    Q.    Who was the police chief?

18    A.    Kent Cochran.

19    Q.    Did you have any disciplinaries

20    in Luverne?

21    A.    No.

22    Q.    Have any disciplinaries in

23    Enterprise?

# FREEDOM COURT REPORTING

1    A.    No.

2    Q.    And Dothan?

3    A.    No.

4    Q.    During your time with the state

5    troopers?

6    A.    No.

7    Q.    Okay.  The shop at the trooper

8    post, when you got there, was the vehicle

9    towed inside or what?

10    A.    I don't remember how it got

11    inside, if it was driven in there or just

12    rolled off the wrecker.

13    Q.    Okay.  Did it wind up inside a

14    building?

15    A.    It did.

16    Q.    Okay.  Where was Ms. Sandoval

17    at that point in time?

18    A.    She was also inside the

19    building and out of the rain.

20    Q.    Okay.  And where was

21    Mr. Barajas?

22    A.    Everybody was inside the

23    building.  Everybody.

# FREEDOM COURT REPORTING

1    Q.    All right.  What did they do

2  while you continued searching the vehicle?

3    A.    Just stood there and watched.

4    Q.    Okay.  And when you concluded

5  searching the vehicle, what happened?

6    A.    I think they were taken over to

7  the HIDTA office, and we put everything

8  back in the vehicle and moved it back

9  outside.

10    Q.    What became of the money?

11    A.    It was turned over to the HIDTA

12  agents.

13    Q.    When?

14    A.    As soon as I got to the shop.

15    Q.    The shop.  Do you know who

16  transported the money for the HIDTA office?

17    A.    No.

18    Q.    Who got it out of the trunk of

19  your car?

20    A.    I don't remember.

21    Q.    Did you handle the money

22  anymore?

23    A.    Not after it was turned over.

# FREEDOM COURT REPORTING

1    Q.    Okay.  Do you know whether it
2  was transported by one person, two or more?
3    A.    I don't know who it was
4  transported by.
5    Q.    Okay.  You never handled the
6  money anymore after you got to the shop, or
7  do you recall?
8    A.    No, sir.
9    Q.    No, you didn't.  I asked you --
10    A.    You asked two questions.  I
11  answered the first one.
12    Q.    You answered the first one.  So
13  you do recall?
14    A.    No.  You asked me if I handled
15  the money anymore after we got to the shop.
16    Q.    You said no?
17    A.    No.
18    Q.    And I take it from that that
19  you do recall not handling the money
20  anymore?
21    A.    That's right.
22    Q.    Did you unlock the trunk for
23  people to take it out?

# FREEDOM COURT REPORTING

1    A.    Yes.  The trunk was unlocked.

2  It was turned over to one of the other

3  agents, and they took it over to the HIDTA

4  office.

5    Q.    Who were the agents that were

6  there at the shop?

7    A.    I remember Robert Thornton was

8  there and I think Neal Thompson.  I think

9  that's it.

10    Q.    Was Mr. Herman there?

11    A.    Oh, yes.  He was there.

12    Q.    Who else was there?

13    A.    Trooper Barnes, Trooper Dailey,

14  Aponte, wrecker driver, occupants of the

15  vehicle.

16    Q.    Who did the search of the

17  vehicle?

18    A.    I did.

19    Q.    You were the only one?

20    A.    No.  It was Trooper Barnes was

21  also present.  I think he searched.

22    Q.    Okay.  Once the search was

23  completed and the money had departed for

1    other areas with other agents, what became

2    of the three occupants of the vehicle?

3         A.      They had left and went over to

4    the HIDTA office.

5         Q.      Was that before the search was

6    completed?

7         A.      Yes.

8         Q.      How did they leave?

9         A.      They rode with the other

10   agents.

11        Q.      Okay.   Were they in custody?

12        A.      No.

13        Q.      Okay.   They were gone before

14   the search of the vehicle was completed,

15   though?

16        A.      I think so.

17        Q.      Okay.   What became of the

18   vehicle?

19        A.      We moved it back outside,

20   locked it up.   And later on they came back

21   and got in the vehicle and left.

22        Q.      How did they get back?

23        A.      I don't remember would drove

# FREEDOM COURT REPORTING    98

1    them back over.

2         Q.    Were you there when they got in

3    the vehicle and left?

4         A.    I think so.

5         Q.    Okay.  Who all got in the

6    vehicle and left?

7         A.    Ms. Sandoval and Mr. Martinez.

8         Q.    Okay.  From the time they were

9    taken to the HIDTA office -- and where is

10   the HIDTA office located?

11        A.    Headquarters downtown.

12        Q.    From the time they went to the

13   HIDTA office and then came back to get the

14   car, how much time passed?

15        A.    I don't know.

16        Q.    Was it the same day?

17        A.    Yes.

18        Q.    Or night?

19        A.    Right.

20        Q.    Okay.  What time did you get

21   off that night?

22        A.    I don't remember.

23        Q.    What shift were you working?

# FREEDOM COURT REPORTING

1        A.        I don't remember.

2        Q.        Did you work overtime?

3        A.        It seems like we did.  It seems

4    like we were on emergency status for the

5    hurricane.

6        Q.        When had you been put on

7    emergency status for the hurricane?

8        A.        I don't remember.

9        Q.        The report you looked over says

10   on the first page -- and we're talking

11   Defendant's Exhibit Number 1 -- that you

12   were sitting in the median of I-85 near an

13   eighteen mile marker, not that you were

14   turning around or anything.  Which was it?

15   You testified earlier you were turning

16   around near the sixteen mile marker?

17       A.        Well, when you pull into a

18   median and a car is coming, you sit for a

19   second.  It ceases your turn.

20       Q.        Okay.  And it was near the

21   eighteen mile marker, not the sixteen mile

22   marker then; is that right?

23       A.        I said earlier I was at the

# FREEDOM COURT REPORTING     100

1     Macon County line which is eighteen mile

2     marker.  You asked me what exit that was

3     closest to.  I said the Waugh exit, exit

4     sixteen.

5          Q.     All right.  And you said that

6     you saw the Toyota RAV 4, and it was

7     weaving in its lane.  What does that mean?

8          A.     Same thing we talked about

9     earlier.  We went through the whole process

10    of us driving down the road and them

11    weaving back and forth.  It's the same

12    thing as I explained earlier.

13         Q.     You said earlier it was weaving

14    out of its lane.  It was weaving out of its

15    lane.  How is that different from weaving

16    in its lane?

17         A.     You can go in the lane and out

18    the lane, in the lane and out the lane,

19    whichever way you want to go.

20         Q.     I see.

21         A.     Half empty, half full.

22         Q.     Does your report anywhere

23    indicate that they crossed lane lines or

# FREEDOM COURT REPORTING    101

```
1    went out of their lane in their weaving

2    process?

3         A.     Does it?

4         Q.     Yes, sir.  Does it?

5         A.     I'm asking you.  Does it?

6         Q.     I'm asking you does it?

7         A.     Okay.  Well, do you want me to

8    read the complete thing?

9         Q.     Well, you read it a few minutes

10   ago.

11        A.     No, sir.

12        Q.     If you want to look at it

13   again, feel free.  I'll sit here and wait.

14        A.     No, sir.  I read the part I

15   asked Mr. Barajas about the money and where

16   he said he found it.

17        Q.     Go ahead and read it.  Tell me

18   if you can find anywhere in there that you

19   indicated that either they weaved out of

20   the lane into another lane or left the

21   roadway during this swerving?

22        A.     Here's a statement where it's

23   outside the roadway.  The RAV 4 pulled in
```

# FREEDOM COURT REPORTING    102

1    front of my car and stopped.  That's

2    outside the roadway because it says I'm in

3    the emergency lane.  There's a statement

4    where it says it's outside of its lane.

5         Q.      Uh-huh.  Was that part of the

6    weaving you were talking about?

7         A.      You said is there a statement

8    in here where it says is it outside of its

9    roadway.  There's your statement.  It's

10    outside of its roadway.

11         Q.      That's not really what I asked.

12         A.      No, sir.  That is what you

13    asked, and I answered your question.

14         Q.      Thank you for that.  What I'll

15    ask you now, then, is is there anywhere in

16    that report that indicates as you've

17    testified earlier that during the weaving

18    that you observed, it left the right lane

19    as opposed to simply weaving within that

20    lane?

21         A.      No, sir.

22              MR. HARMON:  Object to the form.

23                   Go ahead.

# FREEDOM COURT REPORTING    103

1       A.      Doesn't look like it.  It says

2  just weaving in its lane of travel.

3       Q.      Yes, sir.  Is that illegal?

4       A.      That's not.

5       Q.      Okay.  Is there a minimum speed

6  law that applies to that portion --

7       A.      No, sir.  Alabama is not like

8  Georgia and Florida.  We don't have a

9  minimum speed law.

10      Q.      Okay.  Is it illegal to drive

11  fifty miles per hour on that highway?

12      A.      When you impede the normal flow

13  of traffic, that's a violation of the law.

14      Q.      Is it illegal to drive fifty

15  miles per hour on that roadway?

16      A.      Yes, sir.

17      Q.      What does it mean to impede

18  traffic?

19      A.      Well, when the speed limit is

20  seventy miles an hour and you're driving

21  fifty and cars have to slam on brakes and

22  swerve to avoid a collision, that's

23  impeding the flow of traffic.

# FREEDOM COURT REPORTING    104

1          Q.      Okay.   It was a cloudy, rainy

2    day?

3          A.      No, sir.  It was a cloudy day

4    at that time.

5          Q.      You testified earlier you

6    couldn't remember.  You thought it might

7    have rained earlier?

8          A.      No, sir.  I didn't testify to

9    that.  It rained earlier.  At the time I

10   came into contact with the drug money

11   smugglers, it was not raining.

12         Q.      Had it rained before you came

13   into contact with them?

14         A.      Yes, sir.

15         Q.      Okay.  Was the road wet?

16         A.      Define wet.

17         Q.      Okay.

18         A.      Standing water or spots

19   where --

20         Q.      Spots where there's water.

21         A.      Spots where there was water.

22   You'll have a dry spot and a wet spot.  No

23   standing water.

```
 1              MR. MADDOX:  Okay.  Let's take

 2                    just a minute.

 3                 (Brief recess)

 4         Q.      Okay.  Just a few more

 5    questions.  This vehicle that you keep

 6    referring to as a drug smuggler's vehicle,

 7    did you look at the mileage on it?

 8         A.      I'm sure I did.  I don't

 9    remember what it was.

10         Q.      Would you have noted it

11    somewhere?

12         A.      I don't think it is in the

13    report, but --

14         Q.      Was there an impound sheet done

15    on it because it was in your custody?

16         A.      Yes, but we don't put mileage

17    on it.

18         Q.      Where would that sheet be?

19         A.      I have no idea.

20         Q.      Okay.  The --

21         A.      No.  We wouldn't have either

22    because it wasn't impounded.  So there

23    would have been no form done.  It was
```

## FREEDOM COURT REPORTING    106

```
1      just --
2           Q.      It was just there?
3           A.      -- moved from one place to
4      another.
5           Q.      I see.
6           A.      The wrecker bill may have it on
7      there, but you'd have to contact them.
8           Q.      You don't know who the wrecker
9      company was?
10          A.      It seems like it was B and R.
11          Q.      Who would they have sent the
12     bill to?
13          A.      They would have sent it to --
14     it came to the trooper post, and I sent it
15     on over to headquarters.
16          Q.      Okay.  During the search of the
17     vehicle, you were looking not just for
18     drugs and money, I take it?
19          A.      I was looking for anything.
20          Q.      That would have a bearing on
21     narcotics trafficking?
22          A.      No.  Anything illegal.
23          Q.      Illegal.  Or evidence of
```

# FREEDOM COURT REPORTING 107

1    anything?

2        A.    Or proceeds from illegal

3    activity.

4        Q.    Okay.  Were you looking for

5    things like bank books and that sort of

6    thing that might indicate transfers of

7    money and so forth?

8        A.    Yes, sir.  I believe that was

9    all looked for.

10       Q.    All right.  Did you find any

11   gasoline receipts that might show where the

12   vehicle had been?

13       A.    Yes.  We looked for all of

14   that.

15       Q.    Did you find any?

16       A.    I don't remember.  I'd have to

17   look through the case file.

18       Q.    If you found them, you would

19   have them in your custody?

20       A.    We would have probably copied

21   them and released them.

22       Q.    Any hotel receipts in the

23   vehicle or anything like that?

# FREEDOM COURT REPORTING    108

```
1           A.      I don't remember.
2           Q.      Okay.  Did you find any
3      paperwork that would denote where that car
4      or the people in the car had been?
5           A.      Not that I remember.
6           Q.      Okay.  Did you check to see if
7      the car was listed in the operation
8      pipeline database?
9           A.      No, sir.
10          Q.      How about the operation blue
11     light database?
12          A.      It was closed for the
13     hurricane.
14          Q.      Sir?
15          A.      It was closed for the
16     hurricane.
17          Q.      Okay.  The business you don't
18     want to tell me about, Capital -- is it
19     Capital City Lawn Care?
20              MR. HARMON:  He asked me about
21                  it.  Go ahead.
22          Q.      Is that the name of it?
23          A.      Capital only.
```

# FREEDOM COURT REPORTING

1     Q.     Capital Lawn Care.  Is the

2     phone number 590-7238?

3     A.     No, sir.

4     Q.     What's the phone number?

5     A.     850-7780.

6     Q.     Okay.

7             MR. CURTIS:  Bruce, we have

8                 discussed that, and I

9                 believe he's prepared to

10                answer your questions in

11                that regard now.

12    Q.     Okay.  What's the business

13    structure of it?

14    A.     Just lawn care.

15    Q.     Okay.  Is it a corporation?

16    A.     No, sir.

17    Q.     Is it a sole proprietorship?

18    A.     It's not an L.L.C.  It's just a

19    personally owned business.

20    Q.     Are you the only owner?

21    A.     Yes, sir.

22    Q.     Or do you have partners?

23    A.     Oh, it's just me.

## FREEDOM COURT REPORTING    110

```
 1          Q.      Okay.
 2          A.      Let me ask you this.  Who takes
 3     care of your office and home?
 4          Q.      You'll have to see my wife, the
 5     procurement agent.
 6          A.      I'd like to put a bid in on it.
 7          Q.      Well --
 8          A.      I could work something up
 9     today.
10                  (Off-the-record discussion)
11          Q.      Do you have employees?
12          A.      No, sir.
13          Q.      Okay.
14          A.      And I'm in a lot of debt.
15          Q.      I'm sorry.
16          A.      I said I'm in a lot of debt.
17          Q.      I know.  I'm sorry.  I wish it
18     were otherwise, sir.
19                  MR. MADDOX:  Okay.  Give me two
20                     seconds.
21                  (Brief pause)
22          Q.      Did you become aware that
23     Mr. Barajas had medical problems?
```

# FREEDOM COURT REPORTING    111

```
1           A.      He had stated during the

2    encounter out there on the roadside that he

3    had been sick and that's why he had called

4    his sister from California to drive to

5    Florida to pick him up.  He did also say

6    that he was HIV.

7           Q.      Right.  Right.

8           MR. MADDOX:  We're done.  Thank

9                you very much.

10          MR. HARMON:  No questions from

11               the United States.

12

13

14

15

16

17

18

19

20

21

22

23
```

# FREEDOM COURT REPORTING    112

1                    CERTIFICATE

2

3    STATE OF ALABAMA

4    ELMORE COUNTY

5

6            I hereby certify that the above

7    and foregoing deposition was taken down by

8    me in stenotype and the questions and

9    answers thereto were transcribed by means

10   of computer-aided transcription, and that

11   the foregoing represents a true and correct

12   transcript of the testimony given by said

13   witness upon said hearing.

14            I further certify that I am

15   neither of counsel, nor of kin to the

16   parties to the action, nor am I in anywise

17   interested in the result of said cause.

18

19

20        *Virginia Denese Barrett*

21        VIRGINIA DENESE BARRETT

22        MY COMMISSION EXPIRES 5/23/11

23

DEFENDANT'S
EXHIBIT

1

MEMORANDUM
To: Agent Joe Herman
From: Trooper Andy Sutley

On 08/29/2005 around 7:00 PM I was sitting in the median of I-85 near the 18 mile marker. I heard Trooper Wayne Dailey run a driver's license which came back suspended. Trooper Dailey was north bound on I-85 near the 16 mile marker. Trooper Dailey did not call for assistance but I decided to go back him up. As I pulled out of the median, a small black SUV came by my car in the outside lane. As I caught up to the vehicle near the 17 mile marker I noticed it was a Toyota RAV 4 and it was weaving in its lane. I began driving about a car length behind the car in the inside lane. The Toyota dropped its speed to about 50 MPH. The Toyota then sped up to 60 and dropped back to 50. The Toyota continued to weave in its lane of travel. We went under the exit 16 overpass and as I started to get behind the Toyota I noticed a Toyota Camry come up behind the RAV 4. I could not safely make a lane change to get behind the RAV 4. I turned on my rear lights for just a second to slow the Camry down. The RAV 4 continued to weave and go from 50 MPH to 60 MPH. The Camry slowed down and as I started to get over the RAV 4 slammed on brakes. I swerved into the emergency lane to avoid the RAV 4 and the Camry slammed on brakes and swerved to the left and nearly hit my car. I came to a stop without my lights on. The RAV 4 pulled in front of my car and stopped. I turned on my lights and after making sure the road was clear got out and went to the front of my car. We were next to the guard rail and for my safety I called the driver to the back. I asked the driver, Esther Sandoval, for her license and registration. At this time it began raining. I asked Ms. Sandoval to sit in the front of my car. I asked Ms. Sandoval if she had been drinking and she said, "No." I asked her why she was driving all over the road, speeding up and slowing down and stopping for no reason. Sandoval said she did not understand. I asked Sandoval where she was going and she said she was looking for a hotel. I asked Sandoval if she owned the vehicle and she said, "Yes." I looked at her license and asked her if she still lived at the address listed on her license and she said, "No." I asked Sandoval for her current address and she asked for a pen to write it down. Sandoval wrote her current address on my warning book. I asked Sandoval for the registration and she said she did not understand. I asked Sandoval where she was coming from and she said she did not know the city in Florida. I asked her what she was doing in Florida and she said her brother was sick. I asked for the registration again and Sandoval said to ask her brother who could speak English. I went to the passenger side of the car and opened the back door. I asked the back seat passenger, Enrique Barajas, if he could speak English and he said, "Yes." I asked for the registration and Barajas spoke in Spanish to the front seat passenger, Mario Martinez. Martinez pulled the registration from the passenger side window. Martinez handed the registration to me over the back seat. I told Martinez he could roll up the front window and told Barajas to hand Martinez a towel to dry the front seat. It had stopped raining at this time. I asked Barajas and Martinez for identification. I noticed Barajas was breathing heavy and appeared nervous. As Barajas handed me his license, I could see his hand was shaking. I asked Barajas if he was OK and he said, "I've been sick." I asked Barajas where they were coming from and he said, "Tampa." Barajas then began talking on his own. He said he was in Tampa on vacation and became sick. He called his sister in Santa Ana, California to come pick him

up and they were heading back. I asked Barajas how he got to Florida and he said he drove with friends. I opened the front passenger door and asked Martinez for identification. He produced a Pacifcare health care card that had no picture but contained the name Mario G. Martinez. I asked Martinez if he could drive and he said, "Yes." I asked Martinez to drive to the end of the guard rail and he did. I returned to my car, drove behind the RAV 4 and ran the license of Sandoval and Barajas as well as the vehicle tag. I called Trooper Will Barnes to assist me. I finished the warning for impeding the flow of traffic and explained the warning to Sandoval. Trooper Barnes arrived at this time. While waiting for the NCIC information to return, I asked Sandoval who was in the car. She said, "My brother and son-in-law." Since I did not have a picture ID for Martinez I asked Sandoval what her son-in-laws name was. Sandoval had a lost look come over her face. She appeared to be trying to think up a name. I asked Sandoval again what her son-in-laws name was and she said, "I don't know." I asked again, "You don't know what your son-in-laws name is?" Sandoval paused for a few seconds, looked away and said, "No." After receiving the NCIC information, I asked Sandoval if there was any alcohol in the car. She said, "No." I asked if there was any "cerveza" and Sandoval laughed and said, "No." I asked if there were any drugs in the car and Sandoval said, "No." I asked if there were any "drugos" and Sandoval said, "No." During each of these questions Sandoval looked at me and answered. I asked Sandoval if there was any money in the car. Sandoval looked away and down and mumbled, "No." I asked Sandoval if there was any "dinero" in the car. Sandoval again looked away and down and said, "No." I asked Sandoval if I could search the car. Sandoval looked at me and did not answer. I said again, "Can I search your car." Sandoval said, "I am sorry my English is not that good." I asked Sandoval if she could read Spanish and she said, "Yes." I filled out the Alabama Department of Public Safety consent to search form on the Spanish side. I explained the form to Sandoval and told her to read the form. I got out of my car and gave Sandoval time to read the form. I got back in and Sandoval said she needed her glasses. I went to her vehicle and asked Barajas to hand me her purse. The purse did not have her glasses. I told Sandoval to go get her glasses. She did and came back to my car. I told Sandoval she could sit back down in my car and read the form. I gave Sandoval time to read the form and sat back down. I held out a pen and told Sandoval to sign at the bottom if she agreed. Sandoval signed the form. I went to the back of the RAV 4 where Trooper Barnes was talking with Barajas. I asked Barajas if he had luggage in the car and he said, "Yes." I asked Barajas if I could search his luggage and he said, "Yes." I put Barajas' information on the same consent to search form and told Barajas to read the form. After he read the form I asked Barajas to initial by his name and sign if he agreed. Barajas did sign the form. I asked Martinez if he had any luggage in the car and he said, "No." I asked Barajas to sit in the back of my car so he could stay dry. I asked Martinez to sit in Trooper Barnes car. Sandoval remained seated in my front seat. I went to the back of the Toyota RAV 4 and opened the rear door. I opened a cooler, looked inside and sat it on the ground. I looked in two black pieces of luggage and sat them on the ground. I saw a black wind breaker and picked it up. I saw a black bag that was opened containing bundles of US currency. I tried to open a red duffle bag that was beside the black bag. The zipper broke and the bag came open revealing more bundles of US currency. I removed the bags and placed them in the trunk of my car. I went to the passenger side of my car and opened the front door. I asked Sandoval whose money was in the car and she said, "I don't know." I

went to the passenger side of my car and asked Barajas whose money was in the car. Barajas said, "I found the money." I went to Trooper Barnes car and asked Martinez whose money was in the car. Martinez said, "What money." I called the post and advised the PCO to notify the chain of command and ABI. Agent Herman arrived. The car was towed to the auto shop and a further search was conducted. A drill with a Phillips head bit was found in the cargo area. I found screws on the back of the seat had fresh marks. The material was loose as if something had been hidden in the back.

O F F I C I A L   U S E   O N L Y

```
-------------------------------------------------------------------------
|  DEPARTMENT OF HOMELAND SECURITY    | 1. PAGE    3                    |
|               ICE                   |----------------------------------|
|                                     | 2. CASE NUMBER MO16C505M00043   |
| R E P O R T   O F   I N V E S T I G A T I O N |-----------------------|
|           C O N T I N U A T I O N   | 3. REPORT NUMBER: 001           |
-------------------------------------------------------------------------
```

DETAILS OF INVESTIGATION:

On August 29, 2005, at approximately 7:00 p.m., Alabama State Trooper A. Sutley stopped a 2001 Toyota Rav 4 bearing California registration 4PEX880 on Interstate I-85 southbound for a traffic violation. According to Trooper Sutley, he was parked in the median of Interstate 85 near the 18 mile marker in Montgomery, County, Alabama when he heard Trooper W. Dailey run a driver's license check which revealed Trooper Dailey's violator had a suspended driver's license. Trooper Sutley decided to proceed en route to back-up Trooper Dailey. As Trooper Sutley pulled out of the median, he observed a small black SUV travel past his vehicle southbound in the outside lane. As Trooper Sutley caught up to the vehicle near the 17 mile marker, he observed that the vehicle was a Toyota RAV 4 and also that the vehicle was weaving within its lane. Trooper Sutley continued following the vehicle and observed that it decreased its speed to about 50 miles per hour (MPH), then increase to approximately 60 MPH, and then again reduce to 50 MPH. Trooper Sutley continued to observe the Toyota weave in its lane of travel while passing under the Exit 16 overpass. Trooper Sutley began to get behind the vehicle but was obstructed by another vehicle that had come up behind the Toyota RAV 4. According to Trooper Sutley, he could not safely make a lane change to get behind the Toyota Rav 4 and subsequently turned on his rear overhead blue lights to slow the other vehicle. Trooper Sutley continued to observe the Toyota Rav 4 weave and vary its speed from 50 MPH to 60 MPH. As the other vehicle slowed down, Trooper Sutley proceeded to change lanes in order to get behind the Toyota Rav 4. According to Trooper Sutley, the Toyota slammed on its brakes causing Trooper Sutley to swerve into the emergency lane in order to avoid striking the vehicle. As a result of this action, the other vehicle swerved and nearly hit Trooper Sutley's vehicle. Trooper Sutley's vehicle then came to a stop in the emergency lane without activating its emergency lights. According to Trooper Sutley, the Toyota Rav 4 pulled off the roadway and stopped in front of his vehicle. Trooper Sutley then activated his emergency lights and after making sure the road was clear, approached the vehicle near the guard rail for safety. Trooper Sutley called the driver, identified as Esther SANDOVAL, to meet him in front of his vehicle. Trooper Sutley then asked SANDOVAL for her license and vehicle registration. According to Trooper Sutley, it then began to rain so he instructed SANDOVAL to sit in the front of his vehicle. Trooper Sutley stated that he then asked SANDOVAL if she had been drinking, which she responded "No". Trooper Sutley then asked SANDOVAL if there was a reason why she was driving all over the road, speeding up and slowing down, and stopped for no reason. According to Trooper Sutley, SANDOVAL stated that she did not understand. Trooper Sutley then asked SANDOVAL where she was heading and she responded that she was looking for a hotel. When Trooper Sutley asked SANDOVAL if she owned the vehicle, she responded "Yes". Trooper Sutley inquired if the address on.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

DEFENDANT'S
EXHIBIT

4

O F F I C I A L   U S E   O N L Y

| | |
|---|---|
| DEPARTMENT OF HOMELAND SECURITY<br>ICE<br><br>R E P O R T   O F   I N V E S T I G A T I O N<br>C O N T I N U A T I O N | 1. PAGE    4<br>2. CASE NUMBER MO16CS05M00043<br>3. REPORT NUMBER: 001 |

SANDOVAL's driver's license was correct. SANDOVAL stated "No" and wrote the current address on Trooper Sutley's warning book. When Trooper Sutley asked SANDOVAL where she was coming from, she stated that she did not know the name of the city in Florida. When Trooper Sutley inquired about the purpose of her trip to Florida, SANDOVAL stated that her brother was sick. Trooper Sutley again asked for the vehicle registration, SANDOVAL said to ask her brother who spoke English.

Trooper Sutley then approached the passenger side of the vehicle and asked the back seat passenger, later identified as Enrique ALCARAZ-Barajas, if he could speak English. ALCARAZ stated that he could speak English. Trooper Sutley then asked ALCARAZ for the vehicle registration. According to Trooper Sutley, ALCARAZ spoke to the front seat passenger, later identified as Mario MARTINEZ-Guillermo, in Spanish who provided the vehicle registration. According to Trooper Sutley then asked both ALCARAZ and MARTINEZ for identification. According to Trooper Sutley, ALCARAZ appeared to be nervous and breathing heavily. Trooper Sutley also stated that when ALCARAZ handed him his license his hands were shaking. When Trooper Sutley asked ALCARAZ if he was "Ok", he stated that he had been sick. Trooper Sutley then asked ALCARAZ where they were coming from and he stated Tampa, Florida. ALCARAZ then proceeded to make unsolicited statements, stating that he had been in Tampa, Florida on vacation and had become sick. ALCARAZ further stated that he had then called his sister, SANDOVAL, to come pick him up and they were heading back to Santa Ana, California. When Trooper Sutley asked ALCARAZ how he got to Tampa, Florida, he stated that he had traveled with friends. Trooper Sutley again asked MARTINEZ for identification and was provided a Pacificare Health Care card bearing the name of Mario G. Martinez. Trooper Sutley then asked MARTINEZ if he could drive and instructed him to pull the vehicle to the end of the guard rail for safety reasons. Trooper Sutley then moved his vehicle and began conducting vehicle, license and warrant checks on the occupants. Trooper Sutley then contacted Trooper W. Barnes and requested his assistance. Trooper Sutley then issued SANDOVAL a warning citation for impeding traffic and explained the warning to her. During this time, Trooper W. Barnes arrived on the scene. While waiting for the previously run checks to return, Trooper Sutley asked SANDOVAL the identities of the occupants of her vehicle. SANDOVAL stated "My brother and son-in-law". After receiving the NCIC information, Trooper Sutley asked SANDOVAL if there was any alcohol in the car which she said, "No". Trooper Sutley continued and asked if there were any drugs in the car and SANDOVAL again said, "No". During each of the questions Trooper Sutley asked SANDOVAL, she looked at him and answered but Trooper Sutley stated that when he asked if there was any money in the vehicle, SANDOVAL looked away and down and mumbled, "No". Trooper Sutley then asked SANDOVAL for consent to search the vehicle. Trooper Sutley stated that SANDOVAL looked at him and did not answer. Trooper Sutley again asked for consent to search the vehicle, SANDOVAL replied that her English was not good.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE  5 |
|---|---|
| R E P O R T   O F   I N V E S T I G A T I O N   C O N T I N U A T I O N | 2. CASE NUMBER MO16CS05M00043 |
|  | 3. REPORT NUMBER: 001 |

Trooper Sutley asked SANDOVAL if she could read Spanish and she said, "Yes". Trooper Sutley completed an Alabama Department of Public Safety consent to search form using the Spanish version. Trooper Sutley explained the form and instructed SANDOVAL to read it. Trooper Sutley allowed SANDOVAL time to read the form. SANDOVAL voluntarily signed the form granting consent to search the vehicle.

Trooper Sutley then approached the rear of the Toyota Rav 4. Trooper Barnes was at the vehicle speaking with ALCARAZ. Trooper Sutley asked ALCARAZ if he had luggage in the car. ALCARAZ said "Yes". Trooper Sutley then asked ALCARAZ for consent to search his luggage. ALCARAZ voluntarily gave oral and written consent to search his luggage. Trooper Sutley next asked MARTINEZ if he had any luggage in the car, which he responded "No". Trooper Sutley had the occupants exit the vehicle for officer safety prior to conducting the search. Subsequent to the search, Trooper Sutley located a black bag containing bundles of United States currency. Trooper Sutley also located a red duffle bag containing additional bundles of U.S. currency. Trooper Sutley then secured the two bags containing the U.S. currency in the trunk of his vehicle. Trooper Sutley then asked SANDOVAL who was the owner of the currency. SANDOVAL stated that she did not know. Trooper Sutley then asked ALCARAZ about the ownership of the money and he stated that he had found the money. Trooper Sutley said that when he asked MARTINEZ about the money, MARTINEZ acted that he had no knowledge of any money.

Trooper Sutley then contacted Alabama Bureau of Investigation (ABI) agent/HIDTA Task Force Officer (TFO) J. Herman and advised him of the seizure. Agent Herman responded to the scene and decided to have the vehicle and occupants transported to the State Trooper Automotive shop for further inspection because of the unpredictable weather associated with Hurricane Katrina.

Once at the Trooper shop, HIDTA TFO F. Aponte responded and utilized his narcotics detecting canine in searching the area near the vehicle and also the bags containing the U.S. currency. TFO Aponte advised that his canine gave a positive alert for the presence of a narcotic odor in the cargo area of the vehicle and also to the black bag containing the U.S. currency. U.S. Immigration and Customs Enforcement (ICE) Special Agent (S/A) D. Henderson arrived at the Automotive shop and witnessed the search conducted by TFO Aponte. SANDOVAL, MARTINEZ, ALCARAZ and the U.S. currency were then transported to the Montgomery, Alabama HIDTA office for further investigation.

Upon arriving at the HIDTA office, TFO Herman and TFO J. Hurst interviewed ALCARAZ. TFO Herman advised ALCARAZ of his constitutional rights, as per Miranda. ALCARAZ acknowledged his rights orally and in writing and proceeded

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

```
------------------------------------------------- ----------------------------
| DEPARTMENT OF HOMELAND SECURITY     | 1. PAGE     6                         |
|              ICE                     | ---------------------------------------
|                                      | 2. CASE NUMBER MO16CS05M00043        |
| R E P O R T  O F  I N V E S T I G A T I O N | -------------------------------
|       C O N T I N U A T I O N        | 3. REPORT NUMBER: 001                |
------------------------------------------------- ----------------------------
```

to give a voluntary statement. According to ALCARAZ, he found the money in Tampa, Florida about one month ago. ALCARAZ said that he was feeding ducks near a pond located by a Hampton Inn when he found a black plastic garbage bag. ALCARAZ stated that he did not look in the bag when he found it but did so the next day. ALCARAZ stated that the next day, he opened the bag, noticed that there were three bags inside of each other and that the innermost bag contained the bundles of currency. ALCARAZ continued and said that he took another plastic bag, placed the bags containing the money in that bag and hid the bag of money in the bushes near the Hampton Inn where he was staying. ALCARAZ then stated that he called his sister, SANDOVAL, and told her he needed a safe deposit box. ALCARAZ then stated that SANDOVAL flew from Anaheim, California to Tampa and acquired a safe deposit box at a branch of Bank of America somewhere in Tampa. ALCARAZ stated that he then took a Greyhound bus to his home in Tustin, California. ALARCAZ further stated that he stayed at his residence in California for about three weeks. ALCARAZ stated that he traveled to Tijuana, Mexico approximately ten days ago before returning back to Tampa, Florida about two days ago. ALCARAZ stated that he told SANDOVAL that he needed her to return to Tampa to open the safe deposit boxes. ALCARAZ stated that he had arrived in Tampa, Florida in the evening of August 27, 2005. According to ALCARAZ, SANDOVAL and MARTINEZ arrived in Tampa the next day. ALCARAZ further stated that he and SANDOVAL went to the Bank of America on August 29, 2005, where he got his sister to open the boxes and then took them to a room in the bank while SANDOVAL went outside. ALCARAZ stated that he put the money in the two bags that they were found in and placed them in the Toyota Rav 4 without SANDOVAL's or MARTINEZ's knowledge. ALCARAZ stated that all three of them then departed Tampa en route to Santa Ana, California. ALCARAZ then provided a written statement in Spanish relative to the currency.

U.S. Immigration and Customs Enforcement (ICE) S/A Henderson and Senior Special Agent (SS/A) B. Diamond then interviewed ALCARAZ concerning his immigration status. S/A Henderson had previously witnessed that ALCARAZ had been advised of his constitutional rights, as per Miranda. S/A Henderson asked ALCARAZ if he had understood his rights. ALCARAZ stated that he had understood and agreed to answer questions. ALCARAZ stated that he was born in Mexico but had since become a naturalized United States citizen. ALCARAZ further stated that he had become a naturalized U.S. citizen in Los Angeles, California during 1982. Subsequent checks of the Immigration system revealed that ALCARAZ has never been lawfully admitted into the United States. A review of the official file revealed an approved Immigration form I-130, Petition for Alien Relative, for ALCARAZ. S/A Henderson then confronted ALCARAZ with this information and he stated that he had lied about being a U.S. citizen. ALCARAZ further stated that he had lied because he is diagnosed with Acquired Immune Deficiency Syndrome (AIDS) and that he was residing in the United States illegally in order to obtain medication for his condition.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L  U S E  O N L Y

```
|--------------------------------------|-------------------------------|
| DEPARTMENT OF HOMELAND SECURITY      | 1. PAGE    7                  |
|           ICE                        |-------------------------------|
|                                      | 2. CASE NUMBER MO16CS05M00043 |
| R E P O R T  O F  I N V E S T I G A T I O N |-------------------------------|
|       C O N T I N U A T I O N        | 3. REPORT NUMBER: 001         |
|--------------------------------------|-------------------------------|
```

TFO Aponte and TFO Herman next interviewed SANDOVAL. TFO Aponte advised SANDOVAL of her constitutional rights, as per Miranda. SANDOVAL acknowledged her rights and proceeded to give a voluntary statement. SANDOVAL stated that she had no knowledge of the currency located in her vehicle. According to SANDOVAL, she arrived in Tampa about two days ago and was in Tampa to pick up her brother, ALCARAZ. SANDOVAL Stated she did not go to any banks, specifically the bank of America, while in Tampa, Florida. SANDOVAL did state that she has had an account with the Bank of America for the past 20 years. SANDOVAL stated that she had a safe deposit box at the Bank of America in the Garden Grove Branch but not in Tampa. SANDOVAL then requested to speak with an attorney and the interview was subsequently terminated.

S/A Henderson and SS/A Diamond questioned MARTINEZ concerning his immigration status. MARTINEZ stated that he was a native and citizen of Mexico and that he had never been lawfully admitted into the United States. MARTINEZ stated that he had been asked by his wife to call her aunt, SANDOVAL. MARTINEZ stated that SANDOVAL asked him to accompany her to travel from California to Florida to pick up ALCARAZ. MARTINEZ stated that they left California on Friday, August 26, 2005 and traveled for a couple of days to get to Florida. MARTINEZ stated that upon arriving in Florida they went to a hotel and picked up ALCARAZ. MARTINEZ stated that he slept most of the time and had no knowledge of the U.S. currency found in the vehicle. MARTINEZ then stated that he did not want to answer any further questions and the interview was terminated. SS/A Diamond placed MARTINEZ into immigration proceedings and served him with a Notice to Appear.

SANDOVAL, MARTINEZ and the vehicle were subsequently released. TFO R. Thornton released ALCARAZ's personal property to SANDOVAL. Upon releasing the property, TFO Thornton spoke with SANDOVAL who admitted that she understood English but had acted as if she did not because she was scared. The U.S. currency was seized by the Montgomery HIDTA office.

S/A Henderson then contacted the U.S. Attorney's office for the Middle District of Alabama. Assistant U.S. Attorney (AUSA) T. Brown authorized prosecution against ALCARAZ for violation of Title 18, United States Code, section 911, False Claim U.S. Citizenship. ALCARAZ was subsequently placed in the Montgomery City Jail.

On August 31, 2005, ALCARAZ appeared before U.S. Magistrate Judge C. Coody for his initial appearance and preliminary hearing. ALCARAZ was represented by attorney C. Freeman from the Federal Public Defenders office. Judge Coody found probable cause against ALCARAZ and remanded him to the custody of the U.S. Marshals. An Immigration Form I-247 Detainer was filed on ALCARAZ with the U.S. Marshals.

O F F I C I A L  U S E  O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

O F F I C I A L   U S E   O N L Y

| DEPARTMENT OF HOMELAND SECURITY ICE | 1. PAGE    8 |
|---|---|
| | 2. CASE NUMBER M016CS05M00043 |
| R E P O R T   O F   I N V E S T I G A T I O N C O N T I N U A T I O N | 3. REPORT NUMBER: 001 |

Investigation continues.

O F F I C I A L   U S E   O N L Y

THIS DOCUMENT IS LOANED TO YOU FOR OFFICIAL USE ONLY AND REMAINS THE PROPERTY OF THE DEPARTMENT OF HOMELAND SECURITY, ICE. ANY FURTHER REQUEST FOR DISCLOSURE OF THIS DOCUMENT OR INFORMATION CONTAINED HEREIN SHOULD BE REFERRED TO ICE HEADQUARTERS TOGETHER WITH A COPY OF THE DOCUMENT.

U.S. Department of Justice
Drug Enforcement Administration

## REPORT OF INVESTIGATION

Page 1 of 9

| 1. Program Code HIDTA | 2. Cross File | Related Files | 3. File No. KI-05-0058 | 4. G-DEP Identifier TGM2D |
|---|---|---|---|---|
| 5. By: Joe Herman  At: Montgomery, Alabama | ☐ ☐ ☐ ☐ ☐ | | 6. File Title ALCARAZ-BARAJAS, Enrique | |
| 7. ☐ Closed ☐ Requested Action Completed  ☐ Action Requested By: | | | 8. Date Prepared 08-31-2005 | |

9. Other Officers: S/A's W. Marshall Simons and Neill Thompson, TFO's John Hurst, Franscio Aponte, and Robert Thornton, ABI Agent Jim Roberts and ICE Agent S/A David Henderson

10. Report Re: Seizure of Exhibit 1 thru 3 and acquisition of Exhibit N-1 thru N-4.

### SYNOPSIS

This report details the seizure of $543,190.00 in United States currency from Enrique ALCARAZ-BARAJAS.

### DEFENDANT

ALCARAZ-BARAJAS, Enrique
16411 McFadden Avenue, Apartment 302
Tustin, California 92780
SSN: 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
DOB: 01-14-1956

SANDOVAL, Esther A.
1022 West Highland, Apartment 8
Santa Ana, California 92703
SSN: 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
DOB: 09-26-1954

MARTINEZ, GUILLERMO Mario
1265-B East 14th Street
Santa Ana, California 92701
SSN: None
DOB: 06-25-1976

DEFENDANT'S
EXHIBIT

3

### VIOLATIONS

| 11. Distribution: Division NOFD | 12. Signature (Agent)  Joe Herman | 13. Date 08-31-05 |
|---|---|---|
| District | 14. Approved (Name and Title) W. Marshall Simons Group Supervisor | 15. Date 08-31-05 |
| Other   SARI | | |

DEA Form    - 6
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
|---|---|---|
| (Continuation) | 3. File Title ALCARAZ-BARAJAS, Enrique | |

| 4. Page 2 of 9 | | |
|---|---|---|
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 | |

21 USC 881
18 USC 911 - False Claim United States Citizenship

**JUDICIAL DISTRICT**

United States, Middle District of Alabama

**DETAILS**

1.  On 08/29/2005 around 7:00pm, Trooper Sutley was parked in the median of Interstate 85 near the 18 mile marker in Montgomery, County, Alabama when he heard Trooper Wayne Dailey run a driver's license check which revealed Trooper Dailey's violator had a suspended driver's license. Trooper Dailey was north bound on I-85 near the 16 mile marker, and Trooper Sutley decided to back-up Trooper Dailey. As Trooper Sutley pulled out of the median, a small black SUV came by his car traveling southbound in the outside lane. As Trooper Sutley caught up to the vehicle near the 17 mile marker he noticed it was a Toyota RAV 4 and the vehicle was weaving within its lane. Trooper Sutley continued following the Toyota and noticed the Toyota dropped its speed to about 50 MPH, speed up to 60 MPH, and again reduce to 50 MPH. Trooper Sutley continued to observe the Toyota weave in its lane of travel while passing under the Exit 16 overpass.

2.  Trooper Sutley started to get behind the Toyota but noticed a Toyota Camry come up behind the RAV 4. According to Trooper Sutley, he could not safely make a lane change to get behind the RAV 4 and turned on his rear overhead blue lights for just a second to slow the Camry. Trooper Sutley continued to observe the RAV 4 weave and go from 50 MPH to 60 MPH. The Camry slowed down and as Trooper Sutley started to get over the RAV 4 slammed on its brakes causing Trooper Sutley to swerve into the emergency lane to avoid striking the RAV 4. As a result of this action, the Toyota Camry swerved and nearly hit Trooper Sutley's car. Trooper Sutley's vehicle came to a stop without its emergency lights on and the RAV 4 pulled in front and stopped in front of Trooper Sutley's Patrol car. Trooper Sutley activated his emergency lights and after making sure the

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.

U.S. Department of Justice
Drug Enforcement Administration

| | | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
|---|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | | 3. File Title ALCARAZ-BARAJAS, Enrique | |
| 4. Page 3 of 9 | | | |
| 5. Program Code HIDTA | | 6. Date Prepared 08-31-2005 | |

road was clear, got out and went to the front of his car and next to the guard rail for his safety.

3. Trooper Sutley called the driver, identified as Esther SANDOVAL, to him where he asked for her license and registration. Trooper Sutley said that it began to rain and asked SANDOVAL to sit in the front of Trooper Sutley's car. Trooper Sutley asked. SANDOVAL if she had been drinking and she said, "No." Trooper Sutley asked her why she was driving all over the road, speeding up and slowing down, and stopping for no reason.

4. Trooper Sutley continued his interview and asked routine questions relative to SANDOVAL's address which was different from her driver's license and about vehicle ownership. Trooper Sutley asked SANDOVAL for the registration and she said she did not understand. Trooper Sutley asked SANDOVAL her travel itinerary and SANDOVAL said she was coming from Florida but did not know what city and that her brother was sick.

5. Trooper Sutley subsequently approached the Toyota and asked the back seat passenger, Enrique ALCARAZ, if he could speak English and he said, "Yes." Trooper Sutley asked for the registration and ALCARAZ spoke in Spanish to the front seat passenger, Mario MARTINEZ. MARTINEZ pulled the registration from the passenger side window and handed the registration to Trooper Sutley over the back seat. Trooper Sutley asked ALCARAZ and MARTINEZ for identification at which time Trooper Sutley noticed ALCARAZ was breathing heavy and appeared nervous. According to Trooper Sutley, as ALCARAZ handed Trooper Sutley him his license, Trooper Sutley could see ALCARAZ's hand was shaking. Trooper Sutley asked ALCARAZ if he was OK and he said, "I've been sick." I asked ALCARAZ where they were coming from and he said, "Tampa." ALCARAZ then began talking voluntarily and on his own. ALCARAZ said he was in Tampa on vacation and became sick and that he called his sister in Santa Ana, California to come pick him up. According to ALCARAZ, he traveled to Florida with friends. Trooper Sutley next asked MARTINEZ for his identification.

6. When Trooper Sutley asked MARTINEZ for identification, he produced a Pacifcare health care card that had no picture but contained the name

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned

Previous edition dated 8/94 may be used.

16

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
|---|---|---|
| *(Continuation)* | 3. File Title ALCARAZ-BARAJAS, Enrique | |

| 4. Page 4 of 9 | |
|---|---|
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 |

Mario G. MARTINEZ. Trooper Sutley conducted a driver's license and registration check of SANDOVAL and her vehicle and called Trooper Will Barnes to the scene to assist. Trooper Sutley accomplished a warning citation for impeding the flow of traffic and explained the warning to SANDOVAL. It was about that point that Trooper Barnes arrived.

7.   While waiting for the NCIC information to return, Trooper Sutley asked SANDOVAL the identities of the occupants of her Toyota. SANDOVAL said, "My brother and son-in-law." After receiving the NCIC information, Trooper Sutley asked SANDOVAL if there was any alcohol in the car which she said, "No." Trooper Sutley continued and asked if there were any drugs in the car and SANDOVAL again said, "No." During each of the questions Trooper Sutley asked SANDOVAL, she looked at him and answered but when Trooper Sutley asked if there was any money in SANDOVAL's car, SANDOVAL looked away and down and mumbled, "No." Trooper Sutley asked SANDOVAL if he could search the car and SANDOVAL looked at Trooper Sutley and did not answer. Trooper Sutley asked permission to search again and SANDOVAL replied that her English was not good.  Trooper Sutley again asked SANDOVAL if she could read Spanish and she said, "Yes." Sutley completed an Alabama Department of Public Safety consent to search form using the Spanish version. Trooper Sutley explained the form to SANDOVAL and told her to read the form. Trooper Sutley gave SANDOVAL time to read the form and told SANDOVAL to sign at the bottom if she agreed. SANDOVAL subsequently signed the form.

8.   Trooper Sutley went to the back of the RAV 4 where Trooper Barnes was talking with ALCARAZ and asked ALCARAZ if he had luggage in the car. ALCARAZ said "Yes." And Trooper Sutley asked ALCARAZ for permission to search his luggage which ALCARAZ gave Sutley permission. Trooper Sutley added ALCARAZ's personal information to the same consent to search form and told ALCARAZ to read the form. After ALCARAZ read the form, Trooper Sutley asked ALCARAZ to initial by his name and sign if he agreed. ALCARAZ agreed and signed the form. Trooper Sutley next asked MARTINEZ if he had any luggage in the car and he said, "No." After removing the three occupants of the Toyota Rav 4, Trooper Sutley initiated his search.

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

U.S. Department of Justice
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
| | 3. File Title ALCARAZ-BARAJAS, Enrique | |
| 4. Page 5 of 9 | | |
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 | |

9.    During Sutley's search, he found a black opened cloth bag containing bundles of US currency and a red duffle bag that was beside the black bag. When Trooper Sutley tried to open the red duffle bag the zipper broke and the bag came open revealing more bundles of US currency. After finding the money, Trooper Sutley removed the bags and placed them in the trunk of his car.

10.    Trooper Sutley approached SANDOVAL and asked her whose money was in the car. SANDOVAL she said, "I don't know." Trooper Sutley then asked ALCARAZ about the money and ALCARAZ said he had found the money. Trooper Sutley said that when he asked MARTINEZ about the money, MARTINEZ acted that he had no knowledge of any money in SANDOVAL's vehicle.

11.    Alabama Bureau of Investigation Agent Joe Herman was notified about the traffic stop and potential money seizure and subsequently responded to the scene of the traffic stop. Upon arrival it was determined that the Toyota Rav 4 would be towed to the State Trooper Automotive shop for further inspection because of the unpredictable weather associated with Hurricane Katrina.

12.    At the Trooper shop, HIDTA TFO Francisco Aponte responded and using his drug detecting canine "sniffed" the area near the vehicle and also the bags that contained the money that was found in SANDOVAL's vehicle. Aponte's dog alerted positively for the presence of a narcotic odor in the black cloth bag containing some of the money and also in the luggage compartment of SANDOVAL's car. SANDOVAL, MARTINEZ, and ALCARAZ were transported to the Montgomery HIDTA office for further interviews. At the HIDTA office, ALCARAZ was interviewed first.

13.    Herman advised ALCARAZ of his rights as witnessed by Hurst using a standard United States Customs Service rights form. ALCARAZ acknowledged understanding his rights, waived his right to remain silent, declined legal counsel and agreed to answer question and be interviewed. According to ALCARAZ, he found the money in Tampa, Florida about one month ago. ALCARAZ said that she was feeding ducks near a pond located by a Hampton Inn when he found a black plastic garbage bag. ALCARAZ said that he did

DEA Form    - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

18

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
| --- | --- | --- | --- |
| (Continuation) | | 3. File Title ALCARAZ-BARAJAS, Enrique | |
| 4. Page 6 of 9 | | | |
| 5. Program Code HIDTA | | 6. Date Prepared 08-31-2005 | |

not look in the bag when he found it but did so the next day. ALCARAZ said that the next day, he opened the bag, noticed that there were three bags inside of each other and that the innermost bag contained the bundles of money. ALCARAZ continued and said that he took another plastic bag, placed the bags containing the money in that bag and hid the bag of money in the bushes near the Hampton Inn where he was staying. As stated by ALCARAZ, he called his sister (SANDOVAL) and told her he needed a safe deposit box. SANDOVAL subsequently flew from Anaheim, California to Tampa and acquired a safe deposit box at a Bank of America somewhere in Tampa. ALCARAZ said he then took a Greyhound bus to his home in Tustin and never said how SANDOVAL returned to California.

14.    ALARCAZ continued that he stayed at his California residence for about three weeks, went to Tijuana, Mexico about ten days ago and returned back to Tampa about two days ago. ALCARAZ provided that he told his sister (SANDOVAL) that he needed her to return to Tampa to open the safe deposit boxes. ALCARAZ said that he arrived in Tampa in the evening of August 27, 2005, and SANDOVAL and MARTINEZ arrived in Tampa and the next day, August 28, 2005. ALCARAZ said on August 29, 2005, he and SANDOVAL went to the Bank of America where ALCARAZ got his sister to open the boxes and took the boxes to a room in the bank. SANDOVAL went outside the bank while ALCARAZ stayed with the safe deposit boxes. ALCARAZ specified that he put the money in the two bags that they were found in and placed them in SANDOVAL's Toyota Rav 4 without neither SANDOVAL's nor MARTINEZ's knowledge. ALCARAZ said the three subsequently left Tampa for Santa Ana, California. ALCARAZ consequently accomplished a written statement in Spanish relative to his account of event surrounding the money. The interview with ALCARAZ concluded and Herman next interviewed SANDOVAL.

15.    TFO Aponte advised SANDOVAL of her rights as witnessed by Herman using a standard United States Customs Service rights form. SANDOVAL acknowledged understanding her rights, waived her right to remain silent, declined legal counsel and agreed to answer question and be interviewed. Using TFO Aponte for translation, SANDOVAL said that she knew nothing about the money found in her vehicle. At that point, ALCARAZ, and MARTINEZ left Tampa about 1:00pm or 2:00pm on August 29, 2005. According to

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
|---|---|---|
| (Continuation) | 3. File Title ALCARAZ-BARAJAS, Enrique | |

| 4. Page 7 of 9 | |
|---|---|
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 |

SANDOVAL, she arrived in Tampa about two days ago and was in Tampa to pick up her brother ALCARAZ.  SANDOVAL said she did not go to any bank or specifically the bank of America while in Tampa. SANDOVAL did acknowledge that she has had an account with the Bank of America for the past 20 years.  SANDOVAL acknowledged that she had a safe deposit box at the Bank of America in the Garden Grove Branch but not in Tampa. It was at this point in the interview when question were asked about safe deposit boxes that SANDOVAL requested legal counsel. The interview terminated and MARTINEZ was next interviewed by Immigration and Customs Enforcement agents S/A Blake Diamond and S/A David Henderson.

16.    S/A Henderson and S/A Diamond questioned MARTINEZ concerning his immigration status.  MARTINEZ stated that he was a native and citizen of Mexico and that he had never been lawfully admitted into the United States.  MARTINEZ stated that he had been asked by his wife to call her aunt, SANDOVAL.  MARTINEZ stated that SANDOVAL asked him to accompany her to travel from California to Florida to pick up ALCARAZ.  MARTINEZ stated that they left California on Friday, August 26, 2005 and traveled for a couple of days to get to Florida.  MARTINEZ stated that upon arriving in Florida they went to a hotel and picked up ALCARAZ.  MARTINEZ stated that he slept most of the time and had no knowledge of the U.S. currency found in the vehicle.  MARTINEZ then stated that he did not want to answer any further questions and the interview was terminated.  S/A Diamond placed MARTINEZ into immigration proceedings and served him with a Notice to Appear.  MARTINEZ was then released on his own recognizance.

17.    S/A Henderson and S/A Diamond then interviewed ALCARAZ concerning his immigration status.  ALCARAZ acknowledged that he had been advised of his constitutional rights, as per Miranda, and was willing to answer questions and make a voluntary statement.  Upon questioning, ALCARAZ stated that he had been born in Mexico, but was a naturalized United States citizen.  ALCARAZ further stated that he had been naturalized in Los Angeles, California during 1982.  Immigration checks revealed that ALCARAZ had never been lawfully admitted into the United States.  Subsequently, ALCARAZ admitted that he was a native and citizen of Mexico residing in the United States illegally.  ALCARAZ further stated that he had lied

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned

Previous edition dated 8/94 may be used

20

U.S. Department of Justice
Drug Enforcement Administration

| REPORT OF INVESTIGATION | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
|---|---|---|
| *(Continuation)* | 3. File Title ALCARAZ-BARAJAS, Enrique | |
| 4. Page 8 of 9 | | |
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 | |

because he is diagnosed with Acquired Immune Deficiency Syndrome (AIDS) and that he was residing in the United States illegally in order to obtain medication for his condition. The United States Attorney's office for the Middle District of Alabama was contacted and Assistant U.S. Attorney T. Brown authorized prosecution against ALCARAZ. ALCARAZ was arrested for violation of Title 18, United States Code, section 911, False Claim United States citizenship and subsequently placed in the Montgomery City Jail.

18.  On Wednesday, August 31, 2005, S/A Thompson and TFO Thornton took the seized currency to Sterling Bank where is was counted by bank officials and converted to a cashier's check made payable to the United States Marshal's Service Asset Forfeiture Fund. It was determined while counting the currency that the black cloth bag contained $160,280.00 and the red and black cloth bag contained $382,910.00.

## CUSTODY OF DRUG EVIDENCE

1.  Exhibit 1 is one vacuum sweep sample using KI-80 (Blank) and KI-90 (sample) and KI-92 (sample) of the seized currency S/A Greenwood acquired Exhibit 1 on 08-30-2005. On that same date, Agent Herman as witnessed by S/A Greenwood initialed, dated, and sealed Exhibit 1. Agent Herman maintained custody of Exhibit 1 pending submission to the DEA laboratory in Dallas, Texas for drug identification testing.

2.  Exhibit 2 is one vacuum sweep sample using KI-75 (Blank) and KI-76 (sample) of the black bag that contained the currency. S/A Greenwood acquired Exhibit 2 on 08-30-2005. On that same date, Agent Herman as witnessed by S/A Greenwood initialed, dated, and sealed Exhibit 2. Agent Herman maintained custody of Exhibit 2 pending submission to the DEA laboratory in Dallas, Texas for drug identification testing.

3.  Exhibit 3 is one vacuum sweep sample using KI-77 (Blank) and KI-79 (sample) of the red and black bag that contained the currency. S/A Greenwood acquired Exhibit 3 on 08-30-2005. On that same date, Agent Herman as witnessed by S/A Greenwood initialed, dated, and sealed Exhibit

**DEA SENSITIVE**
**Drug Enforcement Administration**

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used

U.S. Department of Justice
Drug Enforcement Administration

| | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 3. File Title ALCARAZ-BARAJAS, Enrique | |
| 4. Page 9 of 9 | | |
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 | |

3.  Agent Herman maintained custody of Exhibit 3 pending submission to the DEA laboratory in Dallas, Texas for drug identification testing.

<u>CUSTODY OF NON DRUG EVIDENCE</u>

1. Exhibit N-1 is $543,190.00 in United States Currency. On 08-31-2005, Agent Thornton and S/A Thompson converted Exhibit N-1 to a cashiers check, #4486840462 from Sterling Bank made payable to the United States Marshal's Service Asset Forfeiture Fund. Agent Herman subsequently took custody of Exhibit N-1 pending submission to the Seized Funds Custodian at the Montgomery DEA District Office.

1. Exhibit N-2 is one black cloth bag that contained United States currency and found during a search of SANDOVAL's vehicle on 08-29-2005. On that same date, Agent Herman took custody of Exhibit N-2. On 08-31-2005, Agent Herman as witnessed by Agent Hurst initialed, dated, and sealed Exhibit N-2. Herman subsequently maintained custody of Exhibit N-2 pending submission to the non-drug evidence custodian at the HIDTA office.

3.  Exhibit N-3 is one red and black cloth bag that contained United States currency and found during a search of SANDOVAL's vehicle on 08-29-2005.  On that same date, Agent Herman took custody of Exhibit N-3. On 08-31-2005, Agent Herman as witnessed by Agent Hurst initialed, dated, and sealed Exhibit N-3. Herman subsequently maintained custody of Exhibit N-3 pending submission to the non-drug evidence custodian at the HIDTA office.

4.  Exhibit N-4 is five safe deposit box keys that were found during a search of SANDOVAL's vehicle on 08-29-2005.  On that same date, Agent Herman took custody of Exhibit N-3. On 08-31-2005, Agent Herman as witnessed by Agent Hurst initialed, dated, and sealed Exhibit N-4. Herman subsequently maintained custody of Exhibit N-4 pending submission to the non-drug evidence custodian at the HIDTA office.

<u>INDEXING</u>

1. ALCARAZ-Barajas, Enrique: NADDIS #  2964903

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned

Previous edition dated 8/94 may be used.

22

**U.S. Department of Justice**
Drug Enforcement Administration

| | | |
|---|---|---|
| **REPORT OF INVESTIGATION** *(Continuation)* | 1. File No. KI-05-0058 | 2. G-DEP Identifier TGM2D |
| | 3. File Title ALCARAZ-BARAJAS, Enrique | |
| 4. Page 10 of 9 | | |
| 5. Program Code HIDTA | 6. Date Prepared 08-31-2005 | |

2. SANDOVAL, Esther A.: NADDIS Negative, aka ALCARAZ-Barajas, Esther, H/F, l/k/a: 1022 West Highland, Apartment 8, Santa Ana, California 92703, SSN: 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, DOB: 09-26-1954, FBI# 657922V7, HT: 5'2", WT: 160, brown eyes, brown hair, POB: Colima, Mexico, CADL: N306217.

3. MARTINEZ-Guillermo, Mario, NADDIS: Negative, H/M, l/k/a: 1265-B East 14th Street, Santa Ana, California 92701, SSN: None, DOB: 06-25-1976, HT: 5'8", WT: 150, brown eyes, brown hair, POB: Mexico.

DEA Form     - 6a
(Jul. 1996)

**DEA SENSITIVE**
Drug Enforcement Administration

This report is the property of the Drug Enforcement Administration.
Neither it nor its contents may be disseminated outside the agency to which loaned.

Previous edition dated 8/94 may be used.