IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| PLAINTIFF, | ) | |
| | ) | |
| v. | ) | CASE NO.: 2:06-cv-116-MEF |
| | ) | |
| FIVE HUNDRED FORTY-THREE | ) | |
| THOUSAND ONE HUNDRED NINETY | ) | (WO - Recommended for Publication) |
| DOLLARS ($543,190.00) IN UNITED | ) | |
| STATES CURRENCY, | ) | |
| | ) | |
| DEFENDANT. | ) | |

# <u>MEMORANDUM OPINION AND ORDER</u>

In this action for Forfeiture *In Rem* pursuant to Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq*., the United States seeks to forfeit and condemn $543,190 in United States currency seized during a traffic stop. Enrique Alcaraz-Barajas ("Alcaraz-Barajas"), the man from whom this sum was seized, opposes the seizure and asserts, what he contends is a lawful claim to the money. The threshold issue before the Court is whether Alcaraz-Barajas has the requisite Article III standing to challenge the forfeiture. For reasons set forth in this Memorandum Opinion and Order, the Court conducted an evidentiary hearing on the issue. Having considered all the evidence before the Court with the applicable legal standards in mind, the Court finds that there is no credible evidence that Alcaraz-Barajas has an interest in the defendant currency sufficient to create in him Article III standing to challenge the forfeiture. Accordingly, the Court will dismiss his claim.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the lawsuit pursuant to 28 U.S.C. §§ 1345 and 1355.[1]  Venue is proper in this district pursuant to 28 U.S.C. § 1395 and 21 U.S.C. § 881(j) because the act or omissions giving rise to the forfeiture occurred in this district and the property is located within this district.

## FACTUAL BACKGROUND[2]

On August 29, 2005 Alcaraz-Barajas, his sister Esther Sandoval ("Sandoval")[3], and another person were in a vehicle traveling on an Interstate 85 near the Montgomery/Macon

---

[1]  Pursuant to 28 U.S.C. § 1345, "the [federal] district courts shall have original jurisdiction of all civil actions, suits or proceedings commenced by the United States . . . " In addition, 28 U.S.C. § 1355(a) provides that "the [federal] district courts shall have original jurisdiction, exclusive of the courts of the States, of any action or proceeding for the recovery or enforcement of any fine, penalty, or forfeiture, pecuniary or otherwise, incurred under any Act of Congress, except matters within the jurisdiction of the Court of International Trade under section 1582 of this title."

[2]  The factual background is predicated on the exhibits offered into evidence by Alcaraz-Barajas at the January 29, 2008 evidentiary hearing.  All of Alcaraz-Barajas' exhibits were previously filed with the Court.  Those exhibits were: Sutley's deposition testimony (Doc. # 73 at Ex. C); Sandoval's November 7, 2007 affidavit (Doc. # 73 at Ex. B); Alcaraz-Barajas' November 7, 2007 affidavit (Doc. # 73 at Ex. A); Alcaraz-Barajas' May 2, 2006 claim (Doc. # 7); Alcaraz-Barajas' December 22, 2005 claim (Doc. # 54-5).  The Court has also considered a document Alcaraz-Barajas admits he signed which states that it was made under oath and subject to the penalty of perjury, namely the December 29, 2005 claim prepared by Carter as his attorney.  (Doc. 54-5 at Ex. A-16.)  This document was properly admitted into evidence as part of the DEA file and authenticated by a declaration from the Forfeiture Counsel of the DEA.  The Court has also considered portions of that declaration establishing information about which claim forms the DEA received and when it received them.  Background information about Alcaraz-Barajas' arrest and deportation is not disputed by Alcaraz-Barajas and is taken from the Verified Complaint.

[3]  Sandoval was driving.

2

County line.  An Alabama State Trooper Andy Sutley ("Sutley") was on patrol in his official vehicle.[4]  As Sandoval's vehicle was passing, Sutley crossed the median to change the direction of his patrol.  This put him in the southbound lanes of Interstate 85 somewhere behind the vehicle in which Alcaraz-Barajas was traveling.  Sutley observed that the vehicle in which Alcaraz-Barajas was riding dropped its speed to a speed well below the legal limit.  It also appeared to Sutley that the vehicle was weaving back and forth.  In Sutley's experience the behavior of the driver of this vehicle was unusual.  Sutley followed the vehicle for awhile observing additional weaving.  Sutley's trooper car was in the left lane and the other vehicle was in the right lane.  Sutley was preparing to initiate a traffic stop to see if the driver of the vehicle was impaired.  Before he could do so another vehicle was approaching him rapidly from behind.  In order to prevent a collision and to cause that vehicle to slow down, Sutley activated the rear lights on his trooper car.

Sandoval saw the lights and a law enforcement vehicle behind her.  She did not believe she had violated any traffic laws, but she pulled over to the side of the road and parked her vehicle.  Because of the way Sandoval pulled over, Sutley believed she had committed a moving violation by impeding the flow of traffic.  Sutley approached the vehicle and asked Sandoval if she was okay.   He also asked for her driver's license and the

_____

[4] Sutley's account of the encounter is taken from his deposition testimony which Alcaraz-Barajas submitted to the Court and again offered Sutley's deposition into evidence at the January 29, 2008 evidentiary hearing.  *See* Doc. # 73 at Ex. C.  The Court notes that this deposition was taken by counsel for Alcaraz-Barajas.  Thus, the testimony was effectively a cross examination of Sutley.

paperwork on the vehicle.

In Sutley's opinion, Sandoval seemed very jittery and nervous. Sandoval responded to Sutley's questions in English. He spoke with her briefly behind her car, but then due to rain he asked her to sit in his car while he checked on her California driver's license and registration. She could not tell him where she was coming from in Florida. She said she was headed back to California.[5] In affidavits filed after the initiation of this lawsuit, Sandoval and Alcaraz-Barajas both contend that they were traveling from Tampa, Florida to Montgomery, Alabama because of Hurricane Katrina.[6] They have not claimed that they told Sutley this during the traffic stop.

Sutley wrote Sandoval a warning ticket. While he was waiting for the information check, he asked her if she had anything illegal in her vehicle. He tried to ask his questions in a mix of English and Spanish, using Spanish for key words. He asked if she had been drinking or if there was alcohol in her car. She looked at him and said "No." He asked if

---

[5] According to Sutley at some point during the roadside encounter Alcaraz-Barajas stated that he was sick and was HIV positive and that he had called his sister from California to drive to Florida to pick him up.

[6] After forming over the Bahamas on August 23, 2005, Hurricane Katrina crossed southern Florida as a moderate Category 1 hurricane on August 25, 2005. The area around Tampa, Florida was not under either a mandatory or a voluntary evacuation order. By August 28 and August 29, the National Weather Service's National Hurricane Center was forecasting only a one percent chance that Hurricane Katrina would come within 65 nautical miles of Tampa, Florida. On the other hand, by August 28 and August 29, the National Weather Service's National Hurricane Center was forecasting an eight percent chance that Hurricane Katrina would come within 65 nautical miles of Mobile, Alabama, which is only a few hours south of Montgomery County, Alabama.

there were drugs in the car.  Again she looked at him and said "No."  He asked if there was any money in the vehicle.  She looked away and did not answer.  He repeated the question. She replied that her English was not that good.

Sutley gave Sandoval a consent to search form seeking consent to search her vehicle. She went to get her glasses out of her vehicle and then she read and signed the form.  She contends that she signed it because she did not believe she could refuse.  Sutley observed several bags in the luggage compartment at the back of Sandoval's sport utility vehicle. Sutley asked Alcaraz-Barajas if he had any luggage in the vehicle and he indicated that he did.  The other passenger in the vehicle indicated that he had no luggage.  Sutley had Alcaraz-Barajas sign a consent to search form as well.  Sutley then searched the vehicle for weapons, drugs and illegal money.  When Sutley opened the back door of the vehicle and began to remove some of the bags, one of the bags in the car fell over.  When the bag fell, the zipper broke and money started to fall out of the bag.  Sutley opened the bag beside it and saw that it was full of money.  He put the bags of money in the trunk of his trooper car.

Sutley asked Sandoval if the money was hers, but she said she knew nothing about it. Sutley asked Alcaraz-Barajas about who the money belonged to and Alcaraz-Barajas responded that he found the money.  Sutley then called Agent Herman of the Alabama Bureau of Investigations.  Because the rain had become quite heavy, Sutley called for a tow truck to tow the vehicle to a place where the search could be completed out of the rain.

Sutley, two other troopers called for backup, the tow truck and the occupants of the

5

vehicle proceeded to the auto shop at the trooper post on Coliseum Boulevard in Montgomery, Alabama. Law enforcement officers then completed the search of the vehicle. During the search, they found a drill in the cargo area of the vehicle. The bit on the drill fit the screws on the back of the seat. Those screws and the screws around the back lights were "tooled up" meaning that they have been taken on and off several times. The areas behind the screws had large natural voids. The cloth on the back of the seat appeared stretched. A drug dog alerted to these areas. Sutley turned the currency he found in the car over to law enforcement officers with HIDTA.

According to the United States, law enforcement seized $543,190 in U.S. Currency from a vehicle in which Alcaraz-Barajas was traveling. While Alcaraz-Barajas has filed three claims under oath in which he indicated that the amount of United States currency seized from him was $543,190, in his November 7, 2007 affidavit, he claimed that the amount of currency seized was more than $700,000. *Compare* Doc. # 54-5, Doc. # 27-2, and Doc. # 7 *with* Doc. # 73-2. As a result of an immigration check, the Alabama State Trooper discovered that Alcaraz-Barajas had never been lawfully admitted into the United States. When this was discovered, the Alabama State Trooper arrested Alcaraz-Barajas and took him into custody.

A grand jury indicted Alcaraz-Barajas on a charge that he falsely and willfully represented himself to be a citizen of the United States in violation of 18 U.S.C. § 911. Jerome Carter ("Carter") was retained to serve as counsel for Alcaraz-Barajas in his criminal

case.  On November 3, 2005, Alcaraz-Barajas entered into a plea agreement with the United States and pled guilty to the sole charge against him.  As part of this plea agreement, Alcaraz-Barajas agreed to submit to federal immigration authorities for deportation.  On January 20, 2006, Alcaraz-Barajas was sentenced to time served for this offense.  Alcaraz-Barajas was deported out of the United States on April 4, 2006.

During the time he was being held in custody in Montgomery, Alabama, Alcaraz-Barajas submitted two claims with the Drug Enforcement Administration ("DEA").  On December 30, 2005, the DEA received a document entitled "Notice of Claim of Mr. Enrique Alcaraz-Barajas."  This claim was delivered to the DEA by Carter on behalf of Alcaraz-Barajas. Alcaraz-Barajas' signature[7] on the document, which was dated December 29, 2005, is notarized.  The Notice of Claim includes references to the DEA asset ID number and case number assigned to the August 29, 2005 seizure of the currency.  It identifies the property seized as being U.S. Currency in the amount of $543,190.  It identifies the place of the seizure as Montgomery Alabama.  It indicates that Alcaraz-Barajas was both the owner of the seized money and the person from whom it was seized.  In this Notice of Claim, Alcaraz-Barajas states the following:

> Comes Now **ENRIQUE ALCARAZ-BARAJAS** and files this notice of claim on seized U.S. Currency in the above referenced matter and states the claim as follows:
> That late July 2005, I noticed a black plastic garbage bag near a pond

---

[7]  The signature "Enrique Alcaraz-B" appears above a line under which is typed "Enrique Alcaraz-Barajas."

outside a Hampton Inn in Tampa, Florida.  Believing it to be abandoned, I moved the bag to some bushes outside the hotel.  The next day, I looked inside to find bundles of U.S. currency.  I made arrangements to secure the money in safe deposit boxes at a Tampa bank.

The money was later seized by Alabama State Troopers after a traffic stop in Montgomery, Alabama.  When asked about the money I explained to the officers that I found the money.  Upon additional interrogation, I was charged with impersonating a U.S. citizen.  A complete search of the vehicle was completed without incident.

I did not file a report with the local police or attempt to locate the owner of the lost money.  I was unsure of the process of staking a claim in relation to the currency, bu would have if I had known there was a process for doing so.

I now, under oath and in fear of perjury, claim my interest in the money as finder of lost currency.  I will waive any interest to the true and rightful owner should one come forward with proof of a superior claim.

Doc. 54-5 at Ex. A-16.

On January 3, 2006, the DEA received a second claim for seized property which purported to be signed by Alcaraz-Barajas and which was filed through the attorney who is now counsel of record for Alcaraz-Barajas in this case, Bruce Maddox ("Maddox").  This Claim is dated December 22, 2005.  It refers to the same DEA asset ID number as the Notice of Claim dated December 29, 2005.  The December 22, 2005 Claim states:

Before me the undersigned authority came Enriqu [sic] Alcaraz-Barajas, who under oath gives the following statement:

1. My name is Enriqu [sic] Alcaraz-Barajas.  I make this claim pursuant to Rule C (6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, for any interest in **$543,190 U.S. Currency,** Identification Number **05-DEA-456576**, made subject of this action for the forfeiture pursuant to Title 18, Unites [sic] States Code (U.S.C.) Section 983(a)(2), and/or Title 21, United States code [sic] (U.S.C.) Section 881 (a)(6) and/or Title 28, United States Code (U.S.C.) Sections 1345 and 1355.

8

> 2. On the date of seizure a total of **$543,190 U.S. Currency** was taken, which I hereby claim.
> 3. I am entitled to the lawful possession of said property, because I lawfully possessed said property at the time of seizure and I lawfully own an interest in same.

Doc. 54-5 at Ex. A-18(emphasis in original). This document bears Alcaraz-Barajas' signature[8] which, according to the document, was notarized in Montgomery, Alabama on December 22, 2005.

In addition to these two claims filed with the DEA, Alcaraz-Barajas filed a claim to the $543,190 in this civil action on May 12, 2006. Although he had been deported in April of 2006, this claim form purports to have been notarized in Orange County, California. The Claim set forth the following:

> Before me the undersigned authority came Enrique Alcaraz-Barajas, who under oath gives the following statement.
> 1. My name is Enrique Alcaraz-Barajas. I make this claim pursuant to Rule C(6) of the Supplemental Rules for Certain Admiralty and Maritime Claims of the Federal Rules of Civil Procedure, for any interest in **$543,190 U.S. Currency**, which the Drug Enforcement Administration seized for forfeiture pursuant to Title 21, United States Code (U.S.C.) Section 881, and which is the subject of this action.
> I am entitled to the lawful possession of said property, because I lawfully possessed said property at the time of the seizure and I lawfully own an interest in same.
> **DATED this the 2nd day of May 2006.**

(Doc. # 7; emphasis in original). The document is signed "Enrique Alcaraz-B" over the

---

[8] The signature appears to say "Enrique Alcáraz." It appears above a line under which is typed "Enriqu Alcaraz-Barajas."

typed name "Enrique Alcaraz-Barajas." *Id.* The Notary Public's block indicated that Alcaraz-Barajas appeared before her in the State of California. *Id.*

On November 7, 2007, it appears that Alcaraz-Barajas appeared in front of the same Notary Public in Orange County, California and signed an affidavit. Doc. # 73-2. In this affidavit, Alcaraz-Barajas stated for the first time that the currency he was transporting in his sister's vehicle was money that he had taken from a bank in Florida, where he had earlier placed it when he intended to open a business in Tampa. *Id.* He stated that the total of the money was more than $700,000. *Id.* He admitted that he had lied to law enforcement in August of 2005, both when he told members of law enforcement that he was a citizen of the United States and when he told them that he had found the money in Florida. *Id.* In the November 7, 2007 affidavit, Alcaraz-Barajas stated that he earned the money while living and working in the United States illegally for thirty years. *Id.* He claimed that he had owned and operated hair businesses and that he built and sold several such businesses. *Id.* He said that he did not put money in the bank because he was not a citizen and he feared that it might be taken. *Id.*

In his November 7, 2007 affidavit, Alcaraz-Barajas stated that Carter presented this document to him and told him to sign it to get his money back. *See* Doc. # 73-2. Alcaraz-Barajas further stated that he signed it at the jail without a notary public being present and that he did not read the document before signing it. *Id.* Alcaraz-Barajas speculated that Carter must have simply put in writing what Barajas had told police when he was arrested.

10

*Id.* Alcaraz-Barajas stated that he did not authorize Carter to file the document in this forfeiture case,[9] and he only had authorized his current counsel to file a claim for him. *Id.*

## PROCEDURAL HISTORY

On February 7, 2006, the United States Attorney's Office for the Middle District of Alabama filed a Verified Complaint for Forfeiture in Rem (Doc. # 1) seeking to forfeit and condemn to the use and benefit of the United States of America $543,190 in United States currency alleged to have been seized from Alcaraz-Barajas on August 29, 2005, for violations of Title II of the Controlled Substances Act, 21 U.S.C. § 801 *et seq.* On February 27, 2006, this court entered an Order for Warrant for Arrest of Property (Doc. # 2) and ordered that the Government serve a copy of the Warrant, Summons, and Verified Complaint for Forfeiture in Rem on all persons known or thought to have an interest in or right against the currency.

On May 12, 2006, Maddox filed a notice of appearance (Doc. # 6) as counsel of record in this action. On that same date, Alcaraz-Barajas filed a Claim (Doc. # 7).[10] While somewhat more abbreviated, the substance of the May 2, 2006 Claim is essentially the same as that of the December 22, 2005 Claim: namely, that Alcaraz-Barajas is entitled to the

---

[9] For the sake of clarity, the Court notes that Carter did not file the claim in this case, but he did file the claim form with the DEA. The United States presented the DEA's file as part of its evidence.

[10] The Claim was signed by "Enrique Alcaraz-B" before a Notary at large for the State of California on May 2, 2006, after Alcaraz-Barajas had been deported. The Claim does not indicate where the document was signed.

lawful possession of the currency because he lawfully possessed it at the time of the seizure and because he lawfully owns an interest in it.   On June 1, 2006, Alcaraz-Barajas filed an Answer (Doc. # 11) and a Motion to Dismiss (Doc. # 10), which this Court denied (*see* Doc. # 21).

Under the Federal Rules of Civil Procedure, the parties were free to commence discovery in this case after they conducted their parties' planning meeting in November of 2006.[11]  This case was initially set for trial on September 17, 2007.  As early as November 16, 2006, the date on which this Court issued its first Uniform Scheduling Order (Doc. # 25), the parties were on notice that dispositive motion, supported by appropriate evidentiary submissions, were due to be filed no later than May 18, 2007.  Nevertheless, it appears that Alcaraz-Barajas failed to conduct the discovery he knew he would need by the May 18, 2007 dispositive motion deadline.

On April 23, 2007, the United States filed a motion for summary judgment (Doc. # 26).  The Court entered a scheduling order for the motion setting a deadline for Alcaraz-Barajas to submit evidence and argument in opposition to the United States' motion for summary judgment.  In its motion, the United States argued that it was entitled to summary judgment for the following reasons: (1) Alcaraz-Barajas lacked Article III standing to contest the forfeiture; (2) Alcaraz-Barajas lacked statutory standing to contest the forfeiture; (3)

---

[11]  Of course, the parties could have conducted discovery even earlier by agreement or by seeking leave of court.

Alcaraz-Barajas should not be allowed to contest forfeiture based on a wholly implausible or patently untrue claim to the money. Alcaraz-Barajas filed an opposition to this motion, but in so doing, failed to address the standing arguments at all. Instead, Alcaraz-Barajas incorrectly argued that the motion to suppress he filed on May 14, 2007, should be decided before the United States' motion for summary judgment. Alcaraz-Barajas also moved to strike some of the United States' evidentiary submissions in support of its summary judgment motions.

On May 18, 2007, Claimant Enrique Alcaraz-Barajas filed a conclusory Motion for Summary Judgment (Doc. # 37). This motion was not supported by a brief or proper legal argument, nor was it supported by *any* evidentiary submissions. Indeed, in this motion Claimant Enrique Alcaraz-Barajas requested the Court to "hold" the motion pending "further discovery, filings, and ruling." This request is a rather surprising one given that the November 16, 2006 Uniform Scheduling Order (Doc. # 25) clearly states:

> Any dispositive motions, i.e., motions to dismiss or motions for summary judgment, shall be filed no later than **May 18, 2007**. A brief and all supporting evidence shall be filed with any such motion.

In the Court's view, the Uniform Scheduling Order made it quite plain that a litigant should not plan on filing a bare-bones motion by the deadline and submitting briefs or evidence in support of it at a later date.

The United States filed responses in opposition to all of Alcaraz-Barajas' motions. On June 1, 2007, the United States filed a motion to stay adjudication (Doc. # 44) of all

issues in the case until after the Court decided the threshold issue of standing. In this motion, the United States included citations to binding legal precedents that made it plain that this Court must decide standing before reaching any other issue in the case. Alcaraz-Barajas moved the Court to stay its decisions on the pending motions so that he could engaged in further discovery and noted that his inability to enter the United States was hampering his ability to pursue this litigation. *See* Doc. # 47.

Faced with incomplete and deficient summary judgment submissions and other issues and Alcaraz-Barajas' prayer for relief based on logistical problems, the Court entered and Order (Doc. # 50) that denied all pending motions and continued the case to a later trial term. The Court intended to allow the parties an opportunity to conduct further discovery and resubmit proper motions at a later date. In so doing, the Court advised the parties that the factual record before it was woefully inadequate and that, in its view, the parties had failed to offer appropriate legal argument in support of many of their requests for relief. *See* Doc. # 50. Furthermore, the Court specifically cautioned the parties about future submissions in support of motions for summary judgment:

> The Court encourages the parties to think carefully about the content of the dispositive motions before filing them. The Court expects all further briefs submitted in support of and in opposition to any motion filed in this case to contain carefully researched and clearly articulated arguments based on properly cited legal authorities. *The Court further expects that motions for summary judgment will be supported by appropriate evidentiary submissions.*

Doc. # 50 (emphasis added). On June 11, 2007, the Court entered a new Uniform Scheduling

14

Order (Doc. # 51) setting a deadline of October 5, 2007 for the filing of dispositive motions, properly supported by briefs and evidentiary submissions.

On August 14, 2007, the United States filed its second motion for summary judgment. *See* Doc. # 53 & Doc. # 54.  Relying on evidentiary materials not previously submitted, the United States argued, as it had in its earlier motion for summary judgment, that Alcaraz-Barajas lacked Article III standing to challenge the forfeiture.  The Court set a deadline for Alcaraz-Barajas' response to the motion.

After securing an extension of time for his response, he submitted a brief in opposition (Doc. # 60) to the United States' motion on September 18, 2007.  Once again Alcaraz-Barajas filed a motion to strike (Doc. # 61) certain evidence and once again  Alcaraz-Barajas argued that the suppression issues should be decided before the standing issue.  Not surprisingly, he cited no legal authority for this contention, which is contrary to established law.  Alcaraz-Barajas also argued that he had found the money and that under Alabama law that was sufficient to give him an ownership interest sufficient for to satisfy the requirements of Article III standing.

For reasons this Court cannot fully fathom, on October 5, 2007, the deadline for dispositive motions, Claimant Enrique Alcaraz-Barajas filed another conclusory motion for summary judgment (Doc. # 70) without a supporting brief and without supporting evidentiary materials.  This motion failed to comply with the requirements of the Uniform Scheduling Order or the Court's Order (Doc. # 50) of June 11, 2007.  The Motion also sought summary

15

judgment in favor of the Claimant pursuant to Federal Rule of Civil Procedure 56.1, a rule that does not exist in the Federal Rules of Civil Procedure.  At the same time that Claimant Enrique Alcaraz-Barajas filed his second deficient summary judgment motion, he filed a Motion for Expansion of Time to File Supporting Documents (Doc. # 69).  By this motion, he sought an additional forty-five days to file documents relating to all pending motions, but asked that the current trial setting remain.  Alcaraz-Barajas predicated the requested delay on the fact that the deposition the arresting officer, whose identity had long been apparent to all concerned, was not taken until October 3, 2007.  Consequently, the deposition transcript was not available at the time Alcaraz-Barajas filed his motion.  Alcaraz-Barajas failed to address why this deposition was not taken sooner.  This Court granted Alcaraz-Barajas some relief in that it extended the deadline for him to file a brief in support of his motion for summary judgment and  evidentiary submissions in support of that motion by November 9, 2007.  *See* Doc. # 71.

On November 9, 2007, Alcaraz-Barajas filed his evidentiary submissions in support of his motion for summary judgment.  These submissions were: the deposition of the arresting officer, an affidavit from Alcaraz-Barajas' sister, and an affidavit from Alcaraz-Barajas dated November 7, 2007.  *See* Doc. # 73.  Inexplicably, Alcaraz-Barajas failed to submit any brief in support of his October 5, 2007 motion for summary judgment.

While the affidavits of Alcaraz-Barajas and his sister[12] filed with the Court on November 9, 2007 appeared to have been submitted in support of Alcaraz-Barajas' motion for summary judgment, the Court could not help notice that they contained facts which were relevant to the Article III standing issue pending before the Court. Specifically, Alcaraz-Barajas, who had long contended that he had found the defendant currency outside a hotel in Florida, now claimed that he had earned the money through operating and selling certain businesses during a thirty year period. *See* Doc. # 73-2. He also claimed for the very first time that the amount of money seized from him was not $543,190, as he had previously stated under oath on three occasions (*see* Doc. # 7, Doc. # 27-2, and Doc. # 54-5), but rather that more than $700,000 in United States currency had been seized from him during the traffic stop. *See* Doc. # 73-2.

On November 26, 2007, the Court issued a Memorandum Opinion and Order (Doc. # 74). In this decision, the Court agreed with the United States that the issue of Article III standing must be decided before any other issues in the case including the suppression issue. The Court explained that in its view Article III standing is a question of law for the Court rather than a matter for a jury. The Court further found that in the circumstances of this case standing could not be decided without an evidentiary hearing. Specifically, the Court explained that Alcaraz-Barajas' conflicting statements about the factual basis for his claim

---

[12] Sandoval's affidavit, which was signed on the same date as Alcaraz-Barajas' affidavit and notarized by the same Notary Public, is in many respects identical in substance to Alcaraz-Barajas' affidavit.

of ownership in the defendant currency required the Court to make a credibility determination about when, if ever Alcaraz-Barajas was telling the truth. The Court advised the parties that at the evidentiary hearing they would be "expected to offer admissible evidence establishing how Alcaraz-Barajas came to possess the defendant property." Doc. # 74.

On January 29, 2008, the Court convened the evidentiary hearing. Alcaraz-Barajas appeared through counsel only. His counsel elected not to present new evidence or live testimony at the hearing. Instead he relied on exhibits previously submitted to the Court, including Alcaraz-Barajas' affidavit of November 7, 2007. The United States did not present any evidence or testimony at the hearing, but it did persist in its argument that Alcaraz-Barajas had not demonstrated that he has Article III standing. Indeed, at the hearing, both Alcaraz-Barajas and the United States presented further argument to the Court on the issue of Article III standing. Additionally, Alcaraz-Barajas' counsel submitted a lengthy brief on the eve of the hearing further outlining his arguments on the Article III standing issue.

## DISCUSSION

The civil forfeiture statute invoked by the United States in this case operates to allow a court to declare any property which is involved in certain types of illegal transactions to be forfeitable to the government. *See United States v. $557,933.89*, 287 F.3d 66, 77 (2nd Cir. 2002). The justification for such a law is that such property is either the proceeds of illegal transactions or somehow being used to facilitate illegal transactions. *Id.* In an action such

as this one, the government is the plaintiff and the property is the defendant. *Id.* at 79. It is the government's right to forfeiture that is the sole cause of action adjudicated. *Id.* If the government fails to meet its burden of proof, a person with a proper claim to the defendant property may take the property without presenting any evidence. *Id.*

Standing is a threshold issue in a forfeiture case. *Id.* at 78. "The function of standing in a forfeiture action is therefore truly threshold only - to ensure that the government is put to its proof only where someone with a legitimate interest contests the forfeiture." *Id.* at 79. The Eleventh Circuit Court of Appeals put it this way,

> [i]t is well established that in order to contest a forfeiture, a claimant must first demonstrate a sufficient interest in the property to give him Article III standing; otherwise, there is no case or controversy, in the constitutional sense, capable of adjudication in the federal courts.

*United States v. $38,000 in U.S. Currency*, 816 F.2d 1538, 1543 (11th Cir. 1987) (citations omitted). If a claimant does not have Article III standing, then the court lacks jurisdiction to consider his claim, including any challenges he has to the events relating to the seizure of the property at issue. *Id.* Thus, Eleventh Circuit precedent requires this Court to address whether Alcaraz-Barajas has standing before addressing whether the seizure of the currency was lawful.[13] *See, e.g., United States v. $38,000 in U.S. Currency*, 816 F.2d at 1543; *United*

---

[13] Alcaraz-Barajas cited no legal authority for his contention that the issue of standing is to be determined after deciding whether the money is appropriately before the Court or after addressing his motion to suppress. Similarly, he cites no legal authority for his contention that the Government must prove that forfeiture is justified before attacking his standing. The Court finds these contentions wholly inconsistent with binding precedent from

*States v. Five Hundred Thousand Dollars*, 730 F.2d 1437, 1439 (11th Cir. 1984); *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars*, 661 F.2d 319, 326 (5th Cir. Unit B Nov. 13, 1981).[14]

Standing is a question of law for the court to decide; it is not a question of fact for the jury. *United States v. $557,933.89,* 287 F.3d at 78. Alcaraz-Barajas' unsupported assertion that the standing issue is one which a jury must resolve is incorrect.

Importantly, it is the claimant's burden to establish standing. *United States v. $38,000 in U.S. Currency*, 816 F.2d 1543 at n.11. *Accord, United States v. $1,231,100 in U.S. Currency*, 999 F.2d 1503, 1505 (11th Cir. 1993);*United States v. Five Hundred Thousand Dollars*, 730 F.2d at 1439 (11th Cir. 1984); *United States v. Three Hundred Sixty Four Thousand Nine Hundred Sixty Dollars*, 661 F.2d at 326. The burden on the claimant is not a heavy one. The claimant must establish that he has a sufficient ownership interest in the property subject to forfeiture to create a case or controversy to confer Article III standing. *See, e.g., Via Mat Int'l S. Am. Ltd v. United States*, 446 F.3d 1258, 1262-63 (11th Cir. 2006) (the heart of Article III standing is the existence of an injury or economic harm to a party with an interest in the seized property); *United States v. $38,000 in U.S. Currency*, 816 F.2d at 1544 (owner of currency and bailee of currency both had Article III standing to challenge

_____

the Eleventh Circuit Court of Appeals.

[14] In *Stein v. Reynolds Securities, Inc.*, 667 F.2d 33, 34 (11th Cir. 1982), the Eleventh Circuit adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after 30 September, 1981.

forfeiture). Unexplained "naked possession" of cash does not rise to the level of a possessory interest required to establish Article III standing to attack a forfeiture proceeding. *See, e.g., United States v. $557,933.89*, 287 F.3d 66, 79 n.10 (2nd Cir. 2002); *United States v. $321, 470 in U.S. Currency*, 874 F.2d 298, 305 (5th Cir. 1989); *Untied States v. One Hundred Sixty-Five Thousand Five Hundred Eighty Dollars in U.S. Currency*, 502 F. Supp. 2d 114, 122 (D. Me. 2007); *United States v. $1,189,466.00 in U.S. Currency*, No. Civ. A. 1:06-cv-33GE, 2006 WL 2228939 at *2 (N.D. Ga. Aug. 2, 2006); *United States v. $746,198 in U.S. Currency*, 299 F. Supp. 2d 923, 928-29 (S.D. Iowa 2004). Of course, a claimant need not prove his case to establish standing to bring suit. *United States v. $38,570.00 in United States Currency*, 950 F.2d 1108, 1112 (5th Cir. 1992). Many cases have held that a claimant must "come forth with *some* evidence of his ownership interest in order to establish standing to contest a forfeiture." *Id.* (emphasis in original). A "bare assertion of ownership of the *res*, without more, is inadequate to prove an ownership interest sufficient to establish standing." *Id.* For this reason, "a claimant is required to submit some additional evidence of ownership along with his claim in order to establish standing to contest the forfeiture," however, such proof is not required where the government admits the claimant's relationship to the currency in the complaint. *Id.* at 113.

When the *res* is real property, it is relatively easy for courts to examine the indicia of dominion and control, including possession, title, and financial stake. When the *res* is highly fungible property, such as currency, many traditional and readily ascertainable measures of

21

control, such as recorded title, are not available. Further complicating the matter is the fact that criminals often employ cash couriers. Due to concerns about "straw man" transfers, "naked possession" claims are insufficient to establish standing. *See, e.g., United States v. $515,060.42 in U.S.* Currency, 152 F.3d 491, 498 (6th Cir. 1998); *United States v. $191,910.00 in U.S. Currency*, 16 F.3d 1051, 1058 (9th Cir. 1994); *United States v. $148,840.00 in U.S. Currency*, 485 F. Supp. 2d 1254, 1258-59 (D. N.M. 2007); *United States v. $290,000.00 in U.S. Currency*, No. 04-1118-JTM, 2006 WL 2475331 at *2 - *5 (D. Kan. Aug. 25, 2006), *aff'd* 249 Fed. Appx. 730 (2007); *United States v. $746,198 in U.S. Currency*, 299 F. Supp. 2d 923, 929 (S.D. Iowa 2004) ("The claimant needs to provide some explanation of the interest for it to qualify as a colorable possessory interest sufficient to establish standing.").

Before the Court for consideration are three claims from Alcaraz-Barajas. In the May 2, 2006 Claim (Doc. # 7) and the December 22, 2005 Claim (Doc. # 54-5 at Ex. A-18), Alcaraz-Barajas relies on his possession of the currency at the time it was seized. This unexplained naked possession of the cash is insufficient to establish standing.

Alcaraz-Barajas December 29, 2005 claim provides greater explanation of how he came to possess the currency later seized. In that Claim, Alcaraz-Barajas provides a sworn account of how he found the money in a plastic garbage bag near a pond outside a hotel in Tampa, Florida. Furthermore, Alcaraz-Barajas admits under oath that he did not file a report with the local police or attempt to locate the owner of the lost money. Even in his most

recent affidavit, Alcaraz-Barajas admits that he told law enforcement in August of 2005 that he had found the money in Florida.

Were this Court to accept as true Alcaraz-Barajas' statements that he found the money in Florida, he would not have Article III standing. Alcaraz-Barajas' property interest in the money he found must be determined by reference to Florida law, not Alabama law. A federal court addressing an ownership interest by a claimant to the property the government seeks to forfeit must determine ownership interests by reference to the law of the state in which the interest arose. *See, e.g., United States v. One Lincoln Navigator 1998*, 328 F.3d 1011, 1013 (8th Cir. 2003); *United States v. U.S. Currency, $81,000.00*, 189 F.3d 28, 33 (1st Cir. 1999); *United States v. One Hundred Sixty-Five Thousand Five Hundred Eighty Dollars in U.S. Currency*, 502 F. Supp. 2d at 119; *United States v. $1,189,466.00 in U.S. Currency*, 2006 WL 2228939 at *2; *United States v. $746,198 in U.S. Currency*, 299 F. Supp. 2d at 930. Each time that Alcaraz-Barajas has stated that he found the money, he has claimed that he found the money in Florida. Thus, the law of Florida determines whether he is a legal owner of the money he found there.

Section 705.101 *et seq.* of the Florida Statutes prescribes procedures for reporting and settling title to lost or abandoned property.[15] Florida law requires any person who finds any

---

[15] Under this statute "lost property" means

all tangible personal property which does not have an identifiable owner and which has been mislaid on public property, upon a public conveyance, on premises used at the time for business purposes, or in parks, places of

lost or abandoned property to report the description and location of the property to a law enforcement officer. Fla. St. Ann. § 705.102(1). Furthermore, it is unlawful for any person who finds any lost or abandoned property to appropriate the property to his own use, and any person who unlawfully appropriates lost or abandoned property to his use commits theft as defined by Florida law. Fla. St. Ann. §§ 705.102(3) & (4). While title to lost or abandoned property can vest in its finder, under Florida law that happens only where the finder reports the find to a law enforcement officer, deposits the found property with a law enforcement agency, and provides the law enforcement agency with a sum to cover reasonable expenses associated with storage. Fla St. Ann. §§ 705.102 (1) & (2); 705.103 & 705.104. Even when the finder takes all these steps, title does not vest with him unless proper notice is provided and unless the rightful owner or a lienholder fail to claim the property within the 90-day custodial time. *Id.*

To the extent that Florida law requires compliance with § 705.101 *et seq.* of the

---

amusement, public recreation areas, or other places open to the public in a substantially operable, functioning condition or which has an apparent intrinsic value to the rightful owner.

Fla. St. Ann. § 705.101(2). The statute also defines "abandoned property" as meaning "all tangible personal property that does not have an identifiable owner and that has been disposed of on public property in a wrecked, inoperative, or partially dismantled condition or *has no apparent intrinsic value to the rightful owner*." Fla. St. Ann. § 705.101(2) (emphasis added). The money seized from Alcaraz-Barajas in Alabama falls would fall within the definition of lost property under Florida law because it has an apparent intrinsic value to the rightful owner and because if it was found, it was found in an area open to the public, namely a hotel parking lot.

24

Florida Statutes to establish a lawful ownership interest in found property, Alcaraz-Barajas has failed to establish compliance.[16]  Indeed, because Alcaraz-Barajas found the defendant property, which meets the definition of lost property under these provisions in Florida law, and did not file a report with law enforcement, Florida law deems him to have no lawful interest in the defendant property and to actually have stolen the defendant property.  While Alcaraz-Barajas possessed the defendant property, he had no legal right to the defendant property under Florida law.  Accordingly, the Court concludes that were it to accept Alcaraz-Barajas' sworn statement that he found the money in Florida, it would also be compelled to find that Alcaraz-Barajas does not have standing pursuant to Article III to contest the forfeiture in this case.

Of course, nearly two years after signing a statement under oath and in fear in perjury that he owned the $543,190 in U.S. currency because he found the money in Florida, and approximately eighteen months after filing a "Claim" in this lawsuit stating that he owned the $543,190 in U.S. currency, Alcaraz-Barajas now has presented the Court with an affidavit

---

[16]  Alcaraz-Barajas has argued that an unpublished decision from the United States District Court for the Southern District of Florida in which the court held that a man who found currency on a public highway had a sufficient property interest under Florida law to give him Article III standing to challenge the forfeiture of the currency supports a finding in this case that Alcaraz-Barajas has Article III standing.  *See, e.g., United States v. Three Hundred Forty Seven Thousand, Five Hundred, Forty Two Dollars ($347,542.00) in U.S. Currency*, No. 99-6792-CIV, 2001 WL 3358528 at *1 & *3 (S.D. Fla. Mar. 19, 2001).  That case is distinguishable, however, because it was clear in that case that the man who found the currency reported it to police in compliance with Florida law.  *Id.*  Alcaraz-Barajas did not comply with the applicable Florida law.  Consequently, he is deemed by law to have stolen the money.

in which he swears that he lied previously. He now claims that more than $700,000 in U.S. currency was seized from him and he swears he earned the money from owning, operating, and selling hair businesses.

Of course, had Alcaraz-Barajas consistently stated that he owned the money because he earned it, there would be no question that he had Article III standing. This is not the case here. Because Alcaraz-Barajas has given contradictory sworn statements concerning very key issues such as the amount of currency seized and the source of the money, the Court has a very difficult time knowing when, if ever, it should believe Alcaraz-Barajas. Complicating matters further is the failure of Alcaraz-Barajas to attempt to provide any evidence beyond his affidavit[17] to substantiate or corroborate his newly minted claim that he earned the money. Alcaraz-Barajas has had many extensions of time and numerous opportunities to amass such evidence. Yet, he did not ascertain whether he could find a way to come to Alabama to give testimony, nor did he arrange for his testimony to be provided to the Court by video-conference.[18] Alcaraz-Barajas did not offer in evidence any records from any of his hair business. He did not provide testimony in any form from any person who purchased one of

_____

[17] Alcaraz-Barajas also relies on his sister's affidavit, but it is suspect because it simply parrots the Alcaraz-Barajas affidavit and it does not establish how Sandoval would have had personal knowledge about Alcaraz-Barajas' business dealings. Moreover, there is no explanation made for why Sandoval did not appear to testify at the evidentiary hearing where her knowledge could have been explored through cross examination.

[18] While Alcaraz-Barajas' counsel represented to the Court that Alcaraz-Barajas is no longer in the United States, the Court has noticed that it appears that at least one Notary Public believed she had seen him in Orange County, California as recently as November of 2007.

his hair businesses.

Based on the record before it, the Court finds no credible evidence whatsoever that Alcaraz-Barajas had a sufficient colorable legal interest in the $543,190. At most he has shown nothing other than a naked possessory interest. Such an interest is legally insufficient to establish Article III standing. *See, e.g., United States v. $557,933.89*, 287 F.3d at 79 n.10; *United States v. $321,470 in U.S. Currency*, 874 F.2d at 305; *United States v. One Hundred Sixty-Five Thousand Five Hundred Eighty Dollars in U.S. Currency*, 502 F. Supp. 2d at 122; *United States v. $148,840.00 in U.S. Currency*, 485 F. Supp. 2d at 1258-59*; United States v. $1,189,466.00 in U.S. Currency*, 2006 WL 2228939 at *2; *United States v. $746,198 in U.S. Currency*, 299 F. Supp. 2d at 928-29; *United States v. $290,000.00 in U.S. Currency*, 2006 WL 2475331 at *2 - *5; *United States v. $746,198 in U.S. Currency*, 299 F. Supp. 2d at 929.

## CONCLUSION

For the foregoing reasons, it is hereby ORDERED that all claims of Enrique Alcaraz-Barajas to the defendant property are DISMISSED WITH PREJUDICE for lack of standing.

DONE this the 25th day of February, 2008.


_____
      /s/ Mark E. Fuller
CHIEF UNITED STATES DISTRICT JUDGE