```
 1              IN THE UNITED STATES DISTRICT COURT

 2              FOR THE MIDDLE DISTRICT OF ALABAMA

 3                     NORTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA,

 6        Plaintiff,

 7   Vs.                          CASE NO.: 2:06cv116-MEF

 8   Five Hundred Forty-Three Thousand
     One Hundred Ninety Dollars,
 9
          Defendant.
10                 * * * * * * * * * * * * * *

11
          HEARING ON UNITED STATES' MOTION FOR SUMMARY JUDGMENT
12                 * * * * * * * * * * * * * *

13
          BEFORE THE HONORABLE UNITED STATES DISTRICT JUDGE MARK E.
14
     FULLER at Montgomery, Alabama, on Tuesday, January 29, 2008,
15
     commencing at 10:30 a.m.
16
                          APPEARANCES
17
     FOR THE PLAINTIFF:        Mr. John T. Harmon
18                             Assistant United States Attorney
                               OFFICE OF THE UNITED STATES ATTORNEY
19                             131 Clayton Street
                               Montgomery, Alabama  36104
20

21   FOR THE DEFENDANT:        Mr. R. Bruce Maddox
                               6728 Taylor Court
22                             Montgomery, Alabama

23              Proceedings reported stenographically;

24              transcript produced by computer

25
```

 1          (The following proceedings were heard before the Honorable

 2     United States District Judge Mark E. Fuller at Montgomery,

 3     Alabama, on Tuesday, January 29, 2008, commencing at

 4     10:30 a.m.:)

 5               THE COURT:  Good morning, counsel.

 6               The first thing I would like to establish for the

 7     record is that we're here today on what I would consider to be

 8     an evidentiary hearing on a threshold issue of standing by the

 9     claimant in this case, Mr. Enrique Alcaraz-Barajas.  The case is

10     *United States of America versus $543,190 in United States*

11     *Currency.*  It is case number 06-cv-116 in the United States

12     District Court for the Middle District of Alabama, Northern

13     Division.

14               Mr. Maddox is here on behalf of the claimant,

15     Mr. Enrique Alcaraz-Barajas, and I know -- is it Mr. Mahaney?

16               MR. MAHANEY:  That's correct, Your Honor.

17               THE COURT:  You've not entered an appearance, but I

18     think without objection, you would be able to participate at

19     counsel table with Mr. Maddox.

20               MR. HARMON:  No objection, Your Honor.

21               Your Honor, at this time, if I might, I would like to

22     inform the Court that we have Tim McCollum.  He's Assistant

23     Attorney General working with the Department of Public Safety,

24     and he's here to observe.  He will not be participating, but I

25     did want to introduce him to the Court.

```
 1              THE COURT:  Any objection, Mr. Maddox?

 2              MR. MADDOX:  No objection.

 3              THE COURT:  This is an informal process, so I would

 4   give latitude that I might be hesitant to do at trial.

 5              Mr. Maddox, I'm going to start with you.  I have

 6   reviewed the memorandum opinion that was entered in this case on

 7   November the 26th.  And for the record, that is document number

 8   74.  I've also rereviewed the notice of claims filed by your

 9   client.  Those are documents numbered 27-2, document number

10   seven.  And his affidavit is document number 73-2, and then

11   there's a subsequent affidavit, which is document 54-5, and that

12   appears to be substantially the same as the May 2nd, 2006

13   affidavit, which is marked document number seven.  I just want

14   the record to reflect that I have in front of me all of the

15   affidavits about the source of the funding.  I've also reviewed

16   the brief in support of standing of the claimant filed by you,

17   Mr. Maddox, on Monday afternoon, the 28th.  So at this time,

18   I'll turn it over to you.

19              MR. MADDOX:  Thank you, sir.  Your Honor, so that we

20   don't have a problem I think I may have created in a previous

21   summary judgment issue, I would like to formally offer documents

22   that are already filed with the Court for purposes of this

23   hearing.  Number one would be the deposition of Trooper Andy

24   Sutley, along with the exhibits that are attached thereto.  I'd

25   like to offer the affidavit of November of 2007 of Enrique
```

 1  Alcaraz-Barajas, the affidavit of November of 2007 of Esther

 2  Sandoval, and the claim that was submitted by my office to the

 3  Drug Enforcement Administration in December -- I think they got

 4  it perhaps in January.

 5          THE COURT:  Ms. Sandoval is your client's sister; is

 6  that correct?

 7          MR. MADDOX:  Yes, sir, that's correct.  And, of course,

 8  our original claim.  And those are the items that we would

 9  offer.  And I would draw the Court's attention to --

10          I guess I need a ruling on whether they're entered into

11  evidence.

12          THE COURT:  Any objection to those being considered by

13  the Court?

14          MR. HARMON:  I do object, Your Honor.  If they're

15  offered in opposition to the United States' second motion for

16  summary judgment, the Court did earlier order submissions by a

17  certain date.  Of course, we're well past that.  I understand

18  the Court did subsequently amend that and allowed a filing later

19  than the date originally established, but Your Honor, to the

20  extent that these are offered at this time, they're outside even

21  the second order, and the United States would object to them

22  being considered as offered today in opposition to the United

23  States' second motion.

24          Additionally, Your Honor, the United States also

25  objects to the blanket admission of Trooper Sutley's

1  deposition.  Generally the Court requires that oppositions in

2  affidavits be delineated and specific portions of each

3  deposition that is cited be established so that the Court can

4  know what portions of the deposition are submitted in opposition

5  to what factual or legal issues are raised.  In this case, a

6  simple blanket submission of the deposition leaves both the

7  Court and United States with the unenviable job of trying to

8  determine what portions of the deposition apply to what specific

9  legal issues or factual issues that are established.  And to the

10  extent that it's a general offer without designation of the

11  salient or specific portions of the deposition which are

12  applicable, the United States would object on those grounds

13  also.

14         THE COURT:  For the limited purpose of this hearing

15  today, I will allow the admissibility of the evidence that you

16  have referred to, Mr. Maddox, and I would ask that you either

17  provide copies or make a more detailed clarification for the

18  purposes of any record that we have today of what exhibits

19  particularly that you're referring to.  If they've not already

20  been submitted into evidence, certainly I would like to have

21  them marked and admitted for the purposes of this hearing

22  today.  And as to any deposition excerpts, if you are going to

23  rely on the excerpts of depositions for the purposes of the

24  issue of standing today on behalf of your client, I would

25  require that you designate those portions so that the United

1  States would have an opportunity to in turn respond with any

2  other information that would be contained in those depositions.

3          MR. MADDOX:  All right, sir.  As to the deposition, if

4  you want me to designate parts right now, I think I can probably

5  do that.  But I would also argue that the totality of the

6  deposition dealt with the facts and circumstances of the seizure

7  of the property, with Mr. Alcaraz-Barajas' actions and behavior

8  during that time, and I don't think we went outside what I would

9  call the totality of the circumstances of what we allege about

10  his both possession and exercise of dominion and control over

11  the property, including his signing a consent to search the bags

12  in which the money was held.

13          THE COURT:  After he was stopped by Trooper Sutley?

14          MR. MADDOX:  Yes, sir.

15          THE COURT:  Well, and to the extent that there's

16  information contained in Trooper Sutley's deposition, do you

17  contend that any of that information would contradict what your

18  client's latest affidavit says in explanation about where the

19  money originated from?

20          MR. MADDOX:  The only thing that it would contradict is

21  that in his statements, according to Trooper Sutley, my client

22  claimed to have found the money.  And of course, he also claimed

23  to be a U.S. citizen.  And Trooper Sutley, according to the

24  deposition, found the money, transported the money, took the

25  occupants of the vehicle into custody, transported them to the

1  HIDTA office ultimately and questioned them, he and other

2  officers.  And they also took the vehicle into custody.  And I

3  think that the facts about what happened at the scene of the

4  stop, including the fact that Mr. Barajas said that he had --

5  that the bags in the back were his, that he claimed ownership of

6  the bags, that he was -- the trooper necessarily thought he

7  should get a consent to search the bags from Mr. Barajas, all

8  are pertinent to this issue as well as the claim of ownership or

9  possession and custody later, whether it be true or not true.

10  So I think the totality of the circumstances there need to be

11  considered by the Court, including the fact that Mr. Barajas

12  felt the necessity to contend that he was a U.S. citizen at one

13  point, too, for purposes of the circumstance.  And that's why I

14  think the totality of the deposition is important, as well as

15  the exhibits which are attached to it, and particularly one that

16  was delineated Defendant's Exhibit 1 to that deposition, which

17  is the report by Mr. Sutley about what happened there.  And in

18  particular on the second page of that report, which is

19  delineated as page 32 -- of that report, not of the

20  deposition -- at one point the trooper reports, I asked Barajas

21  if he had luggage in the car.  He said yes.  I asked Barajas if

22  I could search his luggage.  He said yes.  Which is the exercise

23  by Mr. Barajas of control over the property.  And so I think

24  those are important.  If the Court would like me to delineate in

25  a written document subsequent to this hearing specifically what

1    portions I'd like to be considered for what, I can do that.  But

2    I think that the basis of our claim about that goes to the

3    totality of the circumstances there.

4           THE COURT:  Is it your contention that because of your

5    client's discussions with Trooper Sutley that he somehow

6    evidenced to Trooper Sutley that he exercised dominion and

7    control over that property and had a possessory interest in that

8    property, and that gets you past the Article III threshold

9    standing issue?

10          MR. MADDOX:  That is one of those, yes, sir.

11          THE COURT:  All right.  Is there anything else about

12   that deposition -- and I don't have the benefit of having the

13   deposition in front of me.  I know it's filed in the case, and I

14   can review it before I make a ruling.  Is there anything else

15   about the content of that deposition that you would offer from

16   Trooper Sutley?

17          MR. MADDOX:  Not on those issues.  I think that the

18   Title III standing is the issue we're addressing.  I think that

19   the deposition is important for some other motions that we're

20   not hearing today --

21          THE COURT:  Right.

22          MR. MADDOX:  -- that I would file.

23          THE COURT:  I only want to address the threshold issue

24   of standing today.

25          MR. MADDOX:  Yes, sir.  I guess my question is, does

1    the Court want me to try to delineate more specifically,

2    although I really think the totality of the circumstances is

3    important, specific portions of that deposition?

4         THE COURT:  Well, I don't want to cross examine you,

5    basically, on your brief that was filed, but I do have some

6    questions that I would like for you to explain.

7         MR. MADDOX:  Yes, sir.

8         THE COURT:  And one burden that I have as a trial judge

9    at this point in this case is to try to make a determination --

10   a credibility determination about whether or not your client had

11   a colorable interest in the property that is the subject of this

12   forfeiture.

13        MR. MADDOX:  Yes, sir.

14        THE COURT:  Now, that term "colorable interest in the

15   property" I presume is the subject of our dispute today.  And

16   you've cited case law, I think the Second Circuit and the Ninth

17   Circuit and some Fifth Circuit cases, and there are some

18   Eleventh Circuit cases, and I've even reviewed Judge Thompson's

19   case that you cited on whether or not we should consider this as

20   having been lost property or abandoned property or take his word

21   in his last affidavit as being the true source of the cash.

22        But as far as making a credibility determination, how

23   do you expect for me to do that without the benefit of hearing

24   from any witnesses or hearing from your client?  And I

25   understand the difficulty that you have in getting him here

1  today, because he's not a legal citizen of the country and I

2  presume has been deported and is prohibited from reentering the

3  country without some legal authorization to do so.

4       MR. MADDOX:  I believe that was clarified at a previous

5  status conference, although not on the record.  The

6  government -- and we, I think, agreed with Mr. Harmon that it is

7  illegal for him to come here because of the circumstances of his

8  conviction.

9       MR. HARMON:  Your Honor, I would say absent any

10 additional type proceeding, it would be illegal for Mr. Barajas

11 to attend.  And I do not profess to have a great deal of

12 expertise in the area.  I do know that there are certain

13 methods, I know in criminal cases, whereby illegal aliens may be

14 allowed to stay in the country or reenter for the purposes of

15 testifying in criminal cases.  I'm not aware of any --

16      THE COURT:  I'm even -- I want to hear about the

17 possibility of having some type of -- or having had some type of

18 opportunity to depose Mr. Barajas and have, in essence, a trial

19 deposition that you can take outside the country if Mr. Barajas

20 wasn't allowed to enter this country.  Why wasn't there at least

21 the opportunity to depose him?

22      MR. MADDOX:  A couple of things, Your Honor.  Number

23 one, there would have been an opportunity to depose him but for

24 the circumstances that were addressed in our original motion to

25 dismiss wherein the government, although he was in this country,

```
 1   in custody, and could have been transported here, at that point

 2   in time the government failed to serve him or in any way notify

 3   him in a meaningful way of the pendency -- the pendency of this

 4   action.  Had we known of the pendency of the action while he

 5   was in this country, we could resolve all of these issues with

 6   relatively great ease, including simply asking the Court to

 7   stay his deportation pending the outcome of this case.  That is

 8   past and was past before any pleadings were filed by him and

 9   before he had knowledge of the pendency of this case.  And so I

10   think we have to point, number one, to the government as to

11   that.

12           Number two, the affidavit of Mr. Alcaraz-Barajas

13   indicates that basically that all of his life savings were taken

14   in this.  It is an expensive proposition to take a deposition

15   outside this country.  For purposes of trial, I think we will

16   have to try to do that.

17           But Mr. Barajas, as you will find, I think, from the

18   deposition also is HIV positive, and a great part of his reason

19   for being in this country was to receive medical treatment.  And

20   he is ill, and we're having to deal with the fact that he's

21   getting medical treatment and having to travel to other

22   countries sometimes for what he thinks is appropriate for him,

23   and the expense of doing that has been prohibitive thus far.

24           Since you set this hearing, I have asked him and other

25   members of his family to try to find some way to do that, but as
```

1  of this date, we've been unable to do so.  I'm fairly confident

2  that by time of trial we can do that, and we're kind of at that

3  problem right now of not having him here.

4          The other part of it is, of course, by deposition Your

5  Honor still wouldn't have the opportunity for an ore tenus

6  decision regarding credibility.

7          THE COURT:  Well, if there's any deposition, it would

8  be better than what we have available today.

9          MR. MADDOX:  Yes, sir.

10         THE COURT:  Let me go through your argument, and let me

11 just make sure that I understand what your argument is.

12         Part of what you've argued in your brief appears to

13 imply that mere presence at the scene and a claim of ownership

14 in the property in this case would be sufficient to establish

15 standing under Article III.  Is that your position?

16         MR. MADDOX:  Yes, sir.

17         THE COURT:  Now, whether the property was the proceeds

18 of his businesses that he had built up and sold over the years

19 or proceeds of lost or abandoned property, why wouldn't it still

20 require more than just possession by your client and show that

21 he not only possessed it, but he had some legal title or legal

22 right to the property?  For instance, if it was proceeds of the

23 sales of these businesses, some evidence that these businesses

24 had been sold, possibly from -- even from affidavits from

25 persons who purchased these businesses to establish that they

1   purchased them, how much they paid for them.  If he was an

2   extremely frugal person, maybe he -- tax returns, evidence that

3   he had the means to save up the amount of money that he was

4   found in possession.

5          And if it was proceeds of lost or abandoned property,

6   my second question to you is, what right to this property does

7   he have under Florida law based upon their statute which covers

8   the requirements of an individual who finds property such as

9   this?  And I specifically would refer you to the case that you

10  cited from the Southern District of Florida involving

11  forfeiture of $347,542.  There's a Westlaw cite that is from

12  2001, and you refer to the claimant as Mr. Steven Chandler.  And

13  I believe in that case Mr. Chandler not only found the property,

14  but he notified law enforcement and actually turned the property

15  over to the police and followed through on the Florida statute

16  which would require a person of -- who finds property such as

17  this to go through some, for lack of a better word,

18  administrative procedure to have a colorable interest in this

19  property.

20         So I propose to you under either of those scenarios

21  that he's outlined in his affidavit, what evidence do you have

22  that he was either the owner of this money through the sale of

23  his businesses, or he has satisfied the administrative

24  requirements to be in legal possession of this property as the

25  finder of lost property in Florida?

```
 1          MR. MADDOX:  I think I need to break my response down
 2   into a couple of issues.
 3          THE COURT:  Well, that was a multi part question.  I
 4   don't mind breaking it down singularly, because it's rather
 5   broad.  But I want to give you the opportunity to address either
 6   scenario of the affidavits that he submitted.
 7          MR. MADDOX:  All right, sir.  First of all -- and let
 8   me say, those aren't the only affidavits he's submitted.  By
 9   the -- Well, let me withdraw that.  I think I misspoke.
10          Number one, as to the possession itself, there are
11   different forms and degrees, I think, of possession.  The case
12   law speaks, for example, and I think Your Honor in his order
13   spoke to naked possession.  If I'm just standing here with this
14   pen, I nakedly possess it, but I don't claim any ownership.  I
15   found it on this -- I really did find it when I got here, and I
16   moved it over here.  I don't claim any right to possess it.  I
17   don't claim any right to custody of it.  If somebody else walked
18   up and wanted to walk away with it, I don't claim that they
19   shouldn't do that.
20          THE COURT:  But even if law enforcement comes to you
21   and you had picked that pen up and you are in naked possession
22   of that pen, and you claimed it, it's your pen, hasn't the
23   Eleventh Circuit said that naked possession alone does not
24   provide you with enough evidence of standing?
25          MR. MADDOX:  The fact -- if I actively made the claim
```

1   that it's mine and I have exercised dominion and control over

2   it, they have fairly consistently said that is enough.

3        THE COURT:  So if I find your car keys on the table,

4   and I walk out and have your car keys in my possession and climb

5   in your car and drive down the street, and the police stop me

6   and say, this is Mr. Maddox's car, and I say, oh, no, it's mine,

7   and here's the keys to prove it, you're saying that that's

8   enough for me to make a colorable showing that I possessed and

9   owned that car or had a possessory interest in that car?

10        MR. MADDOX:  Probably not in a criminal action, but in

11   a civil action, I suspect so, yes, sir.

12        THE COURT:  Okay.

13        MR. MADDOX:  I can claim I own your car and sue you and

14   have standing to have that issue litigated whether I have

15   possession of your car or not.

16        THE COURT:  Well, in that --

17        MR. MADDOX:  You might beat me on summary judgment.

18        THE COURT:  Well, that may be a difference -- the

19   difference that we have here is not a lawsuit between two

20   conflicting owners of property, it's the forfeiture action by

21   the United States government over property that your client

22   claims to have a possessory or colorable interest in as a

23   matter of law.  And what I want to try to establish from you or

24   give you the opportunity to explain to me is show me not only

25   that --

1         There's no question that he possessed it.

2         MR. MADDOX:  Yes, sir.

3         THE COURT:  Show me where his colorable interest of law

4    comes from.

5         MR. MADDOX:  He was controlling, transporting the

6    money.  He has consistently said that.  He was solely in custody

7    of it.  No one else was claiming it.  He says it is his money.

8    If that's not enough, what you really are saying is that the

9    burden of proof shifts to the defendant to prove the basis of

10   his case, the ultimate issue of law, basically.

11        THE COURT:  No, I don't want to misinterpret the

12   ultimate issue of law with a colorable issue of a possessory

13   right to property that the government is seeking to forfeit.

14        MR. MADDOX:  Well, most of the case law that we're

15   looking at -- in fact, maybe all of it -- had to do with

16   seizures prior to August 23rd, 2000, when the Civil Asset

17   Forfeiture Reform Act was passed, which changed significantly

18   the burden of proof in civil forfeiture cases.  And as the law

19   now stands -- and, of course, this seizure happened after the

20   passage of that act.  As the law now stands, the defendant does

21   not have to explain the source of his money until the government

22   has met its burden of proof of proving that specific money was

23   related to some specific crime.  And we haven't gotten to that

24   issue yet, and I don't think we will get to that issue because

25   of the search and seizure matter.

```
 1          THE COURT:  So you're saying before your client has to
 2   establish that he has met the threshold burden of establishing a
 3   colorable interest in the property, the government must first
 4   show that it is the proceeds of some ill gotten gain?
 5          MR. MADDOX:  I don't think that's what I'm saying, Your
 6   Honor.
 7          THE COURT:  Okay.  Then correct me.
 8          MR. MADDOX:  What I'm saying is that before he has to
 9   explain where the money comes from, they have to do that.
10   Before he has to explain some innocent owner defense or
11   something of that nature, they've got a burden to meet.
12          THE COURT:  And I don't disagree with that, but I still
13   am of the opinion today that your client bears the initial
14   burden to show that he has a colorable interest in that
15   property.  And if your argument is the fact that he possessed it
16   and told the trooper that it was his when he was stopped, and
17   that's enough, then that's your argument and I'll have to make
18   my decision based on that and the affidavits and the brief that
19   you filed.
20          MR. MADDOX:  Yes, sir.
21          THE COURT:  As well as other evidence I've allowed to
22   come in.
23          MR. MADDOX:  Yes, sir.  He doesn't have to own the
24   property.
25          THE COURT:  No.  I mean, he just has to have a legal
```

1  right to it.  He can be a bailee.  I suppose he could be a

2  lessor.  But he would have to have some legal right to the

3  property.

4      MR. MADDOX:  Yes, sir.  And I think even the Florida

5  law says that he's a bailee.  Whether the facts of the case we

6  cited showed him turning over to the police or not, he was

7  entitled to control of that property within reason.  Whether or

8  not he intended to report it to the police or not is not really

9  in play at this point, because he -- if he did intend to, he

10 never got an opportunity to because of his arrest.  The

11 simple --

12     THE COURT:  Well, but that alone to me is so

13 contradictory.  Because if the source of these proceeds

14 originated from the multiple sales of his hair care businesses

15 over a period of 20 plus years, then the alternative source of

16 the money; that is, that it was found and not reported to law

17 enforcement, can't be true.  So --

18     MR. MADDOX:  That is correct.

19     THE COURT:  So the position that I suppose that you're

20 offering on behalf of Mr. Alcaraz-Barajas today is that the

21 initial story that he told law enforcement, that he found the

22 property, is not true?

23     MR. MADDOX:  That is our position.

24     THE COURT:  And the proceeds of -- or the source of

25 the funds that he was in possession of were proceeds of the

1  sales of his business and possibly the savings that he had

2  accumulated over a 20-plus-year history in this -- in the United

3  States?

4          MR. MADDOX:  Yes, sir.  And I would add that we

5  specifically repudiate the claim that purports to have been done

6  under oath that was filed by the gentleman from Mr. Cochran's

7  law firm in Mobile who represented him in the criminal case.  It

8  was not signed --

9          THE COURT:  Which indicates that he found it?

10         MR. MADDOX:  Yes, sir.

11         THE COURT:  And you are, on behalf of your client,

12  specifically repudiating that and in its place substituting the

13  claim and the following affidavit that talks about it being the

14  source of -- of businesses that he had sold totaling more than

15  $700,000?

16         MR. MADDOX:  Yes, sir.  But more specifically, his

17  affidavit relating to that also indicates that he did not sign

18  that before a notary public; he never was sworn to an oath; he

19  had no idea that it would be submitted on this, and he did not

20  authorize the submission of that in this case.  We don't know

21  why that gentleman did it, and particularly why he did it in the

22  way he did it after charging 20 some-odd thousand dollars.  But

23  it's something that he does not adopt.  He did not authorize the

24  submission.  The submission authorized was the one I sent to

25  DEA.

1          THE COURT:  Okay.

2          MR. MADDOX:  So we reject that.

3          THE COURT:  Okay.  So we're going to talk about the

4    money as having been earned through his businesses or the sales

5    of his businesses.

6          MR. MADDOX:  Yes, sir.  Our brief is directed solely

7    toward an arguendo matter of if the Court chose to believe that

8    he found it in Florida, then we think that he still has standing

9    based on that.

10          THE COURT:  Okay.

11          MR. MADDOX:  That's not the hard part, we're saying.

12    We have two things that we believe give him standing.  One is

13    his possession, the exercise of dominion and control, and his

14    claim of ownership.

15          THE COURT:  Why is that different from naked

16    possession?

17          MR. MADDOX:  Well, naked possession is just having it

18    without anything else.  But --

19          THE COURT:  But having it and claiming that you own it,

20    didn't the Eleventh Circuit say that is naked possession, and

21    that that is not sufficient to establish standing under Article

22    III?

23          MR. MADDOX:  That's not the way we read it, Your

24    Honor.

25          THE COURT:  Okay.

```
 1          MR. MADDOX:  We tend to think -- let's see.  It's in

 2   the brief somewhere.  The Fifth Circuit in the $38,000 case

 3   indicates that the claimant claimed an ownership interest and

 4   had possession of the currency when it was seized.  He was

 5   present when the currency was seized from a passenger in his

 6   car.  And they stressed in that case that the claimant didn't

 7   have to come forward with additional evidence of ownership,

 8   because the government had admitted the claimant was present at

 9   the time and place of the seizure in its complaint, as they do

10   here.

11          THE COURT:  I certainly would give the United States an

12   opportunity to respond.  Is there anything else that you want to

13   offer at this time?  And I'll give you an opportunity to add

14   anything in reply, but --

15          MR. MADDOX:  I would like to simply, I think, point out

16   to the Court as to the affidavit by Mr. Barajas --

17   Alcaraz-Barajas regarding the source of the money, he claims

18   ownership of the money.  He claims that he earned it.  We are,

19   again, in the peculiar situation of having a gentleman who

20   cannot come to the United States under law.  At the time he was

21   arrested, he had a residence in California.  He had property in

22   that residence.  He had papers in that residence.  He never got

23   to go back.

24          Now, he stayed in custody until he was deported by

25   agents of the United States government before they served him
```

 1  with this action, so he had no reason for months and months to

 2  ask anyone to preserve his papers, not having any idea he would

 3  have need for them.  As a result of that, he lost his residence,

 4  and his property was basically thrown out, and he can't come

 5  back to try to retrieve any of that.  He is the only one we know

 6  who knows what might be available, and he is the one who would

 7  know who might be available still and willing to sign affidavits

 8  or testify regarding their purchases of businesses or, for that

 9  matter, people who went to his businesses.

10          If those people exist, they're in the state of

11  California, and it's an onerous burden to obtain evidence for a

12  case in Alabama from the state of California when the person

13  most knowledgeable about those things is forced to stay outside

14  the United States.  That's the predicament we're in.

15          If the Court deems it appropriate, I will make

16  extraordinary measures -- and we're trying to do this for trial

17  anyway.  We will take his deposition somewhere outside the

18  United States.  I don't know how soon that can be done.  But

19  that is the problem we have with him not being served with this

20  action before he left this country, when he could have and

21  should have been served with this action before he left this

22  country.

23          THE COURT:  And in just brief response back to you, you

24  cited the *United States v. $38,000 in Currency*.  For the record,

25  that case is cited at 816 F.2d 1538.  It's an Eleventh Circuit

 1  case, I think, from 1987.  And in that case -- and I think I

 2  cited it in my memorandum opinion -- the Court held in that case

 3  that the owner of the currency and bailee of the currency had

 4  Article III standing to challenge the forfeiture.  And that's

 5  part of what my questioning to you is, is doesn't it take more

 6  than just possession and the admission or assertion that you own

 7  it?  That there has to be a -- and I keep referring back to this

 8  term -- a colorable interest in ownership to establish standing

 9  by Mr. Alcaraz-Barajas in this case, as the Eleventh Circuit

10  noted in that case, in which he not only had standing, but they

11  determined that he was a bailee?  Now, I don't know what

12  evidence they had before them to determine that he was a bailee,

13  and maybe you know more than what you're arguing here today.

14  But at least the Court made that determination that he had some

15  legal interest, even if it was a temporary possessory interest,

16  to the property that he claimed ownership in which gave him the

17  Article III standing requirement.

18          MR. MADDOX:  Judge, I think I have confused myself.

19  Could you give me the cite you just stated again?

20          THE COURT:  The cite that I hope that we're talking

21  about the same, *United States v. $38,000 in Currency,* is cited

22  at 816 F.2d 1538.

23          MR. MADDOX:  All right, sir.

24          THE COURT:  And it goes on, because there are other

25  citations from specific pages.

```
 1            MR. MADDOX:  I'm referring to a different case.

 2            THE COURT:  All right.

 3            MR. MADDOX:  It is United States v. $38,570 in United

 4  States Currency, 950 F.2d 1108, Fifth Circuit case, 1992.

 5            THE COURT:  Okay.

 6            MR. MADDOX:  Therein his presence at the scene of

 7  seizure, some dominion over the money, and claim of ownership

 8  were sufficient.

 9            THE COURT:  Okay.  Let me hear from the government.

10            MR. HARMON:  Thank you, Your Honor.  The first thing

11  the United States would note is that we would take issue with

12  any assertion that the CAFRA legislation in 2000 changed the

13  burden of proof regarding the establishment of standing.  That

14  has been consistent throughout the jurisprudence regarding

15  forfeiture.  The claimant always -- a potential claimant always

16  has the burden of establishing his Article III standing, and

17  because it is a basic jurisdictional issue, that must be

18  addressed.

19            THE COURT:  A threshold issue.

20            MR. HARMON:  Threshold issue.  That's correct, Your

21  Honor.

22            Your Honor, I would point out that -- I guess the two

23  arguments, as I understand it, would be, number one, that the

24  last affidavit submitted by Mr. Barajas was sufficient in order

25  to establish that he has, in fact, asserted a claim, a
```

1    sufficient claim for Article III standing.  The United States

2    would point out to the Court, first, Your Honor, that we have

3    the claim that was submitted by the attorney from Mobile, who,

4    by the way, as the United States has pointed out, was

5    Mr. Barajas' attorney for his related -- factually related, I

6    should say -- criminal case.  He was -- he appeared for

7    Mr. Barajas, entered a plea of guilty, and he was authorized

8    under the supplemental rules of admiralty to accept service for

9    Mr. Barajas of the administrative proceeding which was initiated

10   by DEA.  Of course, we know what his affidavit says.

11          THE COURT:  Let me interject.  Wasn't the first

12   affidavit that you just made reference to used as the basis to

13   establish Mr. Alcaraz-Barajas' claim to the money with DEA?

14          MR. HARMON:  That would be correct, Your Honor.  That

15   was the basis.

16          As the Court knows, the administrative proceeding is a

17   summary proceeding.  And all that must happen at that point is

18   someone file a claim, even if it's -- you know, they generally

19   do not regard the Article III standing problem at that point.

20   At that point, it just stops the proceeding, and it gets

21   referred to the applicable United States Attorney's Office for

22   initiation of judicial proceeding.

23          I would note, too, that Mr. Maddox filed a claim to

24   DEA that basically said, I have -- I'm claiming the right to it

25   by my possession.  Upon United States filing the civil

1  forfeiture action, Mr. Maddox filed another claim that basically

2  repeated the same assertion:  I'm claiming my ownership by right

3  of my possession.  That was what was filed here in the court.

4       THE COURT:  I presume that you would now take issue

5  with what Mr. Maddox has represented in the case from the

6  Fifth Circuit, *U.S. v. $38,000 or in Excess of $38,000* where

7  some dominion and possession of the property and a claim of

8  ownership would be sufficient to establish standing under

9  Article III?

10       MR. MADDOX:  I do, Your Honor.  The cases -- even the

11  cases cited by Mr. Maddox and the case by Judge Thompson

12  consistently use the term possessory interest.  They explicitly

13  go beyond the fact of mere possession to a possessory interest.

14  And of course, an interest is something that can be legally

15  defined.  It's something that has -- there is a legal -- as many

16  people have said, I can claim the Brooklyn Bridge, but it's not

17  a legal claim.  It's not -- there is no basis in law or in fact

18  for such a claim.

19       THE COURT:  All right.  Well, if we've abandoned our

20  claim that this was lost property, and Mr. Alcaraz-Barajas did

21  not complete his administrative requirements to file a claim or

22  turn it over to law enforcement and make the necessary claim to

23  the lost property as Mr. Chandler did in the case of *United*

24  *States versus $347,542 in United States Currency*, the Southern

25  District of Florida, March 19, 2001 case, then we're back to the

1  origin of the proceeds of the sales of his business or the

2  accumulation of revenue from the business that he accumulated

3  over his years of residency in the United States, albeit

4  illegal.

5          MR. MADDOX:  And that's correct, Your Honor.  And just

6  before we just completely go beyond that point, the United

7  States would want to also assert to the Court that even if the

8  Court was prepared to accept the Florida statute, they have not

9  met the requirements.  Even the case cited, the $347,000 case,

10  Your Honor, goes through and shows that the property -- in order

11  for this statute to be effective, it's got to be a public

12  property.  Of course, Mr. Barajas said he found it on the

13  premises of I believe a Hampton Inn, so that would not be

14  accurate.  In addition, Your Honor, as the Court has correctly

15  pointed out, the gentlemen who filed the claim in that case

16  reported it to the police, and under the -- in accordance --

17  apparently, in accordance with the statute.  Your Honor, I had

18  earlier provided to you the -- I believe the complete applicable

19  statutory --

20          THE COURT:  Yes, I have the Florida statute.

21          And let me go back to Florida's definition of lost

22  property under the Florida statutes, annotated, Section 705.101,

23  subparagraph one.  Under the definition of lost property as I

24  have been provided with that definition, it would include

25  property found on premises used at the time for business

1    purposes.  And if Mr. Alcaraz-Barajas is maintaining that he

2    found this money in a Hampton Inn parking lot, I think that that

3    would technically meet part of the definition of lost property.

4    I don't disagree with you that he has not fulfilled the

5    remainder of his statutory obligation to establish for himself a

6    legal or possessory interest in that property other than just

7    possession of lost property, which I believe the Florida statute

8    further goes on to say amounts to theft.

9        MR. HARMON:  That is correct, Your Honor.  Section

10   705.102 says it is unlawful for any person who finds any lost or

11   abandoned property to appropriate the same to his or her own use

12   or to refuse to deliver the same when required.

13       It's very difficult for the United States to give

14   credence to an argument to say that Mr. Barajas intended to

15   fulfill his obligation under the statute when he is found with

16   the money in Alabama.  That, I think, is clear indication that

17   Mr. Barajas did not intend to adhere to the statutory scheme set

18   up in Florida for this type situation, and that he --

19       THE COURT:  Let's don't waste any more time talking

20   about an issue that both sides agree doesn't apply; that is, the

21   issue that it originated from his having found it in the parking

22   lot of this Hampton Inn hotel.  Because from what I understand

23   from Mr. Maddox, that has been superseded by his last affidavit,

24   which claims that he accumulated this money over a period of

25   time and through his sales of businesses and his money

1  management skills.

2       So with that being the claim by Mr. Alcaraz-Barajas, I

3  would like for you to direct your response as to how his

4  possession of that cash and his claim of ownership, even coupled

5  with his now explanation that it originated from the sale of

6  businesses, is not sufficient to establish standing under

7  Article III.

8       MR. HARMON:  Your Honor, I think it's important for the

9  Court to go through the -- again, to somewhat repeat myself, the

10 litany of the affidavits in the filings by Mr. Barajas, which

11 includes at least three earlier affidavits that do not mention

12 his, quote, legal source, unquote, for the property, and

13 instead, you know, took positions that did not even mention

14 this.  Then at the point where it appeared that maybe his claims

15 would be deficient as to the standing issue, the last affidavit

16 submitted, United States would cite the Court to *United States*

17 *v. Two Parcels in Russell County*, 92 Fed.3d, 1123 at 1129, which

18 is an Eleventh Circuit 1996.

19      Your Honor, I am familiar with that case.  I would tell

20 the Court that that is factually different in the sense that

21 this was that case that had gone beyond the Article III standing

22 issue to a summary judgment filed by the United States before

23 Judge -- I think it was Judge Thompson, Your Honor.  And Judge

24 Thompson granted United States summary judgment on the issue of

25 forfeitability.

```
 1          THE COURT:  On the issue of?
 2          MR. HARMON:  On the actual forfeitability or the
 3   forfeiture of the property.
 4          However, what the Court said, which is salient to this
 5   issue, is the mere allegation of a highly unlikely legitimate
 6   source of income without some support to give the allegation
 7   credibility cannot constitute an issue of material fact
 8   defeating summary judgment.
 9          THE COURT:  Give me that cite again.  92 F.3d.
10          MR. HARMON:  1123, 1129, Your Honor.
11          And the Court has absolutely correctly delineated this
12   issue.  When you have these -- I think -- and no disrespect to
13   Mr. Maddox.  He is, I'm sure, only submitting what his client is
14   telling him.  But when you have this highly unlikely scenario
15   played out like this, the Court is not required to give that
16   credence at the summary judgment stage.  The Court -- because
17   the Court said, you cannot -- that cannot constitute an issue of
18   material fact.  And we are here still, Your Honor, at the
19   summary judgment stage.  And as the Court, I believe, has
20   correctly pointed out, without something more at this stage,
21   it's not an issue of material fact as to his Article III
22   standing.  He has submitted at least four affidavits that are
23   materially different.
24          In a sense, what is being urged here on behalf of
25   Mr. Barajas is that by filing false affidavits, I can create an
```

1    issue on summary judgment; which, again, is not, I believe, what

2    the law would accept, that you can create issues of material

3    fact by filing dueling affidavits on your own behalf.

4            THE COURT:  So you believe that there is some

5    requirement on the Court's part to establish or make a

6    credibility determination, even though there's been no

7    subsequent repudiation of an earlier affiant?

8            MR. HARMON:  Your Honor, I might couch it in the sense

9    not so much as a credibility determination as there's got to be

10   in this case, without some support -- additional support -- this

11   was, again, Your Honor, as -- I did try this case, and I recall

12   the situation.  The affidavit submitted in opposition to summary

13   judgment was basically that an elderly woman who worked in a

14   mill -- and we had her employment records -- making like $5 an

15   hour had saved this money over the course of her employment.

16   And the District Court correctly said, this is not sufficient.

17   This is so unlikely, I don't have to give this credence.  And

18   the Eleventh Circuit upheld it.

19            And that's, I believe, Your Honor, precisely where we

20   are here today, although -- albeit not on the issue of direct

21   forfeitability, but on the issue of standing, is that when you

22   have these situations, then there's got to be something more,

23   some support rather than just a conclusory, highly unlikely,

24   legitimate source for the money, you know.  There has got to be

25   something more to go beyond the situation that has been created

1  by Mr. Barajas.  Not by his attorneys, but by his own actions in

2  filing affidavits that the Court cannot in any manner determine

3  the truth of the matter.  And that -- in that instance, I think

4  the Court has correctly stated that it will require something

5  along the lines of someone coming in, saying, yes, I sold a

6  business, I bought a business from Mr. Barajas and paid him

7  cash, or something that could have been done during the long

8  course of this situation.  Because this money was seized two

9  years ago.  It's -- this could have been handled, Your Honor.

10 There could be some scintilla of evidence that would support a

11 highly -- the highly unlikely source and claim that Mr. Barajas

12 has made.  And I think the Court is correct in noting that, and

13 I think the Court is within the law and within the statutory --

14 excuse me -- the precedent set by the Eleventh Circuit to not

15 give credence to this assertion from Mr. Barajas.

16         THE COURT:  Anything else?

17         MR. HARMON:  No, sir.

18         THE COURT:  Mr. Maddox, anything in response?

19         MR. MADDOX:  Just briefly.  The last case that

20 Mr. Harmon was citing and the argument based thereon, again,

21 that was an issue that didn't relate to standing.  Although the

22 lady clearly claimed ownership of the property in that case and

23 was allowed standing, what he's talking about is summary

24 judgment and the preposterousness of whatever occurred within

25 that context.  This Court is dealing with standing, and we think

1  we've cited adequate case law to establish standing.  Whether or

2  not we ultimately win on the merits of the case is an entirely

3  different matter.  We are prepared to address that in an

4  entirely different way, but not with inconsistent facts.

5          THE COURT:  Thank you.  Anything else?

6          MR. HARMON:  Nothing from the United States, Your

7  Honor.

8          THE COURT:  Anything else from the claimant?

9          MR. MADDOX:  No, sir, except that if the Court feels

10  that we have not met the burden on standing, I would like the

11  Court -- request the Court's ruling to say so and give us a

12  chance yet to try to obtain a deposition of Mr. Barajas.  I

13  don't know that it will happen, but I think we would need at

14  least 45 days to do that.

15          THE COURT:  I'll take that under consideration.  I'll

16  also take this under advisement.

17          And before we adjourn the proceedings, let me ask if

18  you would approach so that you can identify those items of

19  evidence that you have submitted for the purposes of this

20  hearing that I've allowed you to admit.  And you don't need to

21  do that in my presence here.  Just make sure that it is noted on

22  the record and that Kelli has an accurate description of those

23  items of evidence for me to review.

24          MR. MADDOX:  Thank you, Your Honor.

25          THE COURT:  All right.

```
1          (Proceedings concluded at 11:25 a.m.)

2                  *  *  *  *  *  *  *  *  *  *  *  *  *  *

3                      COURT REPORTER'S CERTIFICATE

4          I certify that the foregoing is a correct transcript

5   from the record of the proceedings in the above-entitled matter.

6          This 12th day of May 2008.

7

8                                    Patricia G. Starkie
                                     Registered Diplomate Reporter
9                                    Certified Realtime Reporter
                                     Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    IN THE UNITED STATES DISTRICT COURT

 2                   FOR THE MIDDLE DISTRICT OF ALABAMA

 3                            NORTHERN DIVISION

 4

 5   UNITED STATES OF AMERICA,

 6        Plaintiff,

 7   Vs.                          CASE NO.: 2:06cv116-MEF

 8   Five Hundred Forty-Three Thousand
     One Hundred Ninety Dollars,
 9
          Defendant.
10                    * * * * * * * * * * * * * *

11
          HEARING ON UNITED STATES' MOTION FOR SUMMARY JUDGMENT
12                    * * * * * * * * * * * * * *

13
          BEFORE THE HONORABLE UNITED STATES DISTRICT JUDGE MARK E.
14
     FULLER at Montgomery, Alabama, on Tuesday, January 29, 2008,
15
     commencing at 10:30 a.m.
16
                               APPEARANCES
17
     FOR THE PLAINTIFF:       Mr. John T. Harmon
18                            Assistant United States Attorney
                              OFFICE OF THE UNITED STATES ATTORNEY
19                            131 Clayton Street
                              Montgomery, Alabama  36104
20

21   FOR THE DEFENDANT:       Mr. R. Bruce Maddox
                              6728 Taylor Court
22                            Montgomery, Alabama

23              Proceedings reported stenographically;

24              transcript produced by computer

25
```

1      (The following proceedings were heard before the Honorable

2  United States District Judge Mark E. Fuller at Montgomery,

3  Alabama, on Tuesday, January 29, 2008, commencing at

4  10:30 a.m.:)

5           THE COURT:  Good morning, counsel.

6           The first thing I would like to establish for the

7  record is that we're here today on what I would consider to be

8  an evidentiary hearing on a threshold issue of standing by the

9  claimant in this case, Mr. Enrique Alcaraz-Barajas.  The case is

10 *United States of America versus $543,190 in United States*

11 *Currency*.  It is case number 06-cv-116 in the United States

12 District Court for the Middle District of Alabama, Northern

13 Division.

14          Mr. Maddox is here on behalf of the claimant,

15 Mr. Enrique Alcaraz-Barajas, and I know -- is it Mr. Mahaney?

16          MR. MAHANEY:  That's correct, Your Honor.

17          THE COURT:  You've not entered an appearance, but I

18 think without objection, you would be able to participate at

19 counsel table with Mr. Maddox.

20          MR. HARMON:  No objection, Your Honor.

21          Your Honor, at this time, if I might, I would like to

22 inform the Court that we have Tim McCollum.  He's Assistant

23 Attorney General working with the Department of Public Safety,

24 and he's here to observe.  He will not be participating, but I

25 did want to introduce him to the Court.

 1          THE COURT:  Any objection, Mr. Maddox?

 2          MR. MADDOX:  No objection.

 3          THE COURT:  This is an informal process, so I would

 4   give latitude that I might be hesitant to do at trial.

 5          Mr. Maddox, I'm going to start with you.  I have

 6   reviewed the memorandum opinion that was entered in this case on

 7   November the 26th.  And for the record, that is document number

 8   74.  I've also rereviewed the notice of claims filed by your

 9   client.  Those are documents numbered 27-2, document number

10   seven.  And his affidavit is document number 73-2, and then

11   there's a subsequent affidavit, which is document 54-5, and that

12   appears to be substantially the same as the May 2nd, 2006

13   affidavit, which is marked document number seven.  I just want

14   the record to reflect that I have in front of me all of the

15   affidavits about the source of the funding.  I've also reviewed

16   the brief in support of standing of the claimant filed by you,

17   Mr. Maddox, on Monday afternoon, the 28th.  So at this time,

18   I'll turn it over to you.

19          MR. MADDOX:  Thank you, sir.  Your Honor, so that we

20   don't have a problem I think I may have created in a previous

21   summary judgment issue, I would like to formally offer documents

22   that are already filed with the Court for purposes of this

23   hearing.  Number one would be the deposition of Trooper Andy

24   Sutley, along with the exhibits that are attached thereto.  I'd

25   like to offer the affidavit of November of 2007 of Enrique

1  Alcaraz-Barajas, the affidavit of November of 2007 of Esther

2  Sandoval, and the claim that was submitted by my office to the

3  Drug Enforcement Administration in December -- I think they got

4  it perhaps in January.

5          THE COURT:  Ms. Sandoval is your client's sister; is

6  that correct?

7          MR. MADDOX:  Yes, sir, that's correct.  And, of course,

8  our original claim.  And those are the items that we would

9  offer.  And I would draw the Court's attention to --

10         I guess I need a ruling on whether they're entered into

11 evidence.

12         THE COURT:  Any objection to those being considered by

13 the Court?

14         MR. HARMON:  I do object, Your Honor.  If they're

15 offered in opposition to the United States' second motion for

16 summary judgment, the Court did earlier order submissions by a

17 certain date.  Of course, we're well past that.  I understand

18 the Court did subsequently amend that and allowed a filing later

19 than the date originally established, but Your Honor, to the

20 extent that these are offered at this time, they're outside even

21 the second order, and the United States would object to them

22 being considered as offered today in opposition to the United

23 States' second motion.

24         Additionally, Your Honor, the United States also

25 objects to the blanket admission of Trooper Sutley's

1   deposition.  Generally the Court requires that oppositions in

2   affidavits be delineated and specific portions of each

3   deposition that is cited be established so that the Court can

4   know what portions of the deposition are submitted in opposition

5   to what factual or legal issues are raised.  In this case, a

6   simple blanket submission of the deposition leaves both the

7   Court and United States with the unenviable job of trying to

8   determine what portions of the deposition apply to what specific

9   legal issues or factual issues that are established.  And to the

10  extent that it's a general offer without designation of the

11  salient or specific portions of the deposition which are

12  applicable, the United States would object on those grounds

13  also.

14          THE COURT:  For the limited purpose of this hearing

15  today, I will allow the admissibility of the evidence that you

16  have referred to, Mr. Maddox, and I would ask that you either

17  provide copies or make a more detailed clarification for the

18  purposes of any record that we have today of what exhibits

19  particularly that you're referring to.  If they've not already

20  been submitted into evidence, certainly I would like to have

21  them marked and admitted for the purposes of this hearing

22  today.  And as to any deposition excerpts, if you are going to

23  rely on the excerpts of depositions for the purposes of the

24  issue of standing today on behalf of your client, I would

25  require that you designate those portions so that the United

1   States would have an opportunity to in turn respond with any

2   other information that would be contained in those depositions.

3          MR. MADDOX:  All right, sir.  As to the deposition, if

4   you want me to designate parts right now, I think I can probably

5   do that.  But I would also argue that the totality of the

6   deposition dealt with the facts and circumstances of the seizure

7   of the property, with Mr. Alcaraz-Barajas' actions and behavior

8   during that time, and I don't think we went outside what I would

9   call the totality of the circumstances of what we allege about

10  his both possession and exercise of dominion and control over

11  the property, including his signing a consent to search the bags

12  in which the money was held.

13         THE COURT:  After he was stopped by Trooper Sutley?

14         MR. MADDOX:  Yes, sir.

15         THE COURT:  Well, and to the extent that there's

16  information contained in Trooper Sutley's deposition, do you

17  contend that any of that information would contradict what your

18  client's latest affidavit says in explanation about where the

19  money originated from?

20         MR. MADDOX:  The only thing that it would contradict is

21  that in his statements, according to Trooper Sutley, my client

22  claimed to have found the money.  And of course, he also claimed

23  to be a U.S. citizen.  And Trooper Sutley, according to the

24  deposition, found the money, transported the money, took the

25  occupants of the vehicle into custody, transported them to the

```
 1  HIDTA office ultimately and questioned them, he and other
 2  officers.  And they also took the vehicle into custody.  And I
 3  think that the facts about what happened at the scene of the
 4  stop, including the fact that Mr. Barajas said that he had --
 5  that the bags in the back were his, that he claimed ownership of
 6  the bags, that he was -- the trooper necessarily thought he
 7  should get a consent to search the bags from Mr. Barajas, all
 8  are pertinent to this issue as well as the claim of ownership or
 9  possession and custody later, whether it be true or not true.
10  So I think the totality of the circumstances there need to be
11  considered by the Court, including the fact that Mr. Barajas
12  felt the necessity to contend that he was a U.S. citizen at one
13  point, too, for purposes of the circumstance.  And that's why I
14  think the totality of the deposition is important, as well as
15  the exhibits which are attached to it, and particularly one that
16  was delineated Defendant's Exhibit 1 to that deposition, which
17  is the report by Mr. Sutley about what happened there.  And in
18  particular on the second page of that report, which is
19  delineated as page 32 -- of that report, not of the
20  deposition -- at one point the trooper reports, I asked Barajas
21  if he had luggage in the car.  He said yes.  I asked Barajas if
22  I could search his luggage.  He said yes.  Which is the exercise
23  by Mr. Barajas of control over the property.  And so I think
24  those are important.  If the Court would like me to delineate in
25  a written document subsequent to this hearing specifically what
```

 1  portions I'd like to be considered for what, I can do that.  But

 2  I think that the basis of our claim about that goes to the

 3  totality of the circumstances there.

 4        THE COURT:  Is it your contention that because of your

 5  client's discussions with Trooper Sutley that he somehow

 6  evidenced to Trooper Sutley that he exercised dominion and

 7  control over that property and had a possessory interest in that

 8  property, and that gets you past the Article III threshold

 9  standing issue?

10        MR. MADDOX:  That is one of those, yes, sir.

11        THE COURT:  All right.  Is there anything else about

12  that deposition -- and I don't have the benefit of having the

13  deposition in front of me.  I know it's filed in the case, and I

14  can review it before I make a ruling.  Is there anything else

15  about the content of that deposition that you would offer from

16  Trooper Sutley?

17        MR. MADDOX:  Not on those issues.  I think that the

18  Title III standing is the issue we're addressing.  I think that

19  the deposition is important for some other motions that we're

20  not hearing today --

21        THE COURT:  Right.

22        MR. MADDOX:  -- that I would file.

23        THE COURT:  I only want to address the threshold issue

24  of standing today.

25        MR. MADDOX:  Yes, sir.  I guess my question is, does

1    the Court want me to try to delineate more specifically,

2    although I really think the totality of the circumstances is

3    important, specific portions of that deposition?

4         THE COURT:  Well, I don't want to cross examine you,

5    basically, on your brief that was filed, but I do have some

6    questions that I would like for you to explain.

7         MR. MADDOX:  Yes, sir.

8         THE COURT:  And one burden that I have as a trial judge

9    at this point in this case is to try to make a determination --

10    a credibility determination about whether or not your client had

11    a colorable interest in the property that is the subject of this

12    forfeiture.

13         MR. MADDOX:  Yes, sir.

14         THE COURT:  Now, that term "colorable interest in the

15    property" I presume is the subject of our dispute today.  And

16    you've cited case law, I think the Second Circuit and the Ninth

17    Circuit and some Fifth Circuit cases, and there are some

18    Eleventh Circuit cases, and I've even reviewed Judge Thompson's

19    case that you cited on whether or not we should consider this as

20    having been lost property or abandoned property or take his word

21    in his last affidavit as being the true source of the cash.

22         But as far as making a credibility determination, how

23    do you expect for me to do that without the benefit of hearing

24    from any witnesses or hearing from your client?  And I

25    understand the difficulty that you have in getting him here

1  today, because he's not a legal citizen of the country and I

2  presume has been deported and is prohibited from reentering the

3  country without some legal authorization to do so.

4          MR. MADDOX:  I believe that was clarified at a previous

5  status conference, although not on the record.  The

6  government -- and we, I think, agreed with Mr. Harmon that it is

7  illegal for him to come here because of the circumstances of his

8  conviction.

9          MR. HARMON:  Your Honor, I would say absent any

10  additional type proceeding, it would be illegal for Mr. Barajas

11  to attend.  And I do not profess to have a great deal of

12  expertise in the area.  I do know that there are certain

13  methods, I know in criminal cases, whereby illegal aliens may be

14  allowed to stay in the country or reenter for the purposes of

15  testifying in criminal cases.  I'm not aware of any --

16          THE COURT:  I'm even -- I want to hear about the

17  possibility of having some type of -- or having had some type of

18  opportunity to depose Mr. Barajas and have, in essence, a trial

19  deposition that you can take outside the country if Mr. Barajas

20  wasn't allowed to enter this country.  Why wasn't there at least

21  the opportunity to depose him?

22          MR. MADDOX:  A couple of things, Your Honor.  Number

23  one, there would have been an opportunity to depose him but for

24  the circumstances that were addressed in our original motion to

25  dismiss wherein the government, although he was in this country,

 1  in custody, and could have been transported here, at that point

 2  in time the government failed to serve him or in any way notify

 3  him in a meaningful way of the pendency -- the pendency of this

 4  action.  Had we known of the pendency of the action while he

 5  was in this country, we could resolve all of these issues with

 6  relatively great ease, including simply asking the Court to

 7  stay his deportation pending the outcome of this case.  That is

 8  past and was past before any pleadings were filed by him and

 9  before he had knowledge of the pendency of this case.  And so I

10  think we have to point, number one, to the government as to

11  that.

12         Number two, the affidavit of Mr. Alcaraz-Barajas

13  indicates that basically that all of his life savings were taken

14  in this.  It is an expensive proposition to take a deposition

15  outside this country.  For purposes of trial, I think we will

16  have to try to do that.

17         But Mr. Barajas, as you will find, I think, from the

18  deposition also is HIV positive, and a great part of his reason

19  for being in this country was to receive medical treatment.  And

20  he is ill, and we're having to deal with the fact that he's

21  getting medical treatment and having to travel to other

22  countries sometimes for what he thinks is appropriate for him,

23  and the expense of doing that has been prohibitive thus far.

24         Since you set this hearing, I have asked him and other

25  members of his family to try to find some way to do that, but as

1  of this date, we've been unable to do so.  I'm fairly confident

2  that by time of trial we can do that, and we're kind of at that

3  problem right now of not having him here.

4       The other part of it is, of course, by deposition Your

5  Honor still wouldn't have the opportunity for an ore tenus

6  decision regarding credibility.

7       THE COURT:  Well, if there's any deposition, it would

8  be better than what we have available today.

9       MR. MADDOX:  Yes, sir.

10      THE COURT:  Let me go through your argument, and let me

11 just make sure that I understand what your argument is.

12      Part of what you've argued in your brief appears to

13 imply that mere presence at the scene and a claim of ownership

14 in the property in this case would be sufficient to establish

15 standing under Article III.  Is that your position?

16      MR. MADDOX:  Yes, sir.

17      THE COURT:  Now, whether the property was the proceeds

18 of his businesses that he had built up and sold over the years

19 or proceeds of lost or abandoned property, why wouldn't it still

20 require more than just possession by your client and show that

21 he not only possessed it, but he had some legal title or legal

22 right to the property?  For instance, if it was proceeds of the

23 sales of these businesses, some evidence that these businesses

24 had been sold, possibly from -- even from affidavits from

25 persons who purchased these businesses to establish that they

1    purchased them, how much they paid for them.  If he was an

2    extremely frugal person, maybe he -- tax returns, evidence that

3    he had the means to save up the amount of money that he was

4    found in possession.

5         And if it was proceeds of lost or abandoned property,

6    my second question to you is, what right to this property does

7    he have under Florida law based upon their statute which covers

8    the requirements of an individual who finds property such as

9    this?  And I specifically would refer you to the case that you

10   cited from the Southern District of Florida involving

11   forfeiture of $347,542.  There's a Westlaw cite that is from

12   2001, and you refer to the claimant as Mr. Steven Chandler.  And

13   I believe in that case Mr. Chandler not only found the property,

14   but he notified law enforcement and actually turned the property

15   over to the police and followed through on the Florida statute

16   which would require a person of -- who finds property such as

17   this to go through some, for lack of a better word,

18   administrative procedure to have a colorable interest in this

19   property.

20        So I propose to you under either of those scenarios

21   that he's outlined in his affidavit, what evidence do you have

22   that he was either the owner of this money through the sale of

23   his businesses, or he has satisfied the administrative

24   requirements to be in legal possession of this property as the

25   finder of lost property in Florida?

 1          MR. MADDOX:  I think I need to break my response down

 2   into a couple of issues.

 3          THE COURT:  Well, that was a multi part question.  I

 4   don't mind breaking it down singularly, because it's rather

 5   broad.  But I want to give you the opportunity to address either

 6   scenario of the affidavits that he submitted.

 7          MR. MADDOX:  All right, sir.  First of all -- and let

 8   me say, those aren't the only affidavits he's submitted.  By

 9   the -- Well, let me withdraw that.  I think I misspoke.

10          Number one, as to the possession itself, there are

11   different forms and degrees, I think, of possession.  The case

12   law speaks, for example, and I think Your Honor in his order

13   spoke to naked possession.  If I'm just standing here with this

14   pen, I nakedly possess it, but I don't claim any ownership.  I

15   found it on this -- I really did find it when I got here, and I

16   moved it over here.  I don't claim any right to possess it.  I

17   don't claim any right to custody of it.  If somebody else walked

18   up and wanted to walk away with it, I don't claim that they

19   shouldn't do that.

20          THE COURT:  But even if law enforcement comes to you

21   and you had picked that pen up and you are in naked possession

22   of that pen, and you claimed it, it's your pen, hasn't the

23   Eleventh Circuit said that naked possession alone does not

24   provide you with enough evidence of standing?

25          MR. MADDOX:  The fact -- if I actively made the claim

1  that it's mine and I have exercised dominion and control over

2  it, they have fairly consistently said that is enough.

3        THE COURT:  So if I find your car keys on the table,

4  and I walk out and have your car keys in my possession and climb

5  in your car and drive down the street, and the police stop me

6  and say, this is Mr. Maddox's car, and I say, oh, no, it's mine,

7  and here's the keys to prove it, you're saying that that's

8  enough for me to make a colorable showing that I possessed and

9  owned that car or had a possessory interest in that car?

10        MR. MADDOX:  Probably not in a criminal action, but in

11  a civil action, I suspect so, yes, sir.

12        THE COURT:  Okay.

13        MR. MADDOX:  I can claim I own your car and sue you and

14  have standing to have that issue litigated whether I have

15  possession of your car or not.

16        THE COURT:  Well, in that --

17        MR. MADDOX:  You might beat me on summary judgment.

18        THE COURT:  Well, that may be a difference -- the

19  difference that we have here is not a lawsuit between two

20  conflicting owners of property, it's the forfeiture action by

21  the United States government over property that your client

22  claims to have a possessory or colorable interest in as a

23  matter of law.  And what I want to try to establish from you or

24  give you the opportunity to explain to me is show me not only

25  that --

```
 1            There's no question that he possessed it.
 2            MR. MADDOX:  Yes, sir.
 3            THE COURT:  Show me where his colorable interest of law
 4    comes from.
 5            MR. MADDOX:  He was controlling, transporting the
 6    money.  He has consistently said that.  He was solely in custody
 7    of it.  No one else was claiming it.  He says it is his money.
 8    If that's not enough, what you really are saying is that the
 9    burden of proof shifts to the defendant to prove the basis of
10    his case, the ultimate issue of law, basically.
11            THE COURT:  No, I don't want to misinterpret the
12    ultimate issue of law with a colorable issue of a possessory
13    right to property that the government is seeking to forfeit.
14            MR. MADDOX:  Well, most of the case law that we're
15    looking at -- in fact, maybe all of it -- had to do with
16    seizures prior to August 23rd, 2000, when the Civil Asset
17    Forfeiture Reform Act was passed, which changed significantly
18    the burden of proof in civil forfeiture cases.  And as the law
19    now stands -- and, of course, this seizure happened after the
20    passage of that act.  As the law now stands, the defendant does
21    not have to explain the source of his money until the government
22    has met its burden of proof of proving that specific money was
23    related to some specific crime.  And we haven't gotten to that
24    issue yet, and I don't think we will get to that issue because
25    of the search and seizure matter.
```

1           THE COURT:  So you're saying before your client has to

2    establish that he has met the threshold burden of establishing a

3    colorable interest in the property, the government must first

4    show that it is the proceeds of some ill gotten gain?

5           MR. MADDOX:  I don't think that's what I'm saying, Your

6    Honor.

7           THE COURT:  Okay.  Then correct me.

8           MR. MADDOX:  What I'm saying is that before he has to

9    explain where the money comes from, they have to do that.

10   Before he has to explain some innocent owner defense or

11   something of that nature, they've got a burden to meet.

12          THE COURT:  And I don't disagree with that, but I still

13   am of the opinion today that your client bears the initial

14   burden to show that he has a colorable interest in that

15   property.  And if your argument is the fact that he possessed it

16   and told the trooper that it was his when he was stopped, and

17   that's enough, then that's your argument and I'll have to make

18   my decision based on that and the affidavits and the brief that

19   you filed.

20          MR. MADDOX:  Yes, sir.

21          THE COURT:  As well as other evidence I've allowed to

22   come in.

23          MR. MADDOX:  Yes, sir.  He doesn't have to own the

24   property.

25          THE COURT:  No.  I mean, he just has to have a legal

1    right to it.  He can be a bailee.  I suppose he could be a

2    lessor.  But he would have to have some legal right to the

3    property.

4         MR. MADDOX:  Yes, sir.  And I think even the Florida

5    law says that he's a bailee.  Whether the facts of the case we

6    cited showed him turning over to the police or not, he was

7    entitled to control of that property within reason.  Whether or

8    not he intended to report it to the police or not is not really

9    in play at this point, because he -- if he did intend to, he

10   never got an opportunity to because of his arrest.  The

11   simple --

12        THE COURT:  Well, but that alone to me is so

13   contradictory.  Because if the source of these proceeds

14   originated from the multiple sales of his hair care businesses

15   over a period of 20 plus years, then the alternative source of

16   the money; that is, that it was found and not reported to law

17   enforcement, can't be true.  So --

18        MR. MADDOX:  That is correct.

19        THE COURT:  So the position that I suppose that you're

20   offering on behalf of Mr. Alcaraz-Barajas today is that the

21   initial story that he told law enforcement, that he found the

22   property, is not true?

23        MR. MADDOX:  That is our position.

24        THE COURT:  And the proceeds of -- or the source of

25   the funds that he was in possession of were proceeds of the

1    sales of his business and possibly the savings that he had

2    accumulated over a 20-plus-year history in this -- in the United

3    States?

4         MR. MADDOX:  Yes, sir.  And I would add that we

5    specifically repudiate the claim that purports to have been done

6    under oath that was filed by the gentleman from Mr. Cochran's

7    law firm in Mobile who represented him in the criminal case.  It

8    was not signed --

9         THE COURT:  Which indicates that he found it?

10        MR. MADDOX:  Yes, sir.

11        THE COURT:  And you are, on behalf of your client,

12   specifically repudiating that and in its place substituting the

13   claim and the following affidavit that talks about it being the

14   source of -- of businesses that he had sold totaling more than

15   $700,000?

16        MR. MADDOX:  Yes, sir.  But more specifically, his

17   affidavit relating to that also indicates that he did not sign

18   that before a notary public; he never was sworn to an oath; he

19   had no idea that it would be submitted on this, and he did not

20   authorize the submission of that in this case.  We don't know

21   why that gentleman did it, and particularly why he did it in the

22   way he did it after charging 20 some-odd thousand dollars.  But

23   it's something that he does not adopt.  He did not authorize the

24   submission.  The submission authorized was the one I sent to

25   DEA.

1          THE COURT:  Okay.

2          MR. MADDOX:  So we reject that.

3          THE COURT:  Okay.  So we're going to talk about the

4    money as having been earned through his businesses or the sales

5    of his businesses.

6          MR. MADDOX:  Yes, sir.  Our brief is directed solely

7    toward an arguendo matter of if the Court chose to believe that

8    he found it in Florida, then we think that he still has standing

9    based on that.

10         THE COURT:  Okay.

11         MR. MADDOX:  That's not the hard part, we're saying.

12   We have two things that we believe give him standing.  One is

13   his possession, the exercise of dominion and control, and his

14   claim of ownership.

15         THE COURT:  Why is that different from naked

16   possession?

17         MR. MADDOX:  Well, naked possession is just having it

18   without anything else.  But --

19         THE COURT:  But having it and claiming that you own it,

20   didn't the Eleventh Circuit say that is naked possession, and

21   that that is not sufficient to establish standing under Article

22   III?

23         MR. MADDOX:  That's not the way we read it, Your

24   Honor.

25         THE COURT:  Okay.

```
 1          MR. MADDOX:  We tend to think -- let's see.  It's in

 2    the brief somewhere.  The Fifth Circuit in the $38,000 case

 3    indicates that the claimant claimed an ownership interest and

 4    had possession of the currency when it was seized.  He was

 5    present when the currency was seized from a passenger in his

 6    car.  And they stressed in that case that the claimant didn't

 7    have to come forward with additional evidence of ownership,

 8    because the government had admitted the claimant was present at

 9    the time and place of the seizure in its complaint, as they do

10    here.

11          THE COURT:  I certainly would give the United States an

12    opportunity to respond.  Is there anything else that you want to

13    offer at this time?  And I'll give you an opportunity to add

14    anything in reply, but --

15          MR. MADDOX:  I would like to simply, I think, point out

16    to the Court as to the affidavit by Mr. Barajas --

17    Alcaraz-Barajas regarding the source of the money, he claims

18    ownership of the money.  He claims that he earned it.  We are,

19    again, in the peculiar situation of having a gentleman who

20    cannot come to the United States under law.  At the time he was

21    arrested, he had a residence in California.  He had property in

22    that residence.  He had papers in that residence.  He never got

23    to go back.

24          Now, he stayed in custody until he was deported by

25    agents of the United States government before they served him
```

1  with this action, so he had no reason for months and months to

2  ask anyone to preserve his papers, not having any idea he would

3  have need for them.  As a result of that, he lost his residence,

4  and his property was basically thrown out, and he can't come

5  back to try to retrieve any of that.  He is the only one we know

6  who knows what might be available, and he is the one who would

7  know who might be available still and willing to sign affidavits

8  or testify regarding their purchases of businesses or, for that

9  matter, people who went to his businesses.

10        If those people exist, they're in the state of

11  California, and it's an onerous burden to obtain evidence for a

12  case in Alabama from the state of California when the person

13  most knowledgeable about those things is forced to stay outside

14  the United States.  That's the predicament we're in.

15        If the Court deems it appropriate, I will make

16  extraordinary measures -- and we're trying to do this for trial

17  anyway.  We will take his deposition somewhere outside the

18  United States.  I don't know how soon that can be done.  But

19  that is the problem we have with him not being served with this

20  action before he left this country, when he could have and

21  should have been served with this action before he left this

22  country.

23        THE COURT:  And in just brief response back to you, you

24  cited the *United States v. $38,000 in Currency*.  For the record,

25  that case is cited at 816 F.2d 1538.  It's an Eleventh Circuit

1    case, I think, from 1987.  And in that case -- and I think I

2    cited it in my memorandum opinion -- the Court held in that case

3    that the owner of the currency and bailee of the currency had

4    Article III standing to challenge the forfeiture.  And that's

5    part of what my questioning to you is, is doesn't it take more

6    than just possession and the admission or assertion that you own

7    it?  That there has to be a -- and I keep referring back to this

8    term -- a colorable interest in ownership to establish standing

9    by Mr. Alcaraz-Barajas in this case, as the Eleventh Circuit

10   noted in that case, in which he not only had standing, but they

11   determined that he was a bailee?  Now, I don't know what

12   evidence they had before them to determine that he was a bailee,

13   and maybe you know more than what you're arguing here today.

14   But at least the Court made that determination that he had some

15   legal interest, even if it was a temporary possessory interest,

16   to the property that he claimed ownership in which gave him the

17   Article III standing requirement.

18           MR. MADDOX:  Judge, I think I have confused myself.

19   Could you give me the cite you just stated again?

20           THE COURT:  The cite that I hope that we're talking

21   about the same, *United States v. $38,000 in Currency,* is cited

22   at 816 F.2d 1538.

23           MR. MADDOX:  All right, sir.

24           THE COURT:  And it goes on, because there are other

25   citations from specific pages.

```
 1            MR. MADDOX:  I'm referring to a different case.

 2            THE COURT:  All right.

 3            MR. MADDOX:  It is United States v. $38,570 in United

 4  States Currency, 950 F.2d 1108, Fifth Circuit case, 1992.

 5            THE COURT:  Okay.

 6            MR. MADDOX:  Therein his presence at the scene of

 7  seizure, some dominion over the money, and claim of ownership

 8  were sufficient.

 9            THE COURT:  Okay.  Let me hear from the government.

10            MR. HARMON:  Thank you, Your Honor.  The first thing

11  the United States would note is that we would take issue with

12  any assertion that the CAFRA legislation in 2000 changed the

13  burden of proof regarding the establishment of standing.  That

14  has been consistent throughout the jurisprudence regarding

15  forfeiture.  The claimant always -- a potential claimant always

16  has the burden of establishing his Article III standing, and

17  because it is a basic jurisdictional issue, that must be

18  addressed.

19            THE COURT:  A threshold issue.

20            MR. HARMON:  Threshold issue.  That's correct, Your

21  Honor.

22            Your Honor, I would point out that -- I guess the two

23  arguments, as I understand it, would be, number one, that the

24  last affidavit submitted by Mr. Barajas was sufficient in order

25  to establish that he has, in fact, asserted a claim, a
```

1   sufficient claim for Article III standing.  The United States

2   would point out to the Court, first, Your Honor, that we have

3   the claim that was submitted by the attorney from Mobile, who,

4   by the way, as the United States has pointed out, was

5   Mr. Barajas' attorney for his related -- factually related, I

6   should say -- criminal case.  He was -- he appeared for

7   Mr. Barajas, entered a plea of guilty, and he was authorized

8   under the supplemental rules of admiralty to accept service for

9   Mr. Barajas of the administrative proceeding which was initiated

10  by DEA.  Of course, we know what his affidavit says.

11          THE COURT:  Let me interject.  Wasn't the first

12  affidavit that you just made reference to used as the basis to

13  establish Mr. Alcaraz-Barajas' claim to the money with DEA?

14          MR. HARMON:  That would be correct, Your Honor.  That

15  was the basis.

16          As the Court knows, the administrative proceeding is a

17  summary proceeding.  And all that must happen at that point is

18  someone file a claim, even if it's -- you know, they generally

19  do not regard the Article III standing problem at that point.

20  At that point, it just stops the proceeding, and it gets

21  referred to the applicable United States Attorney's Office for

22  initiation of judicial proceeding.

23          I would note, too, that Mr. Maddox filed a claim to

24  DEA that basically said, I have -- I'm claiming the right to it

25  by my possession.  Upon United States filing the civil

1  forfeiture action, Mr. Maddox filed another claim that basically

2  repeated the same assertion:  I'm claiming my ownership by right

3  of my possession.  That was what was filed here in the court.

4        THE COURT:  I presume that you would now take issue

5  with what Mr. Maddox has represented in the case from the

6  Fifth Circuit, *U.S. v. $38,000 or in Excess of $38,000* where

7  some dominion and possession of the property and a claim of

8  ownership would be sufficient to establish standing under

9  Article III?

10        MR. MADDOX:  I do, Your Honor.  The cases -- even the

11  cases cited by Mr. Maddox and the case by Judge Thompson

12  consistently use the term possessory interest.  They explicitly

13  go beyond the fact of mere possession to a possessory interest.

14  And of course, an interest is something that can be legally

15  defined.  It's something that has -- there is a legal -- as many

16  people have said, I can claim the Brooklyn Bridge, but it's not

17  a legal claim.  It's not -- there is no basis in law or in fact

18  for such a claim.

19        THE COURT:  All right.  Well, if we've abandoned our

20  claim that this was lost property, and Mr. Alcaraz-Barajas did

21  not complete his administrative requirements to file a claim or

22  turn it over to law enforcement and make the necessary claim to

23  the lost property as Mr. Chandler did in the case of *United*

24  *States versus $347,542 in United States Currency*, the Southern

25  District of Florida, March 19, 2001 case, then we're back to the

1  origin of the proceeds of the sales of his business or the

2  accumulation of revenue from the business that he accumulated

3  over his years of residency in the United States, albeit

4  illegal.

5       MR. MADDOX:  And that's correct, Your Honor.  And just

6  before we just completely go beyond that point, the United

7  States would want to also assert to the Court that even if the

8  Court was prepared to accept the Florida statute, they have not

9  met the requirements.  Even the case cited, the $347,000 case,

10  Your Honor, goes through and shows that the property -- in order

11  for this statute to be effective, it's got to be a public

12  property.  Of course, Mr. Barajas said he found it on the

13  premises of I believe a Hampton Inn, so that would not be

14  accurate.  In addition, Your Honor, as the Court has correctly

15  pointed out, the gentlemen who filed the claim in that case

16  reported it to the police, and under the -- in accordance --

17  apparently, in accordance with the statute.  Your Honor, I had

18  earlier provided to you the -- I believe the complete applicable

19  statutory --

20       THE COURT:  Yes, I have the Florida statute.

21       And let me go back to Florida's definition of lost

22  property under the Florida statutes, annotated, Section 705.101,

23  subparagraph one.  Under the definition of lost property as I

24  have been provided with that definition, it would include

25  property found on premises used at the time for business

1  purposes.  And if Mr. Alcaraz-Barajas is maintaining that he

2  found this money in a Hampton Inn parking lot, I think that that

3  would technically meet part of the definition of lost property.

4  I don't disagree with you that he has not fulfilled the

5  remainder of his statutory obligation to establish for himself a

6  legal or possessory interest in that property other than just

7  possession of lost property, which I believe the Florida statute

8  further goes on to say amounts to theft.

9       MR. HARMON:  That is correct, Your Honor.  Section

10 705.102 says it is unlawful for any person who finds any lost or

11 abandoned property to appropriate the same to his or her own use

12 or to refuse to deliver the same when required.

13      It's very difficult for the United States to give

14 credence to an argument to say that Mr. Barajas intended to

15 fulfill his obligation under the statute when he is found with

16 the money in Alabama.  That, I think, is clear indication that

17 Mr. Barajas did not intend to adhere to the statutory scheme set

18 up in Florida for this type situation, and that he --

19      THE COURT:  Let's don't waste any more time talking

20 about an issue that both sides agree doesn't apply; that is, the

21 issue that it originated from his having found it in the parking

22 lot of this Hampton Inn hotel.  Because from what I understand

23 from Mr. Maddox, that has been superseded by his last affidavit,

24 which claims that he accumulated this money over a period of

25 time and through his sales of businesses and his money

1  management skills.

2       So with that being the claim by Mr. Alcaraz-Barajas, I

3  would like for you to direct your response as to how his

4  possession of that cash and his claim of ownership, even coupled

5  with his now explanation that it originated from the sale of

6  businesses, is not sufficient to establish standing under

7  Article III.

8       MR. HARMON:  Your Honor, I think it's important for the

9  Court to go through the -- again, to somewhat repeat myself, the

10 litany of the affidavits in the filings by Mr. Barajas, which

11 includes at least three earlier affidavits that do not mention

12 his, quote, legal source, unquote, for the property, and

13 instead, you know, took positions that did not even mention

14 this.  Then at the point where it appeared that maybe his claims

15 would be deficient as to the standing issue, the last affidavit

16 submitted, United States would cite the Court to *United States*

17 *v. Two Parcels in Russell County*, 92 Fed.3d, 1123 at 1129, which

18 is an Eleventh Circuit 1996.

19      Your Honor, I am familiar with that case.  I would tell

20 the Court that that is factually different in the sense that

21 this was that case that had gone beyond the Article III standing

22 issue to a summary judgment filed by the United States before

23 Judge -- I think it was Judge Thompson, Your Honor.  And Judge

24 Thompson granted United States summary judgment on the issue of

25 forfeitability.

```
1              THE COURT:  On the issue of?

2              MR. HARMON:  On the actual forfeitability or the

3    forfeiture of the property.

4              However, what the Court said, which is salient to this

5    issue, is the mere allegation of a highly unlikely legitimate

6    source of income without some support to give the allegation

7    credibility cannot constitute an issue of material fact

8    defeating summary judgment.

9              THE COURT:  Give me that cite again.  92 F.3d.

10             MR. HARMON:  1123, 1129, Your Honor.

11             And the Court has absolutely correctly delineated this

12   issue.  When you have these -- I think -- and no disrespect to

13   Mr. Maddox.  He is, I'm sure, only submitting what his client is

14   telling him.  But when you have this highly unlikely scenario

15   played out like this, the Court is not required to give that

16   credence at the summary judgment stage.  The Court -- because

17   the Court said, you cannot -- that cannot constitute an issue of

18   material fact.  And we are here still, Your Honor, at the

19   summary judgment stage.  And as the Court, I believe, has

20   correctly pointed out, without something more at this stage,

21   it's not an issue of material fact as to his Article III

22   standing.  He has submitted at least four affidavits that are

23   materially different.

24             In a sense, what is being urged here on behalf of

25   Mr. Barajas is that by filing false affidavits, I can create an
```

1    issue on summary judgment; which, again, is not, I believe, what

2    the law would accept, that you can create issues of material

3    fact by filing dueling affidavits on your own behalf.

4           THE COURT:  So you believe that there is some

5    requirement on the Court's part to establish or make a

6    credibility determination, even though there's been no

7    subsequent repudiation of an earlier affiant?

8           MR. HARMON:  Your Honor, I might couch it in the sense

9    not so much as a credibility determination as there's got to be

10   in this case, without some support -- additional support -- this

11   was, again, Your Honor, as -- I did try this case, and I recall

12   the situation.  The affidavit submitted in opposition to summary

13   judgment was basically that an elderly woman who worked in a

14   mill -- and we had her employment records -- making like $5 an

15   hour had saved this money over the course of her employment.

16   And the District Court correctly said, this is not sufficient.

17   This is so unlikely, I don't have to give this credence.  And

18   the Eleventh Circuit upheld it.

19          And that's, I believe, Your Honor, precisely where we

20   are here today, although -- albeit not on the issue of direct

21   forfeitability, but on the issue of standing, is that when you

22   have these situations, then there's got to be something more,

23   some support rather than just a conclusory, highly unlikely,

24   legitimate source for the money, you know.  There has got to be

25   something more to go beyond the situation that has been created

1    by Mr. Barajas.  Not by his attorneys, but by his own actions in

2    filing affidavits that the Court cannot in any manner determine

3    the truth of the matter.  And that -- in that instance, I think

4    the Court has correctly stated that it will require something

5    along the lines of someone coming in, saying, yes, I sold a

6    business, I bought a business from Mr. Barajas and paid him

7    cash, or something that could have been done during the long

8    course of this situation.  Because this money was seized two

9    years ago.  It's -- this could have been handled, Your Honor.

10   There could be some scintilla of evidence that would support a

11   highly -- the highly unlikely source and claim that Mr. Barajas

12   has made.  And I think the Court is correct in noting that, and

13   I think the Court is within the law and within the statutory --

14   excuse me -- the precedent set by the Eleventh Circuit to not

15   give credence to this assertion from Mr. Barajas.

16            THE COURT:  Anything else?

17            MR. HARMON:  No, sir.

18            THE COURT:  Mr. Maddox, anything in response?

19            MR. MADDOX:  Just briefly.  The last case that

20   Mr. Harmon was citing and the argument based thereon, again,

21   that was an issue that didn't relate to standing.  Although the

22   lady clearly claimed ownership of the property in that case and

23   was allowed standing, what he's talking about is summary

24   judgment and the preposterousness of whatever occurred within

25   that context.  This Court is dealing with standing, and we think

1  we've cited adequate case law to establish standing.  Whether or

2  not we ultimately win on the merits of the case is an entirely

3  different matter.  We are prepared to address that in an

4  entirely different way, but not with inconsistent facts.

5          THE COURT:  Thank you.  Anything else?

6          MR. HARMON:  Nothing from the United States, Your

7  Honor.

8          THE COURT:  Anything else from the claimant?

9          MR. MADDOX:  No, sir, except that if the Court feels

10 that we have not met the burden on standing, I would like the

11 Court -- request the Court's ruling to say so and give us a

12 chance yet to try to obtain a deposition of Mr. Barajas.  I

13 don't know that it will happen, but I think we would need at

14 least 45 days to do that.

15         THE COURT:  I'll take that under consideration.  I'll

16 also take this under advisement.

17         And before we adjourn the proceedings, let me ask if

18 you would approach so that you can identify those items of

19 evidence that you have submitted for the purposes of this

20 hearing that I've allowed you to admit.  And you don't need to

21 do that in my presence here.  Just make sure that it is noted on

22 the record and that Kelli has an accurate description of those

23 items of evidence for me to review.

24         MR. MADDOX:  Thank you, Your Honor.

25         THE COURT:  All right.

1      (Proceedings concluded at 11:25 a.m.)

2                * * * * * * * * * * * * * *

3              COURT REPORTER'S CERTIFICATE

4      I certify that the foregoing is a correct transcript

5  from the record of the proceedings in the above-entitled matter.

6          This 12th day of May 2008.

7

8                              Patricia G. Starkie
                               Registered Diplomate Reporter
9                              Certified Realtime Reporter
                               Official Court Reporter
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25